UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KEN WIWA, et al.,                     :

                Plaintifs,       :

   -against-                        :     96 Civ. 8386 (KMW)(HBP)

ROYAL DUTCH PETROLEUM COMPANY;        :
SHELL TRANSPORT AND TRADING
COMPANY, p.l.c.,                      :

             Defendants.      :

----------------------------------X

KEN WIWA, et al.,                     :

               Plaintiffs,      :

   -against-                        :     01 Civ. 1909 (KMW)(HBP)

BRIAN ANDERSON,                       :     MEMORANDUM OPINION
                                            AND ORDER
           Defendant.       :

----------------------------------X


       PITMAN, United States Magistrate Judge:


I.  Introduction


       By notice of motion dated April 2, 2004 (Docket Item

131) defendants seek an Order pursuant to Rules 26(g) and

37(b)(2)(B) of the Federal Rules of Civil Procedure striking

plaintiffs' interrogatory answers in their entirety and preclud-

ing plainitffs from identifying any new individuals that purport

to have personal knowledge of the allegations that are the

subject matter of defendants' interrogatories.  Plaintiffs oppose

the motion and seek an award of their attorney's fees pursuant to
Fed.R.Civ.P. 37(a)(4)(B).  For the reasons set forth below,
defendants' motion is denied in all respects and plaintiffs'
application for attorney's fees is granted.

II.  <u>Facts</u>

    A.  Alleged Facts
        <u>Underlying These Actions</u>

     This action arises out of alleged human rights viola-
tions in Nigeria during the period from 1990 through 1995.

     As set forth in the pending complaints, plaintiffs and
their decedents were active in protesting oil exploration and
development activity by defendants in the Ogoni region of Nige-
ria; according to plaintiffs, these activities have had pro-
foundly damaging ecological effects in the region (Second Amended
Complaint 01 Civ. 1909 at ¶¶ 2, 4, 21, 22, 25; Third Amended
Complaint 96 Civ. 8386 at ¶¶ 2, 4, 33, 34, 37).  Plaintiffs
allege that their lawful protests were suppressed by a host of
human rights violations committed by agents of the Nigerian
government either in conspiracy with defendants and their affili-
ates or at the defendants' request (Second Amended Complaint 01
Civ. 1909 at ¶¶ 2, 4, 16, 17, 26; Third Amended Complaint 96 Civ.
8386 at ¶¶ 2, 4, 25, 27, 38).

Specifically, plaintiffs allege that (1) plaintiff Karalolo Kogbara was beaten and shot in April, 1993 while protesting the destruction of her property (Third Amended Complaint 96 Civ. 8386 at ¶¶ 3, 48), (2) Late N-nah Uebari was shot and killed by the Nigerian military police on October 24, 1993 while defendants' staff members were present (Third Amended Complaint 96 Civ. 8386 at ¶ 64), (3) Ken Saro-Wiwa was arrested and detained in April and June, 1993 (Third Amended Complaint 96 Civ. 8386 at ¶¶ 54), (4) Saro-Wiwa, Dr. Barinem Kiobel, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo and plaintiff Michael Tema Vizor were arrested because of their opposition to defendants' activities (Second Amended Complaint 01 Civ. 1909 at ¶¶ 43-44; Third Amended Complaint 96 Civ. 8386 at ¶¶ 79, 87), and (5) Saro-Wiwa, Kiobel, Kpuinen, Doobee, Nuate, and Gbokoo were subsequently tried by an illegally-constituted military tribunal, falsely convicted of murdering four Ogoni tribal leaders and executed while Vizor was partially acquitted (Second Amended Complaint 01 Civ. 1909 at ¶¶ 60-63; Third Amended Complaint 96 Civ. 8386 at ¶¶ 84, 88, 98, 100-01).  Plaintiffs further allege that (1) Saro-Wiwa's elderly mother and other family members were beaten when they attended Saro-Wiwa's trial (Second Amended Complaint 01 Civ. 1909 at ¶ 51; Third Amended Complaint 96 Civ. 8386 at ¶ 89), (2) during periods of incarceration, plaintiff Owens Wiwa, along with plaintiff Vizor, Saro-Wiwa, Kpuinen,

3

Doobee, Nuate, Gbokoo and Kiobel were beaten and subjected to torture and some were denied adequate food and medical care (Second Amended Complaint 01 Civ. 1909 at ¶¶ 2-3, 30, 35, 41-42, 52, 62; Third Amended Complaint 96 Civ. 8386 at ¶¶ 3, 49, 69, 81-82, 90, 100), and (3) the conviction of Saro-Wiwa, Kiobel was brought about through defendants' bribes to "key witnesses" (Second Amended Complaint 01 Civ. 1909 at ¶ 53; Third Amended Complaint 96 Civ. 8386 at ¶ 91).  Plaintiffs also allege that (1) plaintiff Wiwa, who had previously been arrested and detained without charges, left his medical practice and fled Nigeria after his father's execution because he feared arbitrary arrest, torture and execution (Second Amended Complaint 01 Civ. 1909 at ¶¶ 64, 66; Third Amended Complaint 96 Civ. 8386 at ¶¶ 102, 106), (2) on January 5, 1996, soldiers came to the home of plaintiff Vizor, and upon finding the home empty, destroyed it (Second Amended Complaint 01 Civ. 1909 at ¶ 65; Third Amended Complaint 96 Civ. 8386 at ¶ 103), (3) plaintiff Vizor was forced to flee Nigeria because of the incident on January 5, 1996 and escaped first to Benin and then to Canada (Third Amended Complaint 96 Civ. 8386 at ¶¶ 104-05), and (4) beginning in mid-1994, an additional twenty Ogonis were detained and charged with murder in the same manner as Saro-Wiwa, Kiobel, Kpuinen, Doobee, Nuate, Gbokoo and plaintiff Vizor but were released by the end of 1997

4

(Second Amended Complaint 01 Civ. 1909 at ¶¶ 68-69; Third Amended Complaint 96 Civ. 8386 at ¶¶ 108-09).

As a result of the foregoing, plaintiffs seek damages in both the Second Amended Complaint 01 Civ. 1909 and Third Amended Complaint 96 Civ. 8386 for: (1) summary execution, (2) crimes against humanity, (3) torture, (4) cruel, inhuman or degrading treatment, (5) arbitrary arrest and detention, (6) violations of the rights to life, liberty, security of the person and peaceful assembly and association, (7) wrongful death, (8) assault and battery, (9) intentional infliction of emotional distress, (10) negligent infliction of emotional distress and (11) negligence.  In the Third Amended Complaint 96 Civ. 8386, plaintiffs seek additional damages for a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

B.  The Discovery Dispute
Before the Court

The discovery dispute presently before me arises out of an Order that I issued after a February 10, 2004 discovery conference concerning two sets of interrogatories served by defendants.

Defendants had served interrogatories in both cases seeking the indentity of witnesses with personal knowledge of various facts alleged in the complaints.  For example, Interrogatory 1 in Docket No. 96 Civ. 8386 asked the plaintiffs to

> 1.   Identify all persons who have personal knowl-
> edge that the defendants (or either of them) or any
> Group Company (including SPDC) asked the Nigerian
> Government to use force and intimdation to silence any
> opposition to SPDC's operation's [sic] in Ogoniland as
> alleged in paragraphs 2 and 4 of the Second Amended
> Complaint, including but not limited to the alleged May
> 1993 requests that the Nigerian military take actions
> against villagers as alleged in paragraph 44 of the
> Second Amended Complaint or against plaintiffs as
> alleged in paragraphs 114, 118, 123, 128, 134 and 145
> of the Second Amended Complaint.

(Exhibit E at 4 to the Declaration of Rory O. Milson, Esq., dated
April 1, 2004 ("Milson Decl.")(Docket Item 135)).  All of the
interrogatories in issue are similar in style; each identifies
specific allegations in the relevant complaint and seeks the
identity of witnesses with personal knowledge of those allega-
tions.  Some of the interrogatories seek the identity of wit-
nesses with personal knowledge of the allegations in a single
paragraph of the complaint; others, like Interrogatory 1, quoted
above, combine the allegations of several paragraphs and seek the
identity of witnesses with personal knowledge.

Plaintiffs initially responded to these interrogatories
by identifying individuals and setting forth, in general terms,
what they knew.  Defendants claimed that these responses failed
to identify which witnesses had personal knowledge of the allega-
tions in the complaints and were, therefore, insufficient to
allow defendants to select witnesses for deposition.

Defendants' concerns regarding the interrogatory answers and their alleged inability to identify protential deposition witnesses was one of the subjects discussed at the February 10, 2004 conference.  In an effort to resolve the dispute, I issued an Order directing plaintiffs to identify the witnesses with personal knowledge and to set forth the specific personal knowledge that such witnesses had.  The pertinent paragraph of the Order that I entered as a result of the February 10, 2004 conference provided:

> 1.  Defendants' motion to compel further answers to interrogatories is denied in Docket No. 02 Civ. 7618.  With respect to Docket Nos. 96 Civ. 8386 and 01 Civ. 1909, the motion is denied with respect to all named plaintiffs identified in the interrogatory answers.  With respect to individuals identified in the interrogatory answers other than the named plaintiffs, plaintiffs in Docket Nos. 96 Civ. 8386 and 01 Civ. 1909 are to serve supplemental interrogatory answers within thirty (30) days of the date of this Order specifying what such individuals know through their personal knowledge and what they know through other means.  A witness has personal knowledge of an event if he or she has directly perceived the event through one of the five senses.  A witness who has knowledge of an event only by virtue of what he or she has read or heard does not have personal knowledge of the event.

(Order dated February 13, 2004 at ¶ 2, annexed as Exhibit B to the Milson Decl.).

In response to my February 13, 2004 Order, plaintiffs served supplemental interrogatory responses.  The supplemental interrogatory responses were identical to plaintiffs' original responses except that plainitffs used bold-faced type to indicate

the substance of a witness's personal knowledge.  For example,
the supplemental response to the Interrogatory 1, quoted at page
6 above, provided:

> Nick Ashton-Jones:  On June 26, 1994, Oronto Douglas,
> Uche Onyeagucha, both lawyers with the Nigerian Civil
> Liberties Organisation, and Ashton-Jones a British
> environmentalist, **were brutally beaten after Okuntimo
> found them talking to Ledum Mitee inside Bori Military
> Camp.**  The same day (on June 26, 1994), Okuntinon had a
> conversation with Douglas and Ashton-Jones, in which
> Okuntimo stated, "That he (Okuntino) was doing it all
> for Shell.  But he was not happy because the last time
> he had asked Shell to pay his men their out-station
> allowances he had been refused - which was not unusual
> procedure."

> Robert Azibaola:  President of the Niger-Delta Human
> and Environmental Organization (ND-HERO), was a lawyer
> for the Ogoni 19.  In 1997, **he observed the conditions
> of the Ogoni 19 who were detained in the Port Harcourt
> jail.  He was arrested on August 6, 1996 when defending
> them.  He is attorney of record for local communities
> bringing claims against Shell for oil spills.**

> Tuagei Edward Baanen:  Baanen was a Sergeant in the
> Nigerian Police Force in a presidential escort attach-
> ment in Obalende, Lagos.  **He was present at John
> Kpuinen's arrest by the Federal Investigation Bureau
> (FIB),** a special branch of the NPF that is attached to
> the Presidency.  **Baanen stated that prior to his trans-
> fer to Port Harcourt, John was taken to a special FIB
> underground detention facility and held incommunicado
> for approximately 1 month.  Bannen was allowed to visit
> Kpuinen and he brough food to him daily.**  Approximately
> two weeks after John Kpuinen's arrest, Tuagei was
> subsequentluy told by a Sergeant in the FIB that he
> himself was to be arrested because of his assistance to
> JK [sic] and he then went into hiding.  He later
> learned that police arrived at his home about 30 min-
> utes after he was informed of his putative arrest.

> Richard Boele:  **In February, 1995, UNPO sent Richard
> Boele on an unoffical mission to Nigeria in order to
> investigate the conditions of the Ogoni.**  Over the

course of the mission which lasted from February 17-26, Boele conducted extensive meetings with Ogoni people, chiefs, and prominent Ogoni organizations in both Lagos and Port Harcourt, Rivers State.  Boele also conducted extensive telephone interviews with Ogoni represntatives in London and Port Harcourt.  **Boele ended the mission by witnessing the trial of Ken Saro-Wiwa and Ledum Mitee.**

As a result of the mission, **Boele concluded in his official report that "in 1993, Shell Nigeria entered Ogoniland on at least two occasions under military escort, as a result of which Ogoni people were killed and wounded in a number of incidents."**  According to Boele's mission report, one of these incidents occurred on April 28, 1993, when a U.S. based company contracted by and under the direction of Shell began bulldozing Ogoni crops near Biara under the protection of Nigerian soldiers.  Over 20 people who peacefully protested the destruction of their crops were beaten and fired upon by soldiers, who continued to protect Shell's bulldozing project through the use of deadly force upon the Ogoni protesters.  Boele concludes that Shell and their contractors entered the project in Ogoni with full knowledge of the hostilty toward the project by the local Ogoni.  Boele also conclude that UNPO should retain grave concerns regarding reports that Shell Nigeria supplied communications equipment to Major Okuntino's Internal Security Task Force during operations against Ogoni in May 1994.

<u>Charles Danwi</u>:  **On February 6, 1995, he and Naayone Nkpah claimed that security agents and other prosecution witnesses had bribed them and others to sign false statements, while making clear that "anything" could happen if they failed to accede to these demands. Charles Danwi was given 30,000 Naira, employment in the Gokan a local government coucil, as well as promises of a house, a contract from Shell and OMPADEC (Oil Minerals Producing Areas Development Commission) and some amount of money.**

<u>Oronto Douglas</u>:  He has conducted extensive research and interviews with Shell officials, Nigerian military leaders, as documented in <u>Where Vultures Feast</u>, an interview on June 25, 1994 with Ledum Mittee and other Ogoni detainees, and a report on the Special Military

Tribunal.  On June 26, 1994, Oronto Douglas, Uche
Onyeagucha, both lawyers with the Nigerian Civil
Liberties Organisation, and Nick Ashton-Jones, a Brit-
ish environmentalist, **were brutally beaten after
Okuntino found them talking to Ledum Mitee inside Bori
Miltary Camp**.  The same day (on 26 June 1994), Okuntino
had  a conversation with Douglas in which Okuntimo
stated, that the "Shell company has not been fair to me
in these Operations."  He said he has been risking his
life and that of his soldiers to protect Shell oil
installations.  He said his soldiers have not been
(sic) paid as they were used to."

Glenn Ellis:  In the course of preparing the documenta-
ries, "Delta Force," the "Driling Fields" and "The Heat
of the Moment", Mr. Ellis had direct correspondence
with Shell representaitves and did extensive interviews
with MOSOP leaders.  He quoted Brian Anderson as say-
ing, "the question of machine guns I don't dispute."
He also documented Shell admissions that SPDC helicop-
ters would have been seen over Ogoniland at various
times during the first nine months of 1993, despite the
formal withdrawal of Shell.  He has knowledge about
statements by Shell concerning their requests for
assistance from the military governor of the River
States.

Femi Falana **was second counsel on the team representing
the Ogoni 9 before the special trubunal.  He was spe-
cifically assigned to represent John Kpuinen.  Mr.
Falana saw the attorney for Shell repeatedly in the
courtroom of the special tribunal.  He and the other
lawyers withdrew when it became clear that fair trials
for the defendants were impossible.  He was arrested on
January 12, 1995 and detained until January 20, 1995.
On February 21, 1995, the defense team was stopped as
they tried to enter the House of Assembly Complex, and
Mr. Falana was assaulted during the course of his
representation of the Ogoni 9.  He was arrested on
February 14, 1996 by officers of the State Security
Service (SSS), and held incomunicado.  He was never
charged or tried.  At the time of his arrest, the
security police seized files from his chambers.  He was
released on November 19, 1996.**

Chief Gani Fawehinmi **was Ken Saro-Wiwa's counsel and
saw the attorney for Shell repeatedly in the courtroom**

of the special tribunal.  He and the other lawyers withdrew when it became clear that fair trials for the defendants were impossible.  On February 21, 1995, the defense team was stopped as they tried to enter the House of Assembly Complex and Cheif Fawehinmi was threatened.  At a rally he lead on November 27, 1995, military police assaulted him with tear gas and bullets.  He was arrested on January 1996 by officers of the State Security Service and held incommunicado.  He was never charged or tried.  He was released on November 19, 1996.

Michael Fleshman:  former activist with Africa Fund. In March 2001, he met with Brian Anderson and discussed Anderson's relationship with former dictator Sani Abacha and the "special relationship" between Shell and the Nigerian miltary dictatorship.  In or about November 1999, he met with Alan Detheridge and discussed Shell's treatment of oil spills, and Fleshman's investigations and photos of oil spills.

Augsutine Kpuinen joined MOSOP in 1990, and was chair of local Nwenkova NYCOP in 1992.  In May 1994, Shell was laying pipeline across farmland, **so MOSOP had a demonstration in Bera, at which he was present.**  He heard an official at the workplace instruct the demonstrators to leave or "you'll be carried away as dead bodies." **Within an hour the military arrived in a truck and started shooting.  They killed demonstrators and Mr. Kpuinen carried one body away.  From that day there was military camped out on all roads in Ogoni. On May 21, 1994, he saw the military forcibly prevent John Kpuinen and Ken Saro-Wiwa from attending a rally in Bori and escorting them out of Ogoni.**  Because he was identified as a leader in MOSOP's opposition to Shell, **he was sought by the miltary and forced to flee Nigeria.**

Steven Kretzmann:  former activist for Greenpeace USA and Project Underground.  In early 1996, he met a social policy advisor for Shell, who claimed that "the problem was that in Nigeria, we became the government." In April 1997, he interviewed military and Shell police who stated that part of their responsibilities were to instigate conflict within the Ogoni community around claims for compensation, that Shell "assigned" weapons to the Nigerian police and stored these weapons on

11

Shell premises, and that the specific function of the "Strike Force" details was to intimidate and harass protestors.

Sister Majella McCarron:  In late 1993 - early 1994, during the Petrol workers strike she spoke to Shell's General Manager Achebe who said that Shell was willing to intervene to attempt to intervene [sic] to stop the violence by the River State Internal Security Task Force in Ogoni.  She went into Ogoni on several occasions.  **She observed the military "flattening anything left standing" on one mission in May 1994.**  In Ogoni, she saw flaring and oil spill remains in fields and streams.  After Shell claimed they left Ogoni, she saw oil spilling from pipes in Ogoni and two years ago she saw pictures of fires burning there at that time.

Ledum Mitee:  **On December 28, 1993 he and Owens Wiwa were arrested and detained until January 4, 1994.  On May 22, 1994, when he was MOSOP vice president, he was arrested with Ken Saro-Wiwa and others** in connection with the deaths of four Ogoni leaders on May 21, 1994.  **He was detained and tried by the military tribunal with the Ogoni 9 until October 31, 1995, when he was acquitted of the murder charges.**  Lt. Col[.] Okuntimo admitted to him that Shell paid him and provided vehicles for military operations and rewarded Okuntimo personally.

Nanyone Nkpa:  **On February 27, 1995, he signed an affidavit which stated that security agents and other prosecution witnesses had bribed them and others to sign false statements, while making clear that "anything" could happen if they failed to accede to these demands.**

Ike Okonto:  As co-author of Where Vultures Feast with Oronto Douglas, he interviewed Shell officials and Nigerian officials on their relationships.  See Where Vultures Feast.

Tayo Olokuva:  Formerly employed by the Guardian, Tayo Olokuya was a Nigerian journalist who **was arrested with Owens Wiwa on April 16, 1994 by Okuntimo's men in Ogoni.  He was present when Noble Obani and Owens were nearly shot after their arrest.**

12

Noble Obani-Nwibari **was arrested with Owens Wiwa on April 6, 1994** by Okuntimo and his forces.  The ISTF raided the village of Oloko in February/April 1994.  **He and Owens went there to see what was happening where he was arrested by Okuntimo and incarcerated for one month and tortured.**  Okuntimo ordered that he and Owens were to be shot, but a soldier talked him out of it.  **Because he was incarcerated in the same cell with Owens, he observed Owens being tortured.**  In or about February-March 1993 in the village of Biara, he heard Shell employees say that if the Ogonis do not allow Shell to go into Ogoni, Shell controls the military and can use it to achieve their purposes.  During the Ogoni/Andoni conflict he saw Shell helicopters every day.  **He also saw Shell Police arrest Ogonis on multiple occasions between 1993 and 1996.**

Andy Rowell:  As a freelance journalist and environmental consultant, he has interviewed Shell officials and Nigerian military officials.  In November 1995, he saw restricted Nigerian military memos which suggested that Shell funded military operations against MOSOP; in 1996, he saw a written statement in which Shell admitted making payments to Nigerian soldiers involved in operations in Ogoni where environmental protestors were killed.  These payments included "field allowances", transportation, and an "army escort for protection provided to its contractor Willbros in 1993."

Nwinnen Taoh:  On **April 30, 193, he was shot in the head during protests of the Wilbros/Shell pipeline. Nigerian military then carried his body miles away and left him for dead.  Earlier in the day, as the secretary General of NYCOP-Gokana, Mr. Taoh was part of a negotiating team which negotiated with officials from Willbros, the Nigerian military and Shell.  He was offered a bribe of a gas station.  He also witnessed Shell survey markers on the pipeline path.**

(Milson Decl. Ex. C at 1-5).

     Defendants now claim that all of plaintiffs' supplemental responses are still inadequate.

III.  <u>Analysis</u>

Defendants' motion is defective both procedurally and substantively.

First, both the Federal Rules of Civil Procedure and the Local Civil Rules of this District require that counsel meet and confer concering discovery disputes before seeking judicial intervention.  Fed.R.Civ.P. 37(a)(2)(A) ("The motion [to compel disclosure] must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action."); Local Rule 37.3(a) ("Prior to seeking judicial resolution of a discovery or non-dispositive pre-trial dispute, the attorneys for the affected parties or non-party witness shall attempt to confer in good faith in person or by telephone in an effort to resolve the dispute.").  Defendants papers do not indicate that defendants' counsel made any attempt to resolve this dispute with plainitffs' counsel before making the motion.  This deficiency alone is a sufficient ground for denying the motion.  <u>See</u> <u>Pro Bono Inv., Inc. v. Gerry</u>, 03 Civ. 4347 (JGK), 2005 WL 2429767 at *1 (S.D.N.Y. Sept. 30, 2005); <u>Verizon Directories Corp. v. Yellow Book USA, Inc.</u>, 04-CV-251, 2004 WL 4054842 at *1 n.2 (E.D.N.Y. July 22, 2004).

In addition, the motion fails substantively.  Defendants' motion appears to be grounded on the assumption that

14

plaintiffs must be aware of witnesses with first-hand knowledge of the allegations in the complaint and that plaintiffs are improperly withholding this information.

As the jury charge in virtually every jury trial explains, there are two types of evidence -- direct and circum- stantial.  A party offering circumstantial evidence seeks to prove the ultimate fact in issue by asking the fact finder to draw inferences from the facts observed by the witness, even though the witness has no direct knowledge concerning the ulti- mate fact in issue.  See generally 1 Hon. Leonard B. Sand, John S. Siffert, Walter P. Loughlin & Steven A. Reiss, Modern Federal Jury Instructions Instr. 5-2 and Comments thereto (2005).  If accepted by the fact finder, circumstantial evidence can prove any fact in issue and can constitute proof beyond a reasonable doubt.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003); Jackson v. Virginia, 443 U.S. 307, 324-25 (1979).

A complaint is sufficient under the Federal Rules of Civil Procedure if it provides notice of what the plaintiff's claim is and the grounds on which it rests;[1] the plaintiff need not plead evidence.  Swierkiewicz v. Sorema N.A., 534 U.S. 502, 512-13 (2002).  Thus, a plaintiff may have a viable claim even if he or she has no witnesses with first-hand knowledge of the

---

[1] Although Fed.R.Civ.P. 9(b) requires that certain matter be alleged with specificity, none of Rule 9(b)'s exceptions to the general rule of notice pleading is relevant here.

15

allegations in the complaint, so long as the plaintiff offers documentary and/or circumstantial evidence sufficient to establish the plaintiff's claim by the appropriate burden of proof.[2]

In this case, plaintiffs allege the systematic oppression of the Ogoni and the suppression of their protests of this oppression by brutal and barbaric conduct.[3]  If the defendants engaged in this conduct, it is probable that they would have wished to kept their conduct secret and hidden from non-participating witnesses.  Thus, it is not surprising that there are no witnesses with first-hand knowledge of many of the allegations in the complaints.  This, does not, however, render plaintiff's interrogatory answers deficient.  The real issue concerning plaintiffs' interrogatory answers is whether plaintiffs have identified the witness, and the evidence those witnesses will offer to prove their allegations, and they have clearly done this.  Defendants offer no evidence that plaintiffs are withholding evidence.

Defendants correctly note that plaintiffs have responded to a number of interrogatories without identifying witnesses with first-hand knowledge of any of the allegations in

_____

[2]In employment discrimination cases, for example, discriminatory animus, an essential element of the claim, is almost always proven by circumstantial evidence.  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006).

[3]I express no opinion here concerning the truth or viability of plaintiffs's allegations.

the pertinent paragraphs of the complaints, and argue that these answers are clearly non-responsive.  Defendants may be technically correct, but the deficiency is harmless.  What plaintiffs have obviously done in response to these interrogatories is to identify the witness(es) who will testify in support of the allegations identified in the interrogatory and to summarize the subject matter of their testimony.  Plaintiffs could have answered these interrogatories with a simple "None," since there appear to be no witnesses with personal knowledge of the allegations identified in the interrogatory.  Plaintiffs' identification of the circumstantial testimony they will attempt to offer to prove their allegations, if it is error at all, is harmless.

        To the extent that defendants seek to preclude plaintiffs from identifying any new individuals who claim to have personal knowledge of the allegations that are the subject matter of defendants' interrogatories, their motion is also denied. Fed.R.Civ.P. 26(e) sets forth a party's duty to supplement discovery responses, and Rule 37(c)(1) sets forth the automatic sanctions a party suffers if it fails to respond completely to discovery requests or fails to properly supplement its discovery responses.  At this point, it is impossible to determine whether plaintiff will seek to identify new individuals and, if so, whether Rule 37(c)(1) will preclude their testimony.  This aspect of defendants' motion is, therefore, premature.

Plaintiffs' application pursuant to Fed.R.Civ.P. 37(a)(4)(B) to recover their attorney's fees in connection with this motion is granted.[4]  The sufficiency of the interrogatory answers is apparent, and defendants offer no evidence that they contacted plaintiffs' counsel to attempt to resolve any questions they may have had prior to making this motion.  See Apex Oil Co. v. Belcher Co., 855 F.2d 1009, 1020 (2d Cir. 1988) ("The failure to confer in good faith over discovery disputes in violation of a local rule clearly 'multiplies the proceedings . . . unreasonably and vexatiously,' and [28 U.S.C. §] 1927] thus provides ample authority for sanctions,"); accord Forman v. Mt Sinai Med. Ctr., 128 F.R.D. 591, (S.D.N.Y. 1989) (Wood, J.); see also Carr v. Queens-Long Island Med. Group, P.C., 99 Civ. 3706 (NRB)(JCF), 02 Civ. 1676 (NRB)(JCF), 2003 WL 169793 at *5 (S.D.N.Y. Jan. 24, 2003) ("failure to confer in good faith concerning discovery disputes warranted sanctions").

---

[4]Rule 37(a)(4)(B) provides:

If [a motion to compel discovery] is denied, the court may enter any protective order authorized under Rule 26(c) and shall, after affording an opportunity tobe heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of sanctions unjustified.

18

In addition, the feasibility of proving any fact by circumstantial evidence, i.e. with witnesses who lack first-hand knowledge of the allegations in the complaint, is hardly an obscure principle of law and must have been known to defendants' counsel.  Thus, the absence of witnesses with first-hand knowl-edge of the allegations does not render the interrogatory answers facially deficient.[5]

Defendants have long denied the allegations in the complaints, and it is far from clear whether plaintiffs have sufficient evidence to prove their claims.  A Rule 37 motion, however, is simply not the vehicle to test the adequacy of

---

[5]I also note that the present motion does not appear to be an isolated occurrence.  At approximately the same time defendants made the instant motion they also sought the appointment of special master to act as a "super witness" -- a function  which is plainly not the office of a special master.  See Fed.R.Civ.P. 53(a)(1).  As I explained in my March 31, 2006 Memorandum Opinion and Order in these matters, defendants' motion for a special master lacked any legal basis.

Among other things, defendants sought the appointment of a special master to report on the characteristics of certain cesspools located in Nigeria.  This is clearly something that defendants could establish through their own witnesses and evidence, including photographic evidence.  The notion that the characteristics of location relevant to a lawsuit are an appropriate subject for a special master's report is utterly without legal support.

Considering the present motion in conjunction with defendants' motion for a special master, I am, sadly, left with the conclusion that defendants are engaging in a bad-faith campaign of dilatory motion practice and conclude that an award of attorney's fees is appropriate under Rule 37(a)(4)(B).

plaintiffs' proof and defendants' counsel could not have been unaware of this fact.

IV.  Conclusion

Accordingly, for all the foregoing reasons, defendants' motion is denied in all respects.  Plaintiff's application for sanctions is granted to the extent that plaintiffs are awarded the reasonable attorney's they incurred in opposing defendants' motion.  Plaintiffs are directed to submit affidavits or affirmations pursuant to 28 U.S.C. § 1746 establishing their attorney's fees within ten (10) business days of the date of this Order; defendants shall have ten (10) business days to respond.

Dated:  New York, New York
        September 12, 2006

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Jennifer M. Green, Esq.
Beth Stephens, Esq.
Maria C. LaHood, Esq.
Center for Constitutional Rights
666 Broadway
7th Floor
New York, New York 10012

20

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown Chomsky
Post Office Box 29726
8120 New Second Street
Elkins Park, Pennsylvania 19027

Anthony DiCaprio, Esq.
Michael Ratner, Esq.
Ratner, DiCaprio & Chomsky, LLP
80 Eighth Avenue
Suite 711
New York, New York 10011

Carey R. D'Avino, Esq.
Stephen A. Whinston, Esq.
Keino Robinson, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365

Rick Hertz, Esq.
EARTHRIGHTS International
1612 K Street N.W.
Suite 401
Washington, District of Columbia 20006

Rory O. Millson, Esq.
Thomas G. Rafferty, Esq.
Michael T. Reynolds, Esq.
Adrienne K. Wheatley, Esq.
Christopher Vergonis, Esq.
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475