UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEN WIWA, *et al.*,<br><br>                                    Plaintiffs,<br><br>               – against –<br><br>ROYAL DUTCH PETROLEUM COMPANY, *et al.*,<br><br>                                    Defendants. | 96 Civ. 8386 (KMW)(HBP) |
| KEN WIWA, *et al.*,<br><br>                                    Plaintiffs,<br><br>               – against –<br><br>BRIAN ANDERSON,<br><br>                                    Defendant. | 01 Civ. 1909 (KMW)(HBP) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(b)(1)
MOTION TO DISMISS *WIWA* PLAINTIFFS' ATS CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION**

Rory O. Millson
Rowan D. Wilson
Thomas G. Rafferty

CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for defendants Shell Petroleum,
N.V., as successor to the Royal Dutch
Petroleum Company; Shell Transport and
Trading Company, Ltd., formerly The
"Shell" Transport and Trading Company,
p.l.c.; and Brian Anderson*

January 16, 2009

# Table of Contents

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

Citation Conventions .................................................................................................... iv

Preliminary Statement ................................................................................................... 1

Statement of Facts ......................................................................................................... 2

    A.    SPDC Is a Separate Entity from Defendants. ............................................ 2

    B.    Defendants Had No Involvement in SPDC's Decision to
            Quit Ogoniland in January 1993 in the Face of Violence. ........................ 3

    C.    Defendants Had No Role in the Nigerian Government's
            Decision to Station Army Units in Ogoni. ............................................... 6

Argument ....................................................................................................................... 8

I.     This Court Lacks Jurisdiction Over the Claims Brought Against
       the Corporate Defendants and Mr. Anderson. ......................................... 8

    A.    Defendants Did Not Violate Any Norm of International
            Law Relating to the Events at Korokoro. ............................................... 11

    B.    Defendants Did Not Violate Any Norm of International
            Law Relating to the Events at Biara. ....................................................... 13

    C.    Defendants Did Not Violate Any Norm of International
            Law Relating to the Trial or Execution of Ken Saro-Wiwa. ................... 15

II.    Defendants Conduct Did Not Violate Any Norm of Customary
      International Law. ................................................................................... 20

III.   Absent Extraordinary Circumstances Not Present Here, a Parent
      Corporation Is Not Liable for the Acts of Its Subsidiaries. ................... 22

Conclusion .................................................................................................................... 25

# Table of Authorities

**Page(s)**

## Cases

*Berkey v. Third Ave. Ry. Co.*,
  244 N.Y. 84 (1926) ....................................................................................24

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ..................................................................................20

*Emmpresa Cubana Del Tabaco v. Culbro Corp.*,
  213 F.R.D. 151 (S.D.N.Y. 2003) .................................................................1

*Flores v. S. Peru Copper Corp.*,
  414 F.3d 233 (2d Cir. 2003)................................................................9, 10, 21

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998)........................................................................22

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995)............................................................................8

*Khulumani v. Barclay Nat'l Bank Ltd.*,
  504 F.3d 254 (2d Cir. 2007).....................................................................20, 21

*Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*,
  31 F.2d 265 (2d Cir. 1929).........................................................................23

*Kiobel v. Royal Dutch Petroleum Co.*,
  456 F. Supp. 2d 457 (S.D.N.Y. 2006).......................................................1, 9

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000)........................................................................10

*Malik v. Meissner*,
  82 F.3d 560 (2d Cir. 1996)..........................................................................10

*Maung Ng We v. Merrill Lynch & Co.*,
  No. Civ. 9687, 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000) ...................24

*Military and Paramilitary Activities in and against Nicaragua
  (Nicaragua v. United States), Jurisdiction and Admissibility,*
  1984 ICJ REP. 392, June 27, 1986 .............................................................21

*Musa v. Ehidiamhen*,
  [1994] 3 N.W.L.R. 544 (C.A.) .....................................................................23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006)..........................................................21

*Reilly v. Natwest Markets Group Inc.*,
    181 F.3d 253 (2d Cir. 1999)..................................................................1, 2

*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998)......................................................................10

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)......................................................................... passim

*Union Beverages Ltd. v. Pepsicola Int'l Ltd.*,
    [1994] 3 N.W.L.R. 1 (S.C.).......................................................................23

*United States v. Bestfoods*,
    524 U.S. 51 (1998)....................................................................................22

*Wiwa v. Royal Dutch Petroleum Co.*,
    No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .............9, 25

**Statutes & Rules**

28 U.S.C. § 1331.......................................................................................8

28 U.S.C. § 1350....................................................................................8, 9

Federal Rule of Civil Procedure 12(b)(1) ...........................................10

**Other Authorities**

Act of April 30, 1790, ch. 9, § 10, 1 Stat. 114 (1790) .....................................20

Rome Statute of the International Criminal Court,
    art. 25(3)(c)-(d), July 17, 1998, 37 I.L.M. 999 ..........................................21

4 William Blackstone, Commentaries on the Laws of England 72 (1769) ......................20

**Citation Conventions**

**<u>Companies</u>**

"CMD":  Committee of Managing Directors

"Royal Dutch":  Royal Dutch Petroleum Company, succeeded by Shell Petroleum N.V.

"Shell Transport":  The "Shell" Transport and Trading Company, p.l.c., now known as Shell Transport and Trading Company, Ltd.

"SPDC":  Shell Petroleum Development Corporation of Nigeria

"SPCo.":  Shell Petroleum Company Limited

"SPNV":  Shell Petroleum N.V.

"Willbros":  Willbros West Africa, Inc.

**<u>Pleadings and Court Submissions</u>**

"Compl.":  *Wiwa* Plaintiffs' Fourth Amended Complaint, filed October 2, 2007 (*Wiwa* Docket No. 220)

"Pls.' Int'l Law Br.":  Plaintiffs' Brief on International Law Norms Pursuant to Order of October 7, 2008, filed November 21, 2008 (*Wiwa* Docket No. 296)

"Int'l Law Br.":  Defendants' Memorandum of Law on Issues of International Law Pursuant to the Court's Order of October 7, 2008, filed December 12, 2008 (*Wiwa* Docket No. 303)

"Millson Decl. Ex. __":  Exhibit to the Declaration of Rory O. Millson in Support of Defendants' Memorandum of Law on Issues of International Law Pursuant to the Court's Order of October 7, 2008, filed December 12, 2008 (*Wiwa* Docket No. 304)

"Millson 2d Ex. __": Exhibit to the Declaration of Rory O. Millson in Support of Memorandum of Law in Support of Defendants' Rule 12(b)(1) Motion to Dismiss *Wiwa* Plaintiffs' ATS Claims for Lack of Subject Matter Jurisdiction

"Pls.' RICO Br.":  Plaintiffs' Opposition to Defendants' Motion to Dismiss RICO Claims, filed January 9, 2009 (*Wiwa* Docket No. 313)

"11/24/03 Pls.' Corr. Opp'n to Mot. to Dismiss":  *Wiwa* Plaintiffs' Corrected Opposition to Defendants' Motion to Dismiss, filed November 24, 2003 (*Wiwa* Docket No. 85)

**<u>Court Orders</u>**

"2/13/04 Order":  February 13, 2004 Order of Magistrate Judge Pitman (*Wiwa* Docket No. 121)

iv

"3/31/04 Rep.":  March 31, 2004 Report and Recommendation of Magistrate Judge Pitman (*Kiobel* Docket No. 59)

"9/12/06 Order":  September 12, 2006 Order of Magistrate Judge Pitman (*Wiwa* Docket No. 199)

"9/29/06 Order":  September 29, 2006 Order of Judge Wood (*Wiwa* Docket No. 202)

"6/14/07 Order":  June 14, 2007 Order of Judge Wood (*Wiwa* Docket No. 217)

## **Discovery**

"Pls.' Rev. Resps. to 1st Set of Interrogs.":  Revised Plaintiffs' Objections and Responses to First Set of Interrogatories of Royal Dutch Petroleum Company to the *Wiwa* Plaintiffs

"Pls.' Resps. to RICO Interrogs.":  *Wiwa* Plaintiffs' Response to Defendants' Interrogatories Regarding RICO Claims

"Defs.' Suppl. Resps. to 2d Set of Interrogs.":  Defendants' Supplemental Responses to *Wiwa* Plaintiffs' Second Set of Interrogatories Pursuant to the Court's November 6, 2008 Order

"10/10/03 Suppl. Resps.":  *Wiwa* Plaintiffs' October 10, 2003 Supplemental Responses to Royal Dutch Petroleum Company and Shell Transport and Trading Company's Interrogatories

"Pls.' Resps. to 2d Set of RFAs":  Plaintiffs' Objections and Responses to Defendants' Second Set of Requests for Admission to the *Wiwa* Plaintiffs

"Defs.' 2d Set of RFAs":  Defendants' Second Set of Requests for Admission to the *Wiwa* Plaintiffs

"Pls.' Resps. to 3d Set of RFAs":  *Wiwa* Plaintiffs' Response to Defendants' Third Set of Requests for Admission to the *Wiwa* Plaintiffs Revised Pursuant to October 24, 2008 Order of the Court

"Pls.' Resps. to 4th Set of RFAs":  All Plaintiffs' Responses to Defendants' Fourth Set of Requests for Admission Directed to All Plaintiffs Revised Pursuant to October 24, 2008 Order of the Court

## **Testimony and Declarations**

"[Name] Tr. __":  Deposition Transcript

"[Name] Decl.":  Declaration

## Preliminary Statement

Plaintiffs assert no claim for direct liability against defendants here. Rather, "[p]laintiffs' claims are essentially claims for secondary liability, *i.e.*, claims that Defendants 'facilitated,' 'conspired with,' 'participated in,' 'aided and abetted,' or 'cooperated with' government actors or government activity in violation of international law". *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 463 (S.D.N.Y. 2006). Plaintiffs' claims are that Royal Dutch and Shell Transport are somehow liable for conduct of SPDC, a wholly owned Nigerian subsidiary of SPCo. The claims against Royal Dutch and Shell Transport depend on disregarding the corporate form entirely. Plaintiffs have no viable theory for imputing SPDC's conduct to Royal Dutch or Shell Transport, much less for imputing the conduct of the Nigerian Government to them. Thus, this Court lacks jurisdiction of all of plaintiffs' ATS claims because no norm of customary international law proscribes any acts taken by the "perpetrator[s] being sued". *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 n.20 (2004). Because plaintiffs have no evidence that Royal Dutch, Shell Transport or Mr. Anderson have violated any international law norm, this Court lacks subject matter jurisdiction over these claims.[1]

---

[1] Defendants served interrogatories and RFAs for plaintiffs to identify who they claimed had personal knowledge of the Complaint's allegations about defendants. As Magistrate Judge Pitman acknowledged: "Plaintiffs could have answered these interrogatories with a simple 'None,' since there appear to be no witnesses with personal knowledge of the allegations identified in the interrogatory" and noted that defendants were "technically correct" to note that "plaintiffs have responded to a number of interrogatories without identifying witnesses with first-hand knowledge of any of the allegations in the pertinent paragraphs of the complaints". (9/12/06 Order at 16-17.) This Court relied on that finding. (6/14/07 Order at 4.) Plaintiffs have never supplemented their interrogatory responses to add additional witnesses. At this stage of the litigation, after discovery has closed and after trying at length to obtain this information, plaintiffs may not now come up with new witnesses. *See, e.g., Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 159-61 (S.D.N.Y. 2003); *see also,*

1

**Statement of Facts**

A.     **SPDC Is a Separate Entity from Defendants.**

SPDC is a Nigerian corporation that is a legally separate entity from Royal Dutch and Shell Transport.  (Aribido Decl. ¶¶ 2, 6, Millson 2d Ex. 1.)  SPDC operates its business and makes decisions separately from them.  It exists for the purpose of engaging in the business, *inter alia*, of the exploration and the production of petroleum and natural gas in Nigeria.  (*See* Aribido Decl. ¶¶ 2, 7, Millson 2d Ex. 1; Anderson Tr. 12:17-21, Millson 2d Ex. 2.)  SPDC's managers and board of directors have broad discretion to manage its affairs.  (Aribido Decl. ¶ 6, Millson 2d Ex. 1.)

SPDC's parent, SPCo., is a holding company duly organized under the laws of England.  (Van der Vlist Decl. ¶ 5, Millson 2d Ex. 3.)  SPCo. holds all of SPDC's shares, and also holds shares of several other operating companies in countries other than Nigeria.  (*See id.*)

The corporate defendants, Royal Dutch and Shell Transport consist of a Dutch corporation and an English corporation, respectively.  Royal Dutch is a public company organized and existing under the laws of The Netherlands, with its principal and only place of business in The Hague, The Netherlands.  (Van der Vlist Decl. ¶ 2, Millson 2d Ex. 3.)  Shell Transport is a public company organized under the laws of England with

---

*e.g.*, *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268-69 (2d Cir. 1999).  In their responses to the requests for admission, plaintiffs often admitted that the individual did not "see or hear" the alleged conduct or stated that they cannot locate individuals previously identified in their Rule 26(a) Initial Disclosures.  Either way, each of those responses indicates that they have no witness with personal knowledge of the subject of the RFA.  (2/13/04 Order at 1-2 (defining personal knowledge as something a witness "directly perceived . . . through one of the five senses" as opposed to something a witness knows "only by virtue of what he or she has read or heard").)

2

its principal and only place of business in London, England. (Munsiff Decl. ¶ 2, Millson 2d Ex. 4.)

The CMD consisted of the "Group Managing Directors" of the holding companies, SPCo. and SPNV. Directors of operating companies give presentations to the CMD to update the managing directors on the goings-on of the operating companies. (Sprague Tr. 38:12-16, Millson 2d Ex. 5; Herkströter Tr. 25:10-18, 57:10-58:17, 100:15-102:2, Millson 2d Ex. 6; Jennings Tr. 130:15-25, Millson 2d Ex. 7.) The CMD's main role is to keep the managing directors informed of events affecting the operating companies. The CMD exercises no decision-making authority for individual operating companies like SPDC. (*See* Herkströter Tr. 25:19-23, 74:11-75:21 (CMD policy is "not to interfere from a distance in the affairs of an operating company"), Millson 2d Ex. 6.)

Defendants Royal Dutch and Shell Transport have never engaged in any operations in Nigeria. Both are "solely . . . investment vehicle[s]". (Van der Vlist Decl. ¶ 3, Millson 2d Ex. 3; Munsiff Decl. ¶ 3, Millson 2d Ex. 4.)

After twelve years and extensive discovery, there is no evidence that Royal Dutch and Shell Transport engaged in or directed any activities in Nigeria, or were ever present there.

**B.  Defendants Had No Involvement in SPDC's Decision to Quit Ogoniland in January 1993 in the Face of Violence.**

SPDC was forced to leave Ogoniland in January 1993 as a result of threats and violent attacks against its staff. On November 30, 1992, MOSOP sent a letter to SPDC, among others, demanding that SPDC (1) pay $10 billion to the "people of Ogoni" and (2) "initiate immediate and high-level talks with representatives of the Ogoni people with a view to reaching meaningful and acceptable terms for the further and continued

exploration and exploitation of oil from Ogoni land".  (C 002153, Millson Ex. 6; Pls.'

Resps. to 4th Set of RFAs No. 54, Millson 2d Ex. 8.)  The letter stated that "if within 30

days from the date hereof you fail, refuse and/or neglect to comply with any and all of the

aforementioned demands, it shall be clearly understood that you have decided to cease all

operations thereat and to quit Ogoni land".  (C 002153, Millson Ex. 6; Pls.' Resps. to 4th

Set of RFAs No. 57, Millson 2d Ex. 8.)

On January 4, 1993, Ken Saro-Wiwa made a speech at a large rally in

which he declared SPDC "persona non grata" in Ogoniland.  (*See, e.g.*, Idamkue Tr.

186:6-187:11, Millson Ex. 4; Ikari Tr. 42:16-44:9, Millson Ex. 5.)  Following that

pronouncement, incidents of violence against SPDC in Ogoniland increased.  For

example, an SPDC employee and his wife who were shopping for produce in Ogoniland

were assaulted by Ogoni youths, stripped of their clothes and left naked by the side of the

road.  (*See* Osunde Tr. 56:3-25, Millson Ex. 7.)  On January 18, 1993, SPDC driver

Henry Mogbolu was ambushed and severely beaten in Ogoniland.  The Ogoni who

attacked him asked him whether he knew that SPDC had been told not to come into

Ogoniland.  (*See, e.g.*, C 000910-11, Millson Ex. 8; C 003935-36, Millson Ex. 8; DEF

0011679, Millson Ex. 8.)  SPDC, without consulting Royal Dutch or Shell Transport,

therefore declared Ogoniland a "no go" area.  (C 000910-11, Millson Ex. 8; *see* Pls.'

Resps. to 4th Set of RFAs No. 73, Millson 2d Ex. 8.)

On its own initiative, SPDC had unsuccessful discussions with Mr. Saro-

Wiwa.  For example, at a meeting with Joshua Udofia and Precious Omuku of SPDC in

Port Harcourt in February 1993, Mr. Saro-Wiwa stated that MOSOP would continue to

prevent SPDC from operating in Ogoniland until MOSOP's demands were met and that

escalating the issue to violence was part of his strategy. (*See, e.g.*, Udofia Tr. 260:8-261:13, 306:2-307:9, Millson Ex. 9; Omuku Tr. 182:11-183:11, Millson Ex. 10.) At a subsequent meeting with Joshua Udofia, Precious Omuku, Steve Lawson-Jack and Sylvester Menegbo of SPDC on May 15, 1993, Mr. Saro-Wiwa stated, among other things, that he would not permit continued work on the replacement of the Trans-Niger Pipeline in Ogoniland unless MOSOP's demands were met and that MOSOP would do everything it could to provoke a major crisis. (*See, e.g.*, C 002114-15, Millson Ex. 11; C 002116-18, Millson Ex. 12; Udofia Tr. 307:10-319:13, 371:1-374:22, Millson Ex. 9.) At a meeting with Emeka Achebe of SPDC in June 1993, Mr. Saro-Wiwa stated, among other things that: he sought political and economic independence for the Ogoni; he would attempt to embarrass SPDC if SPDC did not support his goals; he would not permit SPDC to continue work on the replacement of the Trans-Niger Pipeline in Ogoniland until MOSOP's demands were met; and while Mr. Saro-Wiwa knew that SPDC did not deserve the exaggerated claims that he had made against it, he believed that making such claims was necessary to attract attention and put pressure on SPDC.[2] (*See, e.g.*, A 001126-30, Millson Ex. 13; Achebe Tr. 32:17-37:19, 110:5-115:4, Millson Ex. 14.)

Royal Dutch and Shell Transport were not involved in any of these meetings.

---

[2] Plaintiffs claim that defendants coordinated a media and public relations campaign to discredit MOSOP leaders. (*See, e.g.*, Compl. ¶¶ 39h and 85; Pls.' RICO Br. 17-18.) Defendants engaged in no such campaign. Even if true, such an allegation would not establish any violation of norms of international law. Moreover, the fact is, as discussed above, there were acts of violence against SPDC.

In October 1993, following the signing of the Ogoni/Andoni accord, the civilian Governor of River State met with Egbert Imomoh, then General Manager of SPDC, and asked SPDC to resume operations in Ogoniland. (Imomoh Tr. 69:3-71:20, Millson Ex. 15.) At that meeting, Mr. Imomoh told the Governor that "we are not in a hurry to go back to Ogoni. I told him that I was not prepared to risk one drop of blood, one drop of blood either side for a million barrels, I wasn't prepared to risk it". (*Id.* at 70:18-23.)

The decision to discontinue operations in Ogoni was made solely by SPDC, with no involvement by any defendant. (*See* DEF 000227, Millson Ex. 30; Moody-Stuart Tr. 158:24-159:5, Millson Ex. 31; Herkströter Tr. 97:12-99:10, Millson Ex. 28.)[3]

## C. Defendants Had No Role in the Nigerian Government's Decision to Station Army Units in Ogoni.

There was a Nigerian army presence in Ogoni, but not at the request of defendants or of SPDC, let alone "in support of" defendants or SPDC.

In fact, it was Mr. Saro-Wiwa who "begged" General Abacha to send in the army. In November 1993, Mr. Saro-Wiwa sent a letter to Nigeria's then-Head of State, stating that he "went to General Abacha and appealed for help. He promised to send federal troops". (K 11168-72, Millson 2d Ex. 9.) As a result, General Abacha set up the so-called River's State Internal Security Task Force. (K. Wiwa Tr. 105:24-107:21, Millson 2d Ex. 10; s*ee also* Idigima Tr. 350:4-351:8 (stating that Mr. Saro-Wiwa and MOSOP invited the state military governor to Ogoni to observe destruction caused by

---

[3] Mr. Anderson was not employed by SPDC until January 1994 (Anderson Tr. 9:11-13, Millson 2d Ex. 2), almost a year after SPDC's decision to leave Ogoni.

inter-communal violence), Millson Ex. 16.)  Moreover, in January 1994, Ken Saro-Wiwa, writing as president of MOSOP, sought to have the Nigerian military present in Ogoni arrest and detain three individuals.  (*See* Pls.' Resps. to 2d Set of RFAs Nos. 109-113, 117-119, 121-122, Millson 2d Ex. 11; *see also* Ex. A to Defs' 2d Set of RFAs, referred to in No. 122, Millson 2d Ex. 12.)

At the June 7, 1993 meeting with Mr. Achebe, Mr. Saro-Wiwa stated that he thought that it was a good thing the Nigerian military had entered Ogoniland because it would draw additional attention to the situation, and that he "goaded" the Nigerian military so that they would "massacre" people to draw attention to his cause—he "goaded" the Nigerian military so that there would be "blood" as evidence that the Ogoni were being victimized.  (*See, e.g.*, A 001126-30, Millson Ex. 13; Achebe Tr. 32:17-37:19, 110:5-115:4, Millson Ex. 14.)

Plaintiffs simply have no evidence that the decision by the Nigerian Government to send troops into Ogoni or the actions taken by those troops involved participation by Royal Dutch or Shell Transport.  Royal Dutch and Shell Transport were not in Nigeria when that decision was taken and did not provide, or order the provision of, any logistical support, equipment, or weapons or make any payments to the Nigerian police or military.  Plaintiffs admit that they have no witness with personal knowledge to the contrary.  (*See* Pls.' Resps. to 3d Set of RFAs Nos. 73-75, 77-80, 82-96, Millson 2d Ex. 13.)[4]

_____

[4] Although plaintiffs still maintain that Ledum Mitee and Glen Ellis have personal knowledge (Pls. Resps. to 3d Set of RFAs Nos. 76, 81, Millson 2d Ex. 13), the basis of their knowledge is inadmissible hearsay (10/10/03 Suppl. Resps. at 8, Millson 2d Ex. 14), which is not personal knowledge.  (*See* 2/13/04 Order at 1-2.)

Not only did defendants not participate in any surveillance or exchange of intelligence with the Nigerian military in Ogoniland, but SPDC did not either. Although plaintiffs identified Legbara Anthony Idigima as a person purportedly having personal knowledge as to SPDC's involvement, Mr. Idigima testified that he does not have such personal knowledge:

> "Q.    Are you aware of any agreement between SPDC and the Nigerian government on a joint plan to monitor any individual?
>
> A.    I can't remember.
>
> Q.    Are you aware of any agreement between Brian Anderson and the Nigerian government on a joint plan to monitor any individual?
>
> A.    I can't remember."  (Idigima Tr. 187:19-188:1, Millson 2d Ex. 15.)

**Argument**[5]

## I.    THIS COURT LACKS JURISDICTION OVER THE CLAIMS BROUGHT AGAINST THE CORPORATE DEFENDANTS AND MR. ANDERSON.

The "[ATS] requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold". *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) (quoting 28 U.S.C. § 1350). A merely "colorable violation of the law of nations" is not sufficient to establish jurisdiction under the ATS. *Id.* Rather, courts must undertake a "more searching review of the merits" of the case than otherwise would be required "under the more flexible 'arising under' formula" set forth in 28 U.S.C. § 1331. *Id.* Moreover, the *Sosa* Court explicitly held that in deciding whether a norm is sufficiently

---

[5] Plaintiffs allege that defendants are liable for the following violations of law under the ATS: Summary Execution (Claim I), Crimes Against Humanity (Claim II), Torture (Claim III), Cruel, Inhuman, or Degrading Treatment (Claim IV), Arbitrary Arrest and Detention (Claim V), and Violation of the Rights to Life, Liberty, and Security of Person, and Peaceful Assembly and Association (Claim VI).

definite to support a cause of action under the ATS, a court must consider "whether international law extends the scope of liability for a violation of a given norm to *the perpetrator being sued*, if the defendant is a private actor such as a corporation or an individual". *Sosa*, 542 U.S. at 732 n.20 (emphasis added).[6]

Not only does the subject matter jurisdiction of this Court depend on plaintiffs having a more than "colorable" claim against *these defendants* (the "perpetrator[s] being sued"),[7] but the Supreme Court has stressed that courts should not recognize a cause of action for any norm with less definite content and acceptance as the

---

[6] As discussed in defendants' International Law Brief, all of plaintiffs' ATS claims also fail because they are not based on conduct by SPDC (let alone defendants) that implicates a well-defined international norm. (*See generally* Int'l Law Br. 19-80.) That issue, and others, are presently *sub judice* before the Court of Appeals, on appeal from this Court's interlocutory order dated September 29, 2006, *Kiobel*, 456 F. Supp. 2d at 457. Moreover, this Court already dismissed two identical claims for summary execution and rights to life, liberty, security, and association in *Kiobel*. The Court also dismissed the claim for forced exile in *Kiobel*, which is part of plaintiffs' amorphous CIDT claim here for which this Court already stated there exists a "lack of clarity", *Wiwa*, 2002 WL 319887, at *8. The Court also lacks jurisdiction over plaintiff Blessing Kpuinen's claims because she is a United States citizen and the ATS gives district courts jurisdiction over actions "by an alien", 28 U.S.C. § 1350; *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247 (2d Cir. 2003) (ATS "provides a remedy to aliens only"). (*See* Int'l Law Br. 80-81.)

[7] As Magistrate Judge Pitman held, "[i]n order to establish defendants' liability, plaintiffs would have to prove that each attack occurred and that each attack was the product of 'joint action' by the defendants and the Nigerian government, *i.e.*, that there was 'a substantial degree of cooperative action between corporate defendants and the Nigerian government in the alleged violations of international law.'" (3/31/04 Rep. at 25-26 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *13-14 (S.D.N.Y. Feb. 28, 2002)).) "[T]he mere allegation (or even proof) of a common plan here does not eliminate the need . . . to prove the overt acts that caused the injuries claimed and that the overt acts were in furtherance of the alleged conspiracy or joint venture". (*Id.* at 30-31.) Thus, "whether the individual at issue suffered one of the enumerated injuries at the hands of officials of the Nigerian government acting 'in support of defendants . . . require[s] analysis of the circumstances under which the individual suffered his or her injury'" and whether he or she sustained injuries "while the member of the security forces was working 'in support of' defendants". (*Id.* at 13-14.)

three paradigmatic norms of piracy, safe conducts, and infringement of ambassadorial privileges, *id.* at 724, and that a variety of factors counsel in favor of judicial "restraint". *Id.* at 725.

Plaintiffs, as the party asserting subject matter jurisdiction, have the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996). If, at any time, the court determines it lacks subject matter jurisdiction over a claim, the court must dismiss that claim pursuant to Federal Rule of Civil Procedure 12(b)(1). *Makarova*, 201 F.3d at 113.

Where the court's subject matter jurisdiction is challenged, "the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings". *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.30 (2d Cir. 2003); *see also Makarova,* 201 F.3d at 113. "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it". *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

Plaintiffs do not have a scintilla of evidence to establish that Royal Dutch or Shell Transport—the alleged "perpetrator[s] being sued"—had any involvement in the alleged conduct underlying their ATS claims beyond being informed of those events after the events. Plaintiffs have also admitted that they do not have any witness with personal knowledge of the allegations against defendants or SPDC.

Plaintiffs allege that various incidents involving the Nigerian military and police took place in Ogoni and other communities, which plaintiffs claim are predicate acts for purposes of their RICO claim without directly tying any of those events to any

defendant.  (*See, e.g.*, Pls.' RICO Br. 4-15.)  Plaintiffs allege that three incidents form the

basis of plaintiffs' ATS claims:  the events occurring at Korokoro, the events occurring at

Biara, and the trial and execution of the Ogoni Nine.[8]  Even as to those three incidents,

plaintiffs have no evidence that defendants were involved in any way in the wrongful

conduct alleged to have occurred.

    **A.**    **Defendants Did Not Violate Any Norm of International Law Relating to the Events at Korokoro.**

        On October 23, 1993, SPDC responded to a phone call reporting a fire on

a flowline close to the Korokoro flowstation.  (C 000552, Millson 2d Ex. 16; Imomoh Tr.

74:5-10, Millson 2d Ex. 17; Pls.' Resps. to 4th Set of RFAs No. 216, Millson 2d Ex. 8.)

Villagers in Korokoro seized the responding vehicles and detained the crew.  (C 000552;

C 003617-21, Millson 2d Ex. 18; Imomoh Tr. 74:5-10, Millson 2d Ex. 17; *see* Pls.'

Resps. to 4th Set of RFAs Nos. 219, 226, Millson 2d Ex. 8.)  Two days later, the

Governor sent a team to Korokoro to mediate the situation over the fire vehicles (*See*

Imomoh Tr. 105:21-107:6, Millson 2d Ex. 17), but upon arrival, the team was ambushed

by local villagers.  Three soldiers were killed in the attack, and one villager was shot in

the foot to get him to release a soldier.  (Osunde Tr. 98:16-103:6, Millson 2d Ex. 19.)

---

    [8] Plaintiffs do not allege or offer any evidence that defendants were involved in any of the other miscellaneous events alleged.  Plaintiffs do not allege that defendants were involved in any way in the alleged arrest and detention of Mr. Vizor on April 30, 1993 (Compl. ¶ 49), in the alleged looting of his home on January 5, 1996 by Nigerian soldiers (*id.* ¶ 103), or in the alleged forced exile of Mr. Vizor (*id.* ¶¶ 104-105).  Likewise, plaintiffs do not allege that defendants had any involvement in the alleged arrest and detention of Owens Wiwa from December 26, 1993 to January 4, 1994 (*id.* ¶¶ 68-69) or from April 6, 1994 to April 20, 1994 (*id.* ¶ 71), or the alleged forced exile of Mr. Wiwa (*id.* ¶ 102).

Royal Dutch and Shell Transport were neither involved in, nor even aware of, the events that unfolded at Korokoro until after the fact. On November 2-3, 1993, a week after the events, SPDC informed SIPC of the incident at Korokoro.[9] (A 004198-99, Millson 2d Ex. 21; C 004156-67, Millson 2d Ex. 22.) SPDC provided only an overview of what occurred. (A 004198-99, Millson 2d Ex. 21; C 004156-67, Millson 2d Ex. 22.) For example, the June 1, 1993, minutes of the CMD reflect the summary of the event that was provided:

> "Mr. Moody-Stuart reported that . . . [o]n 25 October 1993, the joint inspection team returned to Korokoro to meet with the Chief and discuss the release of the vehicles. The team was attacked by youths who attempted to seize the crew bus and the firearms of the escort. A soldier was wounded in the arm and stomach by one of a series of gunshots from the villagers. The team withdrew with restraint. The injured soldier was in satisfactory condition in hospital. Two other escort members and the bus driver received minor injuries". (A 004198-99, Millson 2d Ex. 21.)

Plaintiffs have not, and cannot, point to any evidence that demonstrates a violation of any norm of international law by Royal Dutch, Shell Transport or Mr. Anderson based on the events at Korokoro. SPDC did not seek advice from Royal Dutch or Shell Transport; Royal Dutch and Shell Transport did not give any instructions or advice to SPDC. Mr. Anderson was not yet employed by SPDC, and consequently cannot have violated any norm of international law relating to the events at Korokoro.

---

[9] Generally, if SPDC wished to describe events in Nigeria, SPDC informed SIPC with copy to SIPM, each service companies, and in turn Mr. Moody-Stuart would report the information to the Committee of Managing Directors. (Van den Broek Tr. 30:15-31:4, Millson 2d Ex. 20.) Thus, defendants would "be[] informed after the event". (*Id.* at 32:19-21.)

## B. Defendants Did Not Violate Any Norm of International Law Relating to the Events at Biara.

Before beginning construction on the Trans-Niger Pipeline (TNP), SPDC ensured that all land acquisition procedures were followed, with communities paid and environmental impact assessments done. (*E.g.*, A 001884-92, Millson 2d Ex. 23; C 002114-18, Millson 2d Ex. 24; DEF 0023862-70, Millson 2d Ex. 25.) When Willbros, the SPDC contractor hired to do the work, began clearing SPDC's right-of-way, villagers protested, shut down operations, and assaulted Willbros employees. (Tillery Tr. 55:12-25, 89:2-90:4, Millson 2d Ex. 26; C 003952-58, Millson 2d Ex. 27; C 002422-23, Millson 2d Ex. 28; C 02410-14, Millson 2d Ex. 29; Pls.' Resps. to 4th Set of RFAs No. 107-109, 132-136 (admitting demonstrations took place), Millson 2d Ex. 8.) Willbros informed the Nigerian Government of the threat to its workers, and the Nigerian Government made an assessment that security in the region was necessary. (Tillery Tr. 213:22-214:5, Millson 2d Ex. 26; C 002410-14, Millson 2d Ex. 29; A 001884-92, Millson 2d Ex. 23; A 000662-66, Millson 2d Ex. 30.)

In April 1993, Willbros attempted to clear crops that had been replanted on the right-of-way near the village of Biara, but villagers blocked the right-of-way. (A 000662-66, Millson 2d Ex. 30.) The military, already present by order of the Nigerian Government, took over the situation. (A 000662-66, Millson 2d Ex. 30.) On May 1, 1993, villagers launched "a full confrontation against [Willbros] work-place and personnel" (A 000662-66, Millson 2d Ex. 30), and on May 3, 1993, Willbros permanently withdrew from the TNP project. (Tillery Tr. 213:2-5, Millson 2d Ex. 26; A 000662-66, Millson 2d Ex. 30; Pls.' Resps. to 4th Set of RFAs No. 142, Millson 2d Ex. 8.)

Royal Dutch and Shell Transport were not involved in, nor even aware of, the events that unfolded at Biara until after the fact. They were not consulted in any way and gave no direction as to how SPDC should proceed. On May 12, 1993, more than a week after the events, SPDC informed SIPC and SIPM of the incident at Biara. (C 004763-64, Millson 2d Ex. 31; A 001884-92, Millson 2d Ex. 23; A 001877-83, Millson 2d Ex. 32; A 004187-89, Millson 2d Ex. 33; Moody-Stuart Tr. 182:25-184:2, Millson 2d Ex. 34.) SPDC provided only an overview of the Biara incident. (C 004763-64; Millson 2d Ex. 31; A 001884-92, Millson 2d Ex. 23; A 001877-83, Millson 2d Ex. 32; A 004187-89, Millson 2d Ex. 33.) For example, the June 1, 1993 minutes of the CMD reflect the summary of the event that was provided:

> "Mr. Moody-Stuart reported that on 30 April 1993 members of the Ogoni community had caused work to be stopped on the last few kilometers of the replacement Trans-Niger pipeline being laid by Williams Brothers. In view of the volatile situation, the work was being carried out with the support of the army, which was unusual in Nigeria. On 1 May, the work was again stopped and vehicles were damaged. Work was suspended on 2 May. On 3 May, an attempt to recommence work was prevented by aggressors using explosives and the job was completely suspended". (A 004187-89, Millson 2d Ex. 33.)

Plaintiffs have not come forward with any evidence that Royal Dutch, Shell Transport or Mr. Anderson participated in these alleged events. Plaintiffs have not, and cannot, point to any evidence that demonstrates a violation of any norm of international law by defendants based on the events at Biara. SPDC sought no advice from Royal Dutch or Shell Transport, and neither Royal Dutch nor Shell Transport gave SPDC an instructions or guidance.[10] Again, Mr. Anderson did not join SPDC until the

---

[10] Although SPDC notified SIPC and SIPM that MOSOP claimed one man was shot on May 4, 1993 near Biara (after Willbros withdrew from the TNP) (*See* A 001877-83,

following January, and therefore cannot have violated any norm of international law in

connection with the events at Biara.

### C. Defendants Did Not Violate Any Norm of International Law Relating to the Trial or Execution of Ken Saro-Wiwa.[11]

The Ogoni Nine, which included Ken Saro-Wiwa, and Michael Vizor

were arrested as suspects in the murders of four Ogoni MOSOP elders in May 1994.[12]  In

November, 1994, a three-man Civil Disturbances Special Tribunal was created and

specially appointed by the Nigerian military regime.  (Compl. ¶ 84.)  The proceedings

began approximately in May 1995.  The tribunal had jurisdiction over plaintiffs' cases,

and it alone handed down the verdict and sentences.  (*See id*. ¶¶ 86, 98.)  The tribunal

found the Ogoni Nine guilty of the murder of the elders of the MOSOP in October 1995

and sentenced them to death.[13]  (Compl. ¶ 98.)

---

Millson 2d Ex. 32), SPDC did not advise Royal Dutch or Shell Transport of any alleged injury to plaintiff Karalolo Kogbara at Biara, even after the fact.

[11] Brian Anderson did not come to Nigeria to join SPDC as Managing Director until January 1994.  (Anderson Tr. 9:11-13, Millson 2d Ex. 2.)  Thus, Mr. Anderson cannot have violated any norm of international law allegedly arising from events occurring before 1994.  With respect to the trial of Mr. Saro-Wiwa in 1994 and 1995, plaintiffs have no evidence of Mr. Anderson's involvement in any way other than to urge fair treatment, legal counsel and proper medical care for Mr. Saro-Wiwa and the rest of the defendants and ultimately to urge the Nigerian Government to grant clemency.  (*See infra* 15-20.)  Thus, plaintiffs have no basis for any of their ATS claims against him individually, and this Court lacks subject matter jurisdiction over those claims.

[12] Plaintiffs base many of their claims on allegations about what happened while the Ogoni Nine and Mr. Vizor were incarcerated.  (*E.g.*, Compl. ¶¶ 81-82, 90, 100.)  Plaintiffs do not allege, and have no evidence, that Royal Dutch, Shell Transport or Mr. Anderson were involved in any way in detaining the Ogoni Nine or Mr. Vizor.

[13] The same tribunal acquitted Michael Vizor.  (*Id.* ¶ 99.)

Defendants had no role or involvement in this process. Defendants had no power to determine whether or how the Nigerian authorities would conduct the proceedings. Nor did they have any authority to affect the structure or composition of the tribunal—a governmental body.

Because SPDC initially believed that the Ogoni Civil Disturbances Tribunal would make general inquiries into civil disturbances in Ogoniland, SPDC retained the firm of Okocha & Okocha as its external solicitors with the intent of having Okocha & Okocha represent SPDC before the Ogoni Civil Disturbances Tribunal. (Okocha Decl. ¶ 22, Millson 2d Ex. 35.) On the first day of the proceedings, numerous groups, including various human rights organizations and SPDC (through Okocha & Okocha), announced their appearances. (*Id.* ¶ 24.) Soon after the proceedings began, however, it became clear that the Tribunal's sole purpose related to the murder of the four Ogoni leaders killed on May 21, 1994. (*Id.* ¶ 25.) O.C.J. Okocha of Okocha & Okocha then promptly made a public statement before the Tribunal explaining: (i) that his earlier announcement of an appearance before the Tribunal on behalf of SPDC was based on the mistaken belief that the purpose of the Tribunal was to inquire into civil disturbances in Ogoniland generally; (ii) that SPDC had no reason to appear before the Tribunal because the full extent of the Tribunal's purpose was to conduct a murder trial; and (iii) that SPDC had no greater interest in the outcome of the murder trial than did any other member of the public. (*Id.*) On that basis, he withdrew SPDC's formal appearance before the Tribunal. (*See id.*) Therefore, SPDC was never recorded as having made a formal appearance before the Tribunal. (*Id.*) Okocha & Okocha then held "a watching

brief" of the proceedings so it could give legal advice if and when allegations were made against SPDC. (*Id.* ¶ 26.)[14]

Plaintiffs claim that Nayone Nkpah and Charles Danwi were bribed to give false testimony against Mr. Saro-Wiwa. Plaintiffs have no evidentiary support for these allegations. In response to an interrogatory, plaintiffs identified Mr. Vizor as having personal knowledge that "Defendants (or either of them) or any Group Company (including SPDC) bribed or attempted to bribe any witness to give false testimony against Ken Saro-Wiwa". (Pls.' Rev. Resps. to 1st Set of Interrogs. No. 19, Millson 2d Ex. 36.) In his deposition, however, Mr. Vizor testified that he never spoke with either of the two witnesses accused of perjury, and that his basis for believing that a witness was bribed by "Shell or SPDC" is that he "believe[s] that very strongly" and, although Mr. Vizor has no relationship with SPDC or any other Group Company, he believes it "is their practice". (Vizor Tr. 56:12-63:12, Millson Ex. 3.) Such a "belief", without more, is an insufficient evidentiary basis upon which to exercise subject matter jurisdiction. In any event, plaintiffs recently confirmed Mr. Vizor's lack of personal knowledge in their RFA responses, wherein they admit that Mr. Vizor does not have personal knowledge that defendants "bribed or attempted to bribe any witness to give false testimony against Ken Saro-Wiwa". (Pls.' Resps. to 3d Set of RFAs No. 126, Millson 2d Ex. 13.)

---

[14] In addition to the witnesses who saw SPDC's counsel in the courtroom, plaintiffs identified Nick Ashton-Jones as a witness with personal knowledge that defendants participated in a campaign with the Nigerian Government to arrest and execute Mr. Saro-Wiwa and John Kpuinen (Pls.' Resps. to 3d set of RFAs No. 100, Millson 2d Ex. 13), but the basis of his knowledge is that he allegedly was "brutally beaten after Okuntimo found [him] talking to Ledum Mitee inside Bori Military Camp" (10/10/03 Suppl. Resps. at 6, Millson 2d Ex. 14). That basis has nothing to do with any of the defendants or SPDC and is unconnected to the allegations for which they are offered.

Defendants never offered to bribe or actually bribed either Nayone Nkpah or Charles Danwi or anyone else to give false testimony before the Ogoni Civil Disturbances Tribunal. Indeed, even Mr. Nkpah and Mr. Danwi claim only that "security agents and other prosecution witnesses had bribed [each of them] and others". (10/10/03 Suppl. Resps. at 12-13, Millson 2d Ex. 14.) In addition, Mr. Nkpah testified as follows:

> "Q. Did you ever see anyone employed by or representing SPDC make a bribe directly to anyone?
>
> A. No." (Nkpah 3/19/04 Tr. at 218:16-18, Millson 2d Ex. 37.)[15]

No employee of SPDC, Royal Dutch or Shell Transport attended any part of the Special Tribunal proceedings. Royal Dutch and Shell Transport were not involved in how SPDC dealt with issues relating to the trial. Rather, Royal Dutch and Shell Transport received updates as to the progress of the trial after the events. Neither Royal Dutch nor Shell Transport directed or advised SPDC to take any actions or refrain from taking any actions relating to the trial.

Defendants did, however, make their positions clear during the trial. For example, on November 30, 1994 and again on May 15, 1995 and October 10, 1995, Sir John Jennings, a director of Shell Transport, sent public letters supporting Mr. Saro-Wiwa's access to a fair trial, proper legal services and proper health care. (*E.g.*, C 004932-34, Millson Ex. 20; A 001388-90, Millson Ex. 21; A 001409-11, Millson Ex. 22.) Moreover, in March 1995, SPDC released its own separate Briefing Note supporting Mr. Saro-Wiwa's access to a fair trial, proper legal services and proper health care. (A 000191-94, Millson Ex. 23.)

---

[15] Plaintiffs did not depose Mr. Danwi.

Following the convictions and before the sentence was carried out, SPDC engaged in further efforts to help Mr. Saro-Wiwa. Mr. Achebe of SPDC went to Abuja, Nigeria's capital, to request that the Nigerian Government not execute Mr. Saro-Wiwa. (Achebe Tr. 41:18-42:16, Millson Ex. 14.) Neither Mr. Achebe nor anyone else at SPDC sought Royal Dutch's or Shell Transport's permission to take such actions, and Royal Dutch and Shell Transport had no role in SPDC's efforts. Similarly, Mr. Anderson tried many times to have discussions with General Abacha, both before and after Mr. Saro-Wiwa was convicted, but he was not successful in obtaining a meeting. (Anderson Tr. 140:15-141:1, 155:14-157:13, Millson 2d Ex. 2.)

When it appeared that the executions were to go forward, Mr. Anderson recommended to the CMD that a letter appealing for clemency be written from the Chairman of the CMD directly to the Nigerian Head of State. (A 004268-70, Millson 2d Ex. 38.) As a result of Mr. Anderson's urging, Cor Herkströter, Chairman of the CMD and a director of Royal Dutch, sent a letter to General Abacha requesting that the Nigerian Government grant clemency. (A 004271, Millson 2d Ex. 39; A 004268-70, Millson 2d Ex. 38.) On November 8, 1995, Shell International Petroleum Company Limited issued a press release describing Mr. Herkströter's letter. (A 001673, Millson Ex. 25.) On November 8, 1995, Mr. Anderson also publicly stated in a separate press release issued by SPDC that Mr. Herkströter had sent General Abacha such a letter. (C 004700, Millson Ex. 24.)

Royal Dutch and Shell Transport never directed SPDC regarding how to proceed with respect to the trial or SPDC's appeal for clemency. (Jennings Tr. 94:13-96:7, Millson 2d Ex. 7.) As with the other ATS claims, there is no evidence that any

defendant violated any norm of international law in connection with the proceedings against the Ogoni Nine by the Nigerian authorities.

## II.    DEFENDANTS CONDUCT DID NOT VIOLATE ANY NORM OF CUSTOMARY INTERNATIONAL LAW.

In *Sosa*, the Court noted that "whether a norm is sufficiently definite to support a cause of action" raises a "related consideration [of] whether *international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued".  *Sosa*, 542 U.S. at 732 & n.20 (emphasis added); *see also Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 269 (2d Cir. 2007) (Katzmann, J., concurring); *id.* at 311 (Korman, J., concurring in part dissenting in part).

Under customary international law, however, there is no civil accessorial liability.  (Int'l Law Br. 62-66.)  For example, both in England and the United States, although customary international law proscribed piracy, secondary liability was imposed by statute.  4 William Blackstone, Commentaries on the Laws of England 72 (1769); Act of April 30, 1790, ch. 9, § 10, 1 Stat. 114 (1790).  Tribunals adjudicating war crimes under various treaties have imposed secondary criminal liability.  However, even though "[a]iding and abetting is an ancient criminal law doctrine", in civil actions it "has been at best uncertain in its application".  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994).  The Supreme Court has been "quite reluctant to infer a private right of action from a criminal prohibition alone", *id.* at 190, and decisions of international criminal tribunals dealing with the issue of criminal secondary liability do not serve as evidence that civil liability exists for aiding and abetting the

violation of any international norm that meets the stringent *Sosa* standard.[16]  In

*Nicaragua v. United States*, the International Court of Justice, applying customary

international law, held that even though the United States had "largely financed, trained,

equipped, armed and organized" the contra force in Nicaragua and had "encouraged the

commission by [the contras] of acts contrary to general principles of humanitarian law",

the Court "does not find a basis for concluding that any such acts which may have been

committed are imputable to the United States of America".  *Military and Paramilitary*

*Activities in and against Nicaragua (Nicaragua v. United States), Jurisdiction and*

*Admissibility*, 1984 ICJ REP. 392, June 27, 1986, ¶¶ 108, 258, & p.148.

      Even to impose secondary criminal liability, the defendant must have

acted with intent to aid and abet the alleged criminal conduct.  *See Khulumani*, 504 F.3d

at 277 (Katzmann, J., concurring); *Presbyterian Church of Sudan v. Talisman Energy,*

*Inc.*, 453 F. Supp. 2d 633, 665-668 (S.D.N.Y. 2006); *see also* Rome Statute of the

International Criminal Court, art. 25(3)(c)-(d), July 17, 1998, 37 I.L.M. 999.[17]

      Plaintiffs have no evidence that Royal Dutch or Shell Transport had any

intent to aid and abet the alleged misconduct of the Nigerian Government.  Royal Dutch

and Shell Transport had no role in two of the alleged incidents (Korokoro and Biara) that

form the basis of plaintiffs' ATS claims (*see supra* at 11-15), and in the third—the trial

---

[16] The decisions of international criminal tribunals, which do not support the types of allegations in this case, also do not serve as "primary sources of customary international law".  *Flores*, 414 F.3d at 264.

[17] Plaintiffs also have no viable claim for conspiracy liability.  International law applies the charge of conspiracy in "only two circumstances", neither of which is present here:  a "conspiracy to commit genocide and common plan to wage aggressive war".  *Talisman*, 453 F. Supp. 2d at 663 (quotations omitted).

and execution of Mr. Saro-Wiwa—both Mr. Anderson and Royal Dutch and Shell

Transport requested Mr. Saro-Wiwa obtain fair treatment, a fair trial and ultimately

clemency after his conviction (*see supra* at 15-20).  Indeed, the only evidence that Royal

Dutch or Shell Transport had any contact whatsoever with the Nigerian Government is

Mr. Herkströter's letter to General Abacha asking for clemency.  Thus, this Court lacks

subject matter jurisdiction any claim for aiding and abetting that might exist against

Royal Dutch, Shell Transport or Mr. Anderson.

## III.    ABSENT EXTRAORDINARY CIRCUMSTANCES NOT PRESENT HERE, A PARENT CORPORATION IS NOT LIABLE FOR THE ACTS OF ITS SUBSIDIARIES.

Even ignoring *Sosa*'s direction that liability may attach only when a norm

of settled international law reaches the conduct of "the perpetrator being sued", plaintiffs

attempt to disregard the separate corporate identities of Royal Dutch and Shell Transport.

"It is a general principle of corporate law deeply ingrained in our

economic and legal systems that a parent corporation . . . is not liable for the acts of its

subsidiaries".  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotations omitted).

A mere showing of an ordinary parent-subsidiary relationship is insufficient to justify the

imputation of liability from that subsidiary to its parent.  "[I]t is hornbook law that the

exercise of control which stock ownership gives to the stockholders . . . will not create

liability beyond the assets of the subsidiary.  That control includes the election of

directors, the making of by-laws . . . and the doing of all other acts incident to the legal

status of stockholders".  *Id.* at 61-62 (quotations omitted); *see also Jazini v. Nissan Motor

Co., Ltd.*, 148 F.3d 181, 184-85 (2d Cir. 1998).

It will "seldom [be] true" that a subsidiary is liable as the agent of the

parent, and only "when both intend that relation to arise, for agency is consensual".

*Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (L. Hand, J.). "Liability normally must depend upon the parent's direct intervention *in the transaction*, ignoring the subsidiary'[s] paraphernalia of incorporation, directors and officers"; the parent "must take immediate direction of *the transaction*". *Id.* (emphasis added).

That is consistent with Nigerian law. (Int'l Law Br. 75-78).[18] Under Nigerian law, agency relationship would not exist between either of Royal Dutch and Shell Transport and SPDC unless: (1) the parent and subsidiary enter into a contract to establish an agency relationship, *Musa v. Ehidiamhen*, [1994] 3 N.W.L.R. 544, 557 (C.A.); (2) the parent and subsidiary are for "all intent and purposes one", *Union Beverages Ltd. v. Pepsicola Int'l Ltd.*, [1994] 3 N.W.L.R. 1, 22 (S.C.) (Mohammed, J., concurring); or (3) the subsidiary is set up to carry out the objectives of the parent company, "so much so that it can control every movement of the subsidiaries", *id.* (citation omitted).

None of the extraordinary circumstances for ignoring the corporate form is present here. Plaintiffs have no evidence, and in fact have not even alleged, that an agency relationship between SPDC and either Royal Dutch or Shell Transport. Royal Dutch and Shell Transport did not enter into any contract with SPDC creating an agency

---

[18] Secondary liability should be addressed on a norm by norm basis, *i.e.*, whether Royal Dutch or Shell Transport's own conduct violates a norm prohibiting, *e.g.*, aiding and abetting torture. (*See* Int'l Law Br. 62-66.) Even under a theory of agency, were it available, would ask whether SPDC was acting as the agent of Royal Dutch or Shell Transport for the specific alleged conduct underlying each claim. (*See id.* at 66-67.) Here, even if one applied federal common law, the law of New York, the law of Nigeria, the law of The Netherlands, or the law of England, plaintiffs cannot point to evidence demonstrating that the separate legal statuses of Royal Dutch and Shell Transport should be disregarded.

relationship.  Moreover, plaintiffs have no evidence that *for all intents and purposes* Royal Dutch, Shell Transport and SPDC act as one.  Plaintiffs have no evidence that Royal Dutch and Shell Transport exercise control over SPDC's operating decisions, much less over any of the actions alleged here.[19]

Royal Dutch and Shell Transport did not direct or control SPDC's activities.  At all times, SPDC made its own operating decisions in Nigeria, as a separate company.  Occasional after-the-fact summaries of events from SPDC to Royal Dutch and Shell Transport does not constitute "control" or "direction".  "It is one thing to consult with or obtain 'recommendations or approval from a parent corporation.  It is quite another for the parent's approval to be *required* before the subsidiary can act".  *Maung Ng We v. Merrill Lynch & Co.*, No. 99 Civ. 9687, 2000 WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000) (quotations omitted).

We end with Judge Cardozo:

> "Liability of the parent has never been adjudged when the subsidiary has maintained so consistently and in so many ways as here the separate organization that is the mark of a separate existence, and when the implication of a contract for unity of operation would be the implication of a contract for the commission of a crime".  *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 94 (1926).[20]

---

[19] For the same reasons, plaintiffs have no basis on which to pierce the corporate veil here. (Int'l Law Br. 72-75.)  Under Nigerian and English law, a court will disregard the separate legal existence and pierce the corporate veil only where the purpose of the parent company is to use the subsidiary as a sham or façade. (*Id.* at 73-75.)  Plaintiffs have not put forth a single fact even to suggest that the corporate form of either SPDC or SPCo. was abused as a sham or façade.

[20] Plaintiffs allege that "the Nigerian military regime was acting as the agent of, and/or working in concert with [the corporate defendants], and was acting within the course and scope of such agency, employment and/or concerted activity". (Compl. ¶ 26.)  Plaintiffs' First Amended Complaint, paragraph 20, contained the exact same language, but this Court stated in its 2002 decision:  "Defendants repeatedly state that plaintiffs

## Conclusion

For the foregoing reasons, defendants respectfully request that the Court dismiss *Wiwa* plaintiffs' ATS claims for lack of subject matter jurisdiction.

January 16, 2009

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by _____

Rory O. Millson
Rowan D. Wilson
Thomas G. Rafferty

825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rmillson@cravath.com
rwilson@cravath.com
trafferty@cravath.com

*Attorneys for defendants Shell Petroleum, N.V., as successor to the Royal Dutch Petroleum Company; Shell Transport and Trading Company, Ltd., formerly The "Shell" Transport and Trading Company, p.l.c.; and Brian Anderson*

---

have alleged that the Nigerian military functioned as corporate defendants' 'agent.' The Court finds, however, that plaintiffs have not relied on that characterization to support their ATCA claims". *Wiwa*, 2002 WL 319887, at \*23 n.30. Furthermore, there is no evidence whatsoever that Royal Dutch or Shell Transport ever met with the Nigerian military. Plaintiffs' sole allegation of a meeting between Royal Dutch and Shell Transport and Nigerian government officials was, in plaintiffs' euphemism, "an admitted inaccuracy" (11/24/03 Pls.' Corr. Opp'n to Mot. to Dismiss 20.) The Court gave plaintiffs permission to amend their Complaint to drop this false allegation. (9/29/06 Order at 6-7.)