**EXHIBIT B**
**PLAINTIFFS' INSTRUCTIONS ON ATS CLAIMS, STATE LAW CLAIMS, AND THEORIES OF LIABILITY**

**TABLE OF CONTENTS**

2.   INSTRUCTIONS FOR ELEMENTS OF ATS CLAIMS ........................................................ 3
Plaintiffs' Proposed Jury Instruction No. 2.0: Overview of Liability of Defendants .................... 3
Plaintiffs' Proposed Jury Instruction No. 2.1: Alien Tort Statute .................................................. 5
Plaintiffs' Proposed Jury Instruction No. 2.2: Extrajudicial Execution ......................................... 7
Plaintiffs' Proposed Jury Instruction No. 2.3: Torture ................................................................. 10
Plaintiffs' Proposed Jury Instruction No. 2.4: Cruel, Inhuman, or Degrading Treatment ........... 13
Plaintiffs' Proposed Jury Instruction No. 2.5: Crimes Against Humanity .................................... 17
Plaintiffs' Proposed Jury Instruction No. 2.6: Arbitrary Arrest and Detention ............................ 20
Plaintiffs' Proposed Jury Instruction 2.7: Violations of the Rights to Life, Liberty and Security of the Person and Peaceful Assembly and Association ..................................................................... 23
Plaintiffs' Proposed Jury Instruction No. 2.8: No Affirmative Defenses for International Law Violations; Political Views ........................................................................................................... 28

4.   INSTRUCTIONS FOR ELEMENTS OF STATE LAW CLAIMS ...................................... 31
Plaintiffs' Proposed Jury Instruction No. 4.1: Assault ................................................................. 31
Plaintiffs' Proposed Jury Instruction No. 4.2: Battery.................................................................. 34
Plaintiffs' Proposed Jury Instruction No. 4.3: Negligence of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria or Brian Anderson in calling in/assisting the military or bribing witnesses.......................................................................................................................... 37
Plaintiffs' Proposed Jury Instruction No. 4.4: Negligence of Shell Nigeria in hiring, supervising, and training members of the Nigerian military or military government..................................... 40
Plaintiffs' Proposed Jury Instruction No. 4.5: Knowledge ........................................................... 42
Plaintiffs' Proposed Jury Instruction No. 4.7: Negligent infliction of emotional distress .......... 46
Plaintiffs' Proposed Jury Instruction No. 4.8: Wrongful death .................................................... 49

6.   INSTRUCTIONS FOR ROYAL DUTCH PETROLEUM CO. AND/OR SHELL TRANSPORT AND TRADING CO., SHELL NIGERIA AND BRIAN ANDERSON'S RESPONSIBILITY FOR GSF'S CONDUCT.................................................................................. 50
Plaintiffs' Proposed Jury Instruction No. 6.1: Overview of Responsibility of Defendants and Shell Nigeria for the military ........................................................................................................ 50
Plaintiffs' Proposed Jury Instruction No. 6.0A: Corporation is a person under law .................... 53
Plaintiffs' Proposed Jury Instruction No. 6.2: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Agency ........................................................... 54
Plaintiffs' Proposed Jury Instruction No. 6.3: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Inherent Danger to Others............................. 57
Plaintiffs' Proposed Jury Instruction No. 6.4: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Ratification..................................................... 59
Plaintiffs' Proposed Jury Instruction No. 6.5: Responsibility of Brian Anderson and Shell Nigeria for acts of the military - Aiding and Abetting ................................................................. 62
Plaintiffs' Proposed Jury Instruction No. 6.6A: Responsibility of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. for acts of the military - Conspiracy. ....................................... 66

1

Plaintiffs' Proposed Jury Instruction No. 6.6: Responsibility of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and/or Brian Anderson for acts of the military - Conspiracy. ............................................................................................................................ 70
Plaintiffs' Proposed Jury Instruction No. 6.7: Responsibility of Shell Nigeria for acts of the Nigerian military—Joint Venture ...................................................................................... 74
Plaintiffs' Proposed Jury Instruction No. 6.8: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Joint Enterprise ............................................. 77
Plaintiffs' Proposed Alternative Jury Instruction No. 6.8: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Joint Enterprise (Nigerian Law) 78
Plaintiffs' Proposed Jury Instruction No. 6.9: Responsibility of Shell Nigeria and Brian Anderson for acts of the military—Instigation or Inducement ................................................... 80
Plaintiff's Proposed Jury Instruction No. 6.10: Responsibility of Shell Nigeria and Brian Anderson for acts of the military -- reckless disregard ............................................................... 83

7.   INSTRUCTIONS FOR DEFENDANTS' LIABILITY FOR SHELL NIGERIA'S AND BRIAN ANDERSON'S CONDUCT; INSTRUCTIONS FOR BRIAN ANDERSON'S LIABILITY FOR SHELL NIGERIA'S CONDUCT ................................................... 85
Plaintiffs' Proposed Jury Instruction No. 7.1: Overview of Responsibility of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. for Shell Nigeria and Brian Anderson....... 85
Plaintiffs' Proposed Jury Instruction No. 7.3: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria—Agency ................................................... 87
Plaintiffs' Proposed Jury Instruction No. 7.4: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria's Officers—Agency ................................. 92
Plaintiffs' Proposed Jury Instruction No. 7.5:  Agency: Scope of Authority/Agent's Imperfect Compliance with Principal's Regulations .............................................................................. 95
Plaintiffs' Proposed Jury Instruction No. 7.6: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria and/or Brian Anderson— Ratification ..... 97
Plaintiffs' Proposed Jury Instruction No. 7.7: Liability of Royal Dutch Petroleum Co. , Shell Transport and Trading Co. and Brian Anderson For Acts of Shell Nigeria— Aiding and Abetting ........................................................................................................................................... 100
Plaintiffs' Proposed Jury Instruction No. 7.8: Liability of Defendants For Acts of Shell Nigeria— Conspiracy .............................................................................................................. 106
Plaintiffs' Proposed Jury Instruction No. 7.9: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria—Alter-Ego (ATS Claims) .................... 112
Plaintiffs' Proposed Jury Instruction No. 7.9A: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Responsibility of Shell Nigeria—Joint Venture ...................... 115
Plaintiffs' Proposed Jury Instruction No. 7.10: Liability of Brian Anderson for acts of Shell Nigeria – Corporate Officer Liability ....................................................................................... 118

**2.      INSTRUCTIONS FOR ELEMENTS OF ATS CLAIMS**

**Plaintiffs' Proposed Jury Instruction No. 2.0: Overview of Liability of Defendants**

Defendants in this case are Royal Dutch Petroleum Co., Shell Transport and Trading Co. and Brian Anderson. Plaintiffs contend the Defendants are responsible for their own acts and for acts of violence committed against the Plaintiffs by members of the Nigerian military and military government.

As for their own acts, Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. were negligent in their dealings with the Nigerian military. Plaintiffs contend that Brian Anderson committed negligence and intentional infliction of emotional distress by helping the military to perpetrate unnecessary violence, and by offering to trade Ken Saro-Wiwa's freedom for an end to the international protests against Shell.

Plaintiffs also contend that Defendants are liable for the acts of others. In law, a person can be liable for acts they did not personally commit, under various "theories of liability." A theory of liability explains why one individual or corporation is legally responsible for the actions of another individual or corporation. A number of theories have been presented to you in this case. Each of these is separate. A plaintiff need only prove one theory of liability to make a person fully responsible for another person's conduct. If you find against plaintiffs on any one theory, such a finding does not affect any other theory. You must still individually consider plaintiffs' other theories of liability.

Plaintiffs contend that Royal Dutch Petroleum Co., Shell Transport and Trading Co. and Brian Anderson are responsible for acts of members of the military because each defendant conspired with members of the military.

In addition, Plaintiffs separately contend that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of members of the military because they are responsible for the conduct or responsibility of Shell Nigeria, Brian Anderson and other officers of Shell Nigeria, who in turn are responsible for the conduct of the military. The theories of liability under which plaintiffs contend the corporate defendants are responsible for the conduct of Shell Nigeria, Brian Anderson and other officers of Shell Nigeria are discussed later in these instructions. Likewise, the theories of liability under which plaintiffs contend Shell Nigeria, Brian Anderson and other officers of Shell Nigeria are responsible for the acts of members of the military are also discussed later in these instructions.

Plaintiffs also contend that Brian Anderson is responsible for conduct of the military. As has just been noted, the theories of liability by which plaintiffs seek to hold Mr. Anderson liable are discussed later in these instructions.

3

To summarize with respect to plaintiffs' theories of liability: if you find that the military committed any wrong that harmed plaintiffs, such as extrajudicial execution; torture; cruel, inhuman or degrading treatment; crimes against humanity; arbitrary arrest or detention; violations of the rights to life, liberty and security of the person and peaceful assembly and association; assault; battery; wrongful death, intentional infliction of emotional distress or negligent infliction of emotional distress, you must determine whether Brian Anderson and/or one or both corporate defendants (individually or through Shell Nigeria or Shell Nigeria officials), are responsible for the conduct of the military. Regardless of whether you find Royal Dutch Petroleum Co. or Shell Transport and Trading Co. responsible for Shell Nigeria's conduct, you should separately consider whether these corporate defendants are responsible for the conduct of Brian Anderson and other Shell Nigeria officials.

**<u>DEFENDANTS' OBJECTIONS:</u>**  Defendants object to this instruction in its entirety as prejudicial and inappropriate, describing highly disputed issues of fact and law.  Defendants object to this instruction appearing as part of the section containing agreed-upon instructions.

**Plaintiffs' Proposed Jury Instruction No. 2.1: Alien Tort Statute**

Plaintiffs' claims for extrajudicial execution; torture; cruel, inhuman or degrading treatment; crimes against humanity; arbitrary arrest or detention; and violations of the rights to life, liberty and security of the person and peaceful assembly and association are brought under a law known as the Alien Tort Statute, a U.S. law that allows lawsuit claiming violations of international law to be decided in United States courts.

International law prohibits the above named acts. A person who is injured by any of these international law violations may sue in a United States court under the Alien Tort Statute.  This is true even if the international law violations occur in another country such as Nigeria.

The plaintiffs allege that the defendants violated their rights to be free from extrajudicial execution; torture; crimes against humanity; cruel, inhuman or degrading treatment; arbitrary arrest or detention; and violations of the rights to life, liberty and security of the person and peaceful assembly and association.  If you find that the plaintiffs have established that any of these rights protected by the Alien Tort Statute were violated, and if you find that the defendants are responsible under any one of the theories of liability presented in this case, then the defendants are liable for the Alien Tort Statute violations.

**Sources**

28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.")

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 732–33 (2004)

*Hilao v. Estate of Marcos*, 25 F.3d 1467, 1475–76 (9th Cir. 1994)

*Bowoto v. Chevron Corp.*, No. 99-02506 (N.D. Cal.), Instructions to Jury (Final as Amended – 11/25/08) at 9 ("Plaintiffs' claims for torture and for cruel, inhuman or degrading treatment are brought under a law known as the Alien Tort Statute, a U.S. law that governs the application of international law in the United States. International law prohibits torture and prohibits cruel, inhuman or degrading treatment. Any person who is injured by any of these international law violations may sue in a United States court under the Alien Tort Statute. This is true even if the international law violations occur in another country such as Nigeria. The plaintiffs allege that the defendants violated their rights under the Alien Tort Statute to be free from torture and to be free from cruel, inhuman, or degrading treatment. If you find that the plaintiffs have established that their rights protected by the Alien Tort Statute were violated, and if you find that the defendants are liable under any one of the theories of liability presented in this case, then the defendants are liable for the Alien Tort Statute violations. If you find that plaintiffs' rights were not violated, or that defendants are not liable for any violation that may have occurred, then defendants are not liable.")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.1**

Defendants object to this instruction because it assumes that plaintiffs' international law claims are cognizable under the ATS.  This Court, however, does not have subject matter jurisdiction over plaintiffs' ATS claims under 28 U.S.C. § 1350.  (*See* Defs.' R&O Stmt. Part I.A.)  Furthermore, in determining whether a party has violated a norm of

customary international law that is cognizable under the ATS, a jury must look at the alleged conduct of the "perpetrator being sued". *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 n.20 (2004). Contrary to the Supreme Court's dictates, this instruction asks the jury to look first at whether anyone violated plaintiffs' rights under the ATS, and then asks the jury to look at whether defendants can be held liable for another person's alleged conduct based on one of their indirect theories of liability. (*See* Int'l Law Br. at 1-6.) Plaintiffs, however, cannot bring a claim under the ATS based on indirect liability because there is no civil indirect liability under customary international law. (*See id*. at 62-66.) Nor has a corporation ever been held *directly* liable by an international tribunal.

**Plaintiffs' Proposed Jury Instruction No. 2.2: Extrajudicial Execution**

Plaintiffs contend that Uebari N-Nah, Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo and Dr. Barinem Kiobel suffered extrajudicial execution.

To establish this claim, plaintiffs must prove by a preponderance of the evidence that:
that:

    1) Uebari N-Nah, Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo or Dr. Barinem Kiobel suffered a deliberate killing, and

    2) that such killing was not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

The term "extrajudicial" does not mean that the execution was not authorized by a judge, court or tribunal, but that the killing was not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  A killing may be extrajudicial even if it is done pursuant to a judgment that is legal under the laws of Nigeria.

Regularly constituted court

A "regularly constituted court" must be independent and impartial, and this term definitely excludes all special tribunals (that is, courts or tribunals created for a specific event).

Judicial guarantees

"The judicial guarantees which are recognized as indispensable by civilized peoples" include, but are not limited to:

    a)  the right to have a conviction and sentence reviewed by appeal to a higher court or tribunal;

    b)  the right to a lawyer that may represent the accused without restrictions or undue pressure and the right to freely communicate with one's lawyer;

    c)  the right to a fair hearing free from torture of the accused and bribery of witnesses; and

    d)  the right of access to evidence in the possession of the prosecution that could potentially assist the accused.

Defendants' liability

If you find that members of the Nigerian military or military government committed extrajudicial execution, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether any instruction should be given on extrajudicial execution.  If such an instruction is given, plaintiffs believe that the parties agree that the elements of extrajudicial execution include a deliberate killing that was not authorized by a previous judgment pronounced by a court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  The parties differ over the content of "judicial guarantees"

and whether a extrajudicial execution is possible in the context judgment that is "legal under the laws of Nigeria, and/or handed down by a "lawfully" constituted court, can carry out an extrajudicial killing.  This disagreement and others are further reflected in the parties' objections.

**Sources:**

Torture Victim Protection Act, 28 U.S.C. §1350 note ("For the purposes of this Act, the term 'extrajudicial killing' means a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.")

*Hamdan v. Rumsfeld*, 548 U.S. 557, 632 (2006) ("The commentary accompanying a provision of the Fourth Geneva Convention, for example, defines '"regularly constituted"' tribunals to include 'ordinary military courts' and 'definitely exclud[e] all special tribunals.'"); *id.* at 633 (indispensable judicial guarantees "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 (Protocol I)."); *id.* at 634 (accused "must be privy to the evidence against him").

Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (June 8, 1977), art. 75(4) ("No sentence may be passed and no penalty may be executed on a person found guilty of a penal offence related to the armed conflict except pursuant to a conviction pronounced by an impartial and regularly constituted court respecting the generally recognized principles of regular judicial procedure, which include the following: (a) the procedure shall provide for an accused to be informed without delay of the particulars of the offence alleged against him and shall afford the accused before and during his trial all necessary rights and means of defence; (b) no one shall be convicted of an offence except on the basis of individual penal responsibility; (c) no one shall be accused or convicted of a criminal offence on account or any act or omission which did not constitute a criminal offence under the national or international law to which he was subject at the time when it was committed; nor shall a heavier penalty be imposed than that which was applicable at the time when the criminal offence was committed; if, after the commission of the offence, provision is made by law for the imposition of a lighter penalty, the offender shall benefit thereby; (d) anyone charged with an offence is presumed innocent until proved guilty according to law; (e) anyone charged with an offence shall have the right to be tried in his presence; (f) no one shall be compelled to testify against himself or to confess guilt; (g) anyone charged with an offence shall have the right to examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him; (h) no one shall be prosecuted or punished by the same Party for an offence in respect of which a final judgement acquitting or convicting that person has been previously pronounced under the same law and judicial procedure; (i) anyone prosecuted for an offence shall have the right to have the judgement pronounced publicly; and (j) a convicted person shall be advised on conviction or his judicial and other remedies and of the time-limits within which they may be exercised.").

*See also* Plaintiffs' Brief on International Law Norms Pursuant to Order of October 7, 2008 at 14-26.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.2

Defendants' object to this instruction because this Court does not have subject

8

matter jurisdiction over this claim. (*See* Defs.' R&O Stmt. Part I.B.1.) There is no universal, specific and obligatory norm of customary international law for civil indirect liability for summary execution.

This Court has already held in *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 464-65 (S.D.N.Y. 2006), a case based on the same facts with respect to this claim, that plaintiffs cannot make out a claim for summary execution against defendants. As this Court stated, it was not aware of a single "international authority establishing the elements of extrajudicial killing".

This ATS claim has also been displaced by the TVPA. Congress passed the TVPA to implement the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and moot the question whether a private right of action exists under the ATS for extrajudicial killing. The TVPA provides federal courts a "clear mandate" and "unambiguous" basis upon which to adjudicate federal claims for summary execution. Plaintiffs, however, have abandoned any claim for summary execution—or extrajudicial killing—under the TVPA. (*See* 2/23/09 Order at 7 n.7.)

Furthermore, plaintiffs' reliance on a host of "judicial guarantees" from domestic law, many of which are not clearly defined, does not create a norm of customary international law that is cognizable under the ATS. Surveying domestic law for conduct that is widely proscribed does not turn that conduct into a specific norm of customary international law. *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003) ("Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law."); *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) ("We cannot subscribe to plaintiffs' view that the Eighth Commandment 'Thou shalt not steal' is part of the law of nations [even though] every civilized nation doubtless has this as a part of its legal system."). Thus, defendants object to (a) through (d) under that heading.

Finally, even if plaintiffs could establish a well-defined norm prohibiting summary execution under customary international law by way of certain "fundamental judicial guarantees", plaintiffs' allegations do not constitute a viable ATS claim for summary execution *against the defendants*. There is no well-defined norm of customary international law that prohibits the types of alleged conduct alleged by the "perpetrator[s] being sued". None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law. There is no "definite" norm of customary international law that holds corporations liable for alleged acts summary execution committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Defendants object to plaintiffs' paragraph with the heading "Public Officials". This paragraph is prejudicial and false as it assumes that the Nigerian military was working with defendants.

Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections. (*See* Defs.' R&O Stmt. Part I.A, I.C.)

Defendants in particular would strike from the third paragraph the following: "A killing may be extrajudicial even if it is done pursuant to a judgment that is legal under the laws of Nigeria".

Defendants in particular would strike from the paragraph with the heading "Regularly constituted court" the following: ", and this term definitely excludes all special tribunals (that is, courts or tribunals created for a specific event)".

**Plaintiffs' Proposed Jury Instruction No. 2.3: Torture**

Plaintiffs contend that Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo, Dr. Barinem Kiobel, Karolo Kogbara, Michael Tema Vizor and Uebari N-nah suffered torture.  To establish this claim for any particular plaintiff, plaintiffs must prove by a preponderance of the evidence:

> 1) That Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo, Dr. Barinem Kiobel, Karolo Kogbara, Michael Tema Vizor or Uebari N-nah was subjected to severe pain or suffering, whether physical or mental;
> 2) That this pain or suffering was inflicted for the purpose of obtaining information or a confession; for punishment, intimidation, or coercion; or for any reason based on discrimination;
> 3) That this pain or suffering was inflicted by, or with the consent or acquiescence of, a public official or other person acting in an official capacity.

Severe pain or suffering

In addition to physical pain, severe pain or suffering includes prolonged mental harm caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering, or from the threat of imminent death.

Public officials

In this context, members of the Nigerian military or military government, including those working with Shell, are considered public officials.

Defendants' liability

If you find that members of the Nigerian military or military government committed torture, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether any instruction should be given on torture.  If such an instruction is given, plaintiffs believe that the parties do agree that the elements of torture include subjecting a person to severe pain or suffering, whether physical or mental; for the purpose of obtaining information or a confession; for punishment, intimidation, or coercion; or for any reason based on discrimination.  Plaintiffs believe the parties also agree that severe pain or suffering includes prolonged mental harm caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering, or from the threat of imminent death.  Last, plaintiffs believe that the parties agree that the pain or suffering must be inflicted by, or with the consent of a public official or other person acting in an official capacity, although they disagree over whether acquiescence of a public official is also sufficient.  The parties disagree whether custody or control of the victim is an element.  Additional disagreements are reflected in the objections.

**Sources**

*Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* Dec. 10, 1984, art. 1, G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc. A/39/51

(1984), 23 I.L.M. 1027 and 24 I.L.M 535 (ratified by the United States October 21, 1994) ("For the purposes of this Convention, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.")

*In re Estate of Ferdinand Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir. 1994) ("The right to be free from official torture is fundamental and universal, a right deserving of the highest stature under international law, a norm of *jus cogens*.")

Constitution of the Federal Republic of Nigeria, art. 34(1)(a) ("Every individual is entitled to respect for the dignity of his person, and accordingly (a) no person shall be subject to torture or to inhuman or degrading treatment")

Torture Victim Protection Act, 28 U.S.C. §1350 note ("For the purposes of this Act (1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from (A) the intentional infliction or threatened infliction of severe physical pain or suffering . . . (C) the threat of imminent death . . .")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.3

Defendants' object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part I.B.3.)  There is no universal, specific and obligatory norm of customary international law for civil indirect liability for torture.

This ATS claim has also been displaced by the TVPA.  Congress passed the TVPA to implement the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and moot the question whether a private right of action exists under the ATS for torture.  The TVPA provides federal courts a "clear mandate" and "unambiguous" basis upon which to adjudicate federal claims for torture.  Plaintiffs, however, have abandoned any claim for torture under the TVPA.  (*See* 2/23/09 Order at 7 n.7.)

Furthermore, this claim is not cognizable under the ATS because plaintiffs do not allege that defendants administered or committed torture.  *Sosa* distinguished between the person who allegedly administered the torture and the alleged "perpetrator being sued".  (*See id*. at 35-37.)  None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law.  There is no "definite" norm of customary international law that holds corporations liable for alleged acts of torture committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Defendants object to plaintiffs' paragraph with the heading "Public Officials".  This paragraph is prejudicial and false as it assumes that the Nigerian military was working with defendants.

Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections. (*See* Defs.' R&O Stmt. Part I.A, I.C.)

**Plaintiffs' Proposed Jury Instruction No. 2.4: Cruel, Inhuman, or Degrading Treatment**

Plaintiffs contend that Ken Saro Wiwa, Ken Wiwa, Blessing Kpuinen, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Karalolo Kogbara, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, Daniel Gbokoo, David Kiobel, Dr. Barinem Kiobel, James B. N-nah and Uebari N-nah suffered cruel, inhuman, and degrading treatment.

Cruel, inhuman or degrading treatment includes acts that fall short of torture.

To establish this claim for any particular plaintiff, plaintiffs must prove by a preponderance of the evidence:

    1. That Ken Saro Wiwa, Ken Wiwa, Blessing Kpuinen, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Karalolo Kogbara, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, Daniel Gbokoo, David Kiobel, Dr. Barinem Kiobel, James B. N-nah or Uebari N-nah was subjected to mental or physical suffering, anguish, humiliation, fear or debasement;

    2. That this suffering, anguish, humiliation, fear or debasement was inflicted by, or with the consent or acquiescence of, a public official or other person acting in an official capacity;

    3. That this suffering, anguish, humiliation, fear or debasement was either cruel, inhuman, or degrading.  Treatment need only meet one of these criteria:

        a) Treatment is "cruel" if it causes serious mental or physical suffering or injury or constitutes a serious attack on human dignity.

        b) Treatment is "inhuman" if it deliberately causes severe suffering, mental or physical, which, in the particular situation, is unjustified.

        c) Treatment is "degrading," if its effect is such as to arouse feelings of fear, anguish, or inferiority capable of humiliating or debasing the plaintiff.  Degrading treatment need not be deliberate, that is, the person engaged in such treatment did not have to intend to degrade; what matters is the effect.

Cruel, inhuman, or degrading treatment

You may find that all of the circumstances that Plaintiffs were subjected to, taken together, constituted cruel or inhuman or degrading treatment which caused lasting psychological or physical harm to Plaintiffs.  Whether treatment is cruel, inhuman, or degrading depends upon an assessment of all the evidence before you, including the specific conditions at issue, duration of the measures imposed, the objectives pursued by the perpetrators, and the physical or mental effects on the person(s) involved.

Harm to relatives

The infliction of severe mental anguish through the commission of heinous offenses against the victim's immediate relatives has also been recognized as a form of cruel, inhuman or degrading treatment.

Public officials

In this context, members of the Nigerian military or military government, including those working with Shell, are considered public officials.

Defendants' liability

If you find that members of the Nigerian military or military government committed cruel, inhuman or degrading treatment, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether any instruction should be given on CIDT.  If such an instruction is given, plaintiffs believe that the parties agree that CIDT occurs where an individual is subjected to mental or physical suffering, anguish, humiliation, fear or debasement that was cruel, inhuman or degrading, and that it includes conduct that falls short of torture.  Plaintiffs believe that the parties also agree that whether treatment is cruel, inhuman, or degrading depends upon an assessment of all the evidence, including the specific conditions at issue, duration of the measures imposed, the objectives pursued by the perpetrators, and the physical or mental effects on the person(s) involved. Last, plaintiffs believe that the parties agree that CIDT must be inflicted by, or with the consent of, a public official or other person acting in an official capacity, although they disagree over whether acquiescence of a public official is also sufficient.  The parties disagree about other elements of this claim.

**Sources**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 16, G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984), 23 I.L.M. 1027 and 24 I.L.M 535 (entered into force for the United States Nov. 20, 1994) ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.")

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 at *9 (S.D.N.Y. 2002) ("The Court is satisfied that Owens Wiwa and Jane Doe have alleged 'cruel, inhuman, or degrading' conduct that, while falling short of torture and summary execution, violates international law and is hence cognizable under the [ATS]."); *see also Xuncax v. Gramajo*, 886 F. Supp. 162, 187 (D. Mass. Ct. 1995); *Paul v. Avril*, 812 F. Supp. 207, 209 (S.D. Fla.1993)

*Prosecutor v. Delalic*, Case No. IT-96-21-T ¶ 552 (ICTY Trial Chamber Nov. 16, 1998) ("cruel treatment constitutes an intentional act or omission . . . which causes serious mental or physical suffering or injury or constitutes a serious attack on human dignity")

*The Greek Case*, [1969] Y.B. Eur. Conv. on H.R. 12A at 186 ("The notion of inhuman treatment covers at least such treatment as deliberately causes severe suffering, mental or physical, which, in the particular situation, is unjustifiable.").

*Kudla v. Poland*, 35 Eur. Hum. Rts. Rep. 11, ¶ 92 (Oct. 26, 2000) ("The Court . . . has deemed treatment to be 'degrading' because it was such as to arouse in the victims feelings of fear, anguish and inferiority capable of humiliating and debasing them.")

*Peers v. Greece*, 33 Eur. Hum. Rts. Rep. 51, ¶ 74 (April 19, 2001) (confirming that the absence of positive intent to humiliate or debase does not rule out a finding of degrading treatment); *Timurtas v. Turkey*, App. No. 23531/94 ¶¶ 98 (Eur. Ct. H.R. 2001) (finding CIDT in the context of "a callous disregard for the applicant's concerns")

*Ayder v. Turkey*, App. No. 23656/94 ¶¶ 108–110 (Eur. Ct. H.R. 2004) (finding that military attacks on villages constitute CIDT); *Hajrizi Dzenajl v. Yugoslavia*, U.N. Doc. CAT/C/29/D/161/2000 ¶ 9.2 (Comm. Against Torture Nov. 21, 2002) (finding burning and destruction of houses to be CIDT); *Kurt v. Turkey*, App. No. 24276/94 ¶¶ 133–34 (Eur. Ct. H.R. 1998) (finding the mental anguish suffered by relatives of disappeared persons, who were not themselves in custody, to be CIDT)

Constitution of the Federal Republic of Nigeria, art 34(1)(a) ("Every individual is entitled to respect for the dignity of his person, and accordingly (a) no person shall be subject to torture or to inhuman or degrading treatment")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.4

Defendants' object to this instruction because this Court does not have subject matter jurisdiction over this claim. (*See* Defs.' R&O Stmt. Part I.B.4.) There is no universal, specific and obligatory norm of customary international law for civil indirect liability for cruel, inhuman, or degrading treatment ("CIDT").

Additionally, the legislative history of the TVPA compels the rejection of plaintiffs' cruel, inhuman or degrading treatment claim as Congress only executed in part the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment when it adopted the TVPA. Congress chose to create a remedy for torture and extrajudicial killing only, and chose not to create a remedy for CIDT, another subject of the Convention.

This claim is not cognizable under the ATS because there are "conceptual difficulties" and "problems of definability" with any claim for CIDT. A proposed prohibition against CIDT is an amorphous rule that does not meet the specificity requirements of *Sosa*. Indeed, this Court noted the CIDT claims' "lack of clarity". *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 U.S. Dist. LEXIS 3293, at *23 (S.D.N.Y. Feb. 28, 2002). For a claim to be actionable under the ATS, "the proposed tort must be characterized by universal consensus in the international community as to its binding status and its content". *Forti v. Suarez-Mason*, 694 F. Supp. 707, 712 (N.D. Cal. 1988). CIDT lacks the "definite content" of the 18th-century paradigms of piracy, offenses against ambassadors and violations of safe conduct.

None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law. There is no "definite" norm of customary international law that holds corporations liable for alleged acts of cruel, inhuman or degrading treatment committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Plaintiffs also rely on a host of incompetent sources, including cases from the European Court of Human Rights, that are not "those sources [the Supreme Court has] long, albeit cautiously, recognized". *Sosa*, 542 U.S. at 733-34 (citing *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

Defendants object to plaintiffs' paragraph with the heading "Public Officials". This paragraph is prejudicial and false as it assumes that the Nigerian military was working with

defendants.

        Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections. (*See* Defs.' R&O Stmt. Part I.A, I.C.)

**Plaintiffs' Proposed Jury Instruction No. 2.5: Crimes Against Humanity**

Plaintiffs contend that Ken Saro Wiwa, Ken Wiwa, Blessing Kpuinen, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Karalolo Kogbara, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, Daniel Gbokoo, David Kiobel, Dr. Barinem Kiobel, James B. N-nah and Uebari N-nah suffered abuses that were part of crimes against humanity.  To establish this claim, plaintiffs must prove by a preponderance of the evidence:

> 1) That Ken Saro Wiwa, Ken Wiwa, Blessing Kpuinen, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Karalolo Kogbara, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, Daniel Gbokoo, David Kiobel, Dr. Barinem Kiobel, James B. N-nah or Uebari N-nah suffered any of the following acts: murder, extermination, deportation, imprisonment, torture, rape, persecution on political, racial, ethnic, cultural or religious grounds, enforced disappearance of persons, or other inhumane acts;
> 2) The person or persons who committed the act did so as part of a widespread or systematic attack directed against a civilian population; and
> 3) The person or persons who committed the act knew or, based on the circumstances, should have known that the act was part of a widespread or systematic attack.

Attack

An "attack" in the context of a crime against humanity can be any course of conduct that involves the commission of acts of violence.  This includes any mistreatment of a civilian population.

Widespread or systematic nature of the attack

An attack is "widespread" where it is large-scale in nature and targets a large number of people. An attack is "systematic" if the acts of violence were organized and were unlikely to occur randomly.  Patterns of crimes, in the sense of the non-accidental repetition of similar criminal conduct on a regular basis, are a common expression of such systematic occurrence.

Population

The use of the word "population" does not mean that the entire population of the geographical area in which the attack is taking place must have been subjected to that attack. It is sufficient to show that enough individuals were targeted, or that they were targeted in such a way as to show that the attack was in fact directed against a civilian 'population,' rather than against a limited and randomly selected number of individuals.

Perpetrator's knowledge

While the perpetrator must know that his own acts are part of a widespread or systematic attack, he need not have the intent to commit the broader attack.

Burden of proof

Although this claim refers to "crimes against humanity," you are not being called on to decide a criminal case.  As with other claims, the plaintiffs' burden of proof is a preponderance of the evidence, and not the higher burden of proof required in criminal cases.

Defendants' liability

If you find that members of the Nigerian military or military government committed crimes

against humanity, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether any instruction should be given on crimes against humanity. If such an instruction is given, plaintiffs believe that the parties do agree that crimes against humanity involves certain acts committed as part of a widespread or systematic attack. Plaintiffs believe that the parties further agree that these acts include murder, torture, rape, persecution and other inhumane or violent acts, although there are some differences in the parties' descriptions of this last category. The parties disagree about other elements of this claim.

**Sources**
*See generally* Plaintiffs' Brief on International Law Norms Pursuant to Order of October 7, 2008 at 37-44.

Rome Statute of the International Criminal Court, art. 7 (providing that "'crime against humanity' means any of the following acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack: Murder; Extermination . . . Deportation or forcible transfer of population; Imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law; Torture; Rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity; Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender as defined in paragraph 3, or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court; Enforced disappearance of persons . . . Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health")

*Wiwa*, 2002 U.S. Dist. LEXIS 3293 at *27 - 29, 31 (quoting art. 7 definition; "In sum, under the definition of 'crimes against humanity' provided in Article 7 of the I.C.C., plaintiffs must demonstrate (1) violation of one of the enumerated acts, (2) committed as part of a widespread attack against a civilian population, (3) with knowledge of the attack.")

*Prosecutor v. Blagojevic/Jokic*, No. IT-02-60-T, ¶ 543 (ICTY Trial Chamber, Jan. 17, 2005) ("'Attack' in the context of a crime against humanity can be defined as a course of conduct involving the commission of acts of violence.")

*Prosecutor v. Simic, Tadic, and Zaric*, IT-95-9-T ¶39 (ICTY Trial Chamber, Oct. 17, 2003) (the term attack may "encompass any mistreatment of the civilian population")

*Prosecutor v. Limaj*, Judgment, No. ICTY- 03-66-T (Nov. 30, 2005) ¶ 183 ("The term 'widespread' refers to the large scale nature of the attack and the number of victims, while the phrase 'systematic' refers to the organized nature of the acts of violence and the improbability of their random occurrence.")

*Prosecutor v. Kunarac*, ¶ 90 (ICTY Appeals Chamber, June 12, 2002) ("[T]he use of the word 'population' does not mean that the entire population of the geographical entity in which the attack is taking place must have been subjected to that attack. It is sufficient to show that enough individuals were targeted in the course of the attack, or that they were targeted in such a way as to satisfy the Chamber that the attack was in fact directed against a civilian 'population,' rather than against a limited and randomly selected number of individuals."

*Prosecutor v. Kvocka*, Case No. IT-98-30/lT, Trial Chamber I Judgment, ¶ 129  (Nov. 2, 2001) (holding that while the perpetrator must know that his own acts are part of a widespread or systematic attack, he need not have the same intent as the participants in the broader attack).

## **DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.5**

Defendants' object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part I.B.2.)  There is no universal, specific and obligatory norm of customary international law for civil indirect liability for crimes against humanity.

This claim is not cognizable under the ATS because the definition and scope of crimes against humanity remains unclear under international law.  "Crimes against humanity" lacks the "definite content" of the 18th-century paradigms of piracy, offenses against ambassadors and violations of safe conduct.  Plaintiffs' own incompetent sources, such as the statutes of the ICTY and ICTR, as well as the Rome Statute, reveal that there no agreement as to what constitutes "crimes against humanity".

None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law.  There is no "definite" norm of customary international law that holds corporations liable for alleged acts of crimes against humanity committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Defendants object to the first element of plaintiffs' instruction because certain "acts" are not at issue in this case such as "extermination", "deportation", and "enforced disappearance of persons".

Defendants object to the third element of plaintiffs' instruction because the requirement under international law is knowledge, not "based on the circumstances, should have known".

Defendants object to both paragraphs of this instruction under the headings "Perpetrator's knowledge" and "burden of proof" because they are both redundant and unnecessary.

Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections. (*See* Defs.' R&O Stmt. Part I.A, I.C.)

**Plaintiffs' Proposed Jury Instruction No. 2.6: Arbitrary Arrest and Detention**

Plaintiffs contend that Ken Saro Wiwa, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Saturday Doobee, Felix Nuate, Daniel Gbokoo, and Dr. Barinem Kiobel suffered arbitrary arrest and detention.  To establish this claim, plaintiffs must prove by a preponderance of the evidence:

> 1) That Ken Saro Wiwa, John Kpuinen, Owens Wiwa, Michael Tema Vizor, Saturday Doobee, Felix Nuate, Daniel Gbokoo, or Dr. Barinem Kiobel was detained;
>
> 2) The person or persons who detained each detainee was a public official or other person acting in an official capacity, or did so with the consent or acquiescence of such person; and
>
> 3) Any one of the following conditions is present:
>
>> a) The detention was not accompanied by notice of the charges brought against him; or
>>
>> b) The detainee did not have an early opportunity to communicate with family or consult counsel; or
>>
>> c) The detainee was not brought to trial within a reasonable time; or
>>
>> d) The detainee was tortured while in detention; or
>>
>> e) The detention was incompatible with principles of justice or with the dignity of the person.

Public officials

In this context, members of the Nigerian military or military government, including those working with Shell, are considered public officials.

Defendants' liability

If you find that members of the Nigerian military or military government committed arbitrary arrest and detention, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether any instruction should be given on arbitrary arrest and detention.  If such an instruction is given, plaintiffs believe the parties do agree that arbitrary arrest and detention includes circumstances in which the detainee is not notified of the charges against him. The parties disagree whether the detention needs to be prolonged and disagree about other elements of the claim.

**Sources**

*Jean v. Dorelien*, No. 03-20161 (S.D. Fla.) (verdict issued Feb. 23, 2007), Court's Instructions to the Jury at 14 ("On Lexiuste Cajuste's claim for arbitrary detention, he has the burden of proving each of the following elements by a preponderance of the evidence: 1. Lexiuste Cajuste was detained; 2. The person or persons who detained Lexiuste Cajuste did so under actual or apparent authority, or color of law, of Haiti; and 3. Any one of the following elements: a. The detention of Lexiuste Cajuste was not accompanied by notice of charges; or b. The person or persons detaining Lexiuste Cajuste did not give him an early opportunity to communicate with family or consult counsel; or c. The person or persons detaining Lexiuste Cajuste failed to bring him to

trial within a reasonable time; or d. Lexiuste Cajuste was tortured while in detention; or e. The detention of Lexiust Cajuste was incompatible with the principles of justice or with the dignity of the human person."); *see also id.* at 11 ("Acts 'under color of law' are done when a government official is purporting or pretending to act in the performance of official duty.  A government official acts 'under color of law' not only when he or she acts within the limits of lawful authority, but also when he or she acts without or beyond the bounds of lawful authority. . . .")

**Restatement (Third) of Foreign Relations Law, §702, comment h (1987)** ("Detention is arbitrary if it is not pursuant to law; it may be arbitrary also if "it is incompatible with the principles of justice or with the dignity of the human person." Statement of U.S. Delegation, 13 GAOR, U.N.Doc. A/C.3/SR.863 at 137 (1958). Detention is arbitrary if it is supported only by a general warrant, or is not accompanied by notice of charges; if the person detained is not given early opportunity to communicate with family or to consult counsel; or is not brought to trial within a reasonable time.")

***Doe v. Liu Qi***, 349 F. Supp. 2d 1258, 1325-26 (N.D.Cal. 2004) ("The Restatement further provides that detention is arbitrary if 'it is not accompanied by notice of charges; if the person detained is not given early opportunity to communicate with family or to consult counsel; or is not brought to trial within a reasonable time.' Restatement at § 702 cmt. h. . . . Second, the court should examine whether the detention was arbitrary in that it was 'incompatible with the principles of justice or with the dignity of the human person.' *Martinez*, 141 F.3d at 1384 (*quoting* the Restatement § 702 cmt. h).  In this regard, along with the factors referred to in the Restatement § 702 cmt. h (*e.g.* failure to notify detainee of charges, permit an early opportunity to communicate with family or consult with counsel), the conditions of confinement may be a factor. Where the detainee is subject to torture, courts have found the detention arbitrary. *See. e.g. Xuncax*, 886 F. Supp. at 169-70; *Paul v. Avril*, 901 F. Supp. 330, 335 (S.D. Fla. 1994). Even if the conduct is short of torture, at least one court has found that inhuman conditions beyond the 'run-of-the-mill due process violations,' such as when the conditions of confinement are 'horrendous by any contemporary standard of human decency,' support a finding of arbitrary detention. *Eastman Kodak Co.*, 978 F. Supp. at 1094 (detainee forced to share filthy cell with murderers, drug dealers and AIDS patients, and left without food, blanket or protection from inmates committing murder in his presence).")

***Mehinovic v. Vuckovic***, 198 F. Supp. 2d 1322, 1349 (N.D. Ga. 2002) ("Generally, detention is arbitrary if 'it is not pursuant to law; it may be arbitrary also if it is incompatible with the principles of justice or with the dignity of the human person.'  More specifically, arbitrary detention is the detention of a person in an official detention facility or in any other place, without notice of charges and failure to bring that person to trial within a reasonable time.")

*Eastman Kodak Co.v. Kavlin*, 978 F.Supp. 1078, 1093-94 (S.D.Fla. 1997) ("International law clearly forbids arbitrary detentions. . . . The Court . . . rejects the unsupported proposition that arbitrary detention only becomes cognizable under the ATCA when accompanied by torture. Furthermore, even assuming that some level of aggravation is required to distinguish cognizable arbitrary detentions from run-of-the-mill due process violations, plaintiff has alleged that his stay in the prison was horrendous by any contemporary standard of human decency. . . . If aggravation is required, plaintiff has pleaded it sufficiently. . . . Some courts referring to the tort

of arbitrary detention have included the adjective 'prolonged,' while others have omitted it. . . . Fortunately, the Court need not decide in the abstract whether 'prolonged' is an element required in an arbitrary detention claim. Even assuming that it is, the Court sees no reason why a prison stay of eight or ten days cannot be considered a 'prolonged' detention.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.6

Defendants' object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part I.B.5.)  There is no universal, specific and obligatory norm of customary international law for civil indirect liability for arbitrary arrest and detention.

The Supreme Court in *Sosa* dealt directly with a claim for arbitrary arrest and detention, and decided that the plaintiff had demonstrated "no norm of customary international law so well defined as to support the creation of a federal remedy".  *Sosa*, 542 U.S. at 738.  The Court found that any consensus concerning arbitrary arrest and detention as an international norm was "at a high level of generality" only.  *Id.* at 736 n.27.  Plaintiffs have not suggested a more specific or concrete definition of "arbitrary arrest and detention" than the definition rejected by the Supreme Court in *Sosa*.  Thus, arbitrary arrest and detention lacks the "definite content" of the 18th-century paradigms of piracy, offenses against ambassadors and violations of safe conduct

None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law.  There is no "definite" norm of customary international law that holds corporations liable for alleged acts of arbitrary arrest and detention committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Defendants object to plaintiffs' third element for this instruction (the listing of "condition" (a) through (e)).  This list is not from any source of international law, several "conditions" are vague (*e.g.*, "principles of justice or with the dignity of the person") and others are simply reiterations of other claims (*e.g.*, person was "tortured" while in detention).

Defendants object to plaintiffs' paragraph with the heading "Public Officials". This paragraph is prejudicial and false as it assumes that the Nigerian military was working with defendants.

Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections. (*See* Defs.' R&O Stmt. Part I.A, I.C.)

**Plaintiffs' Proposed Jury Instruction 2.7: Violations of the Rights to Life, Liberty and Security of the Person and Peaceful Assembly and Association**

Plaintiffs contend that Karalolo Kogbara, Michael Tema Vizor, Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo, Dr. Barinem Kiobel, Uebari N-nah, and Owens Wiwa suffered violations of the rights to life, liberty, security of the person, and peaceful assembly and expression; that is, that plaintiffs suffered abuses designed to prevent or punish peaceful community or political activities.

Plaintiffs contend that Karalolo Kogbara suffered this violation when she was shot deliberately by military personnel in the course of a peaceful protest, as part of a campaign to suppress community activities in opposition to the operations of Shell Nigeria, Royal Dutch Petroleum Co., and Shell Transport and Trading Co.

Plaintiffs contend that Michael Tema Vizor suffered these violations when he was arrested, detained and tortured by military personnel to prevent him from participating in activities in opposition to the operations of Shell Nigeria, Royal Dutch Petroleum Co., and Shell Transport and Trading Co.

Plaintiffs contend that Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo, and Dr. Barinem Kiobel suffered these violations when they were arrested, detained, tortured, and executed by military personnel to prevent them from participating in activities in opposition to the operations of Shell Nigeria, Royal Dutch Petroleum Co., and Shell Transport and Trading Co.

Plaintiffs contend that Uebari N-nah suffered this violation when he was shot and killed by military personnel as part of a campaign to suppress community opposition to the operations of Shell Nigeria, Royal Dutch Petroleum Co., and Shell Transport and Trading Co.

Plaintiffs contend that Owens Wiwa suffered these violations when he was arrested and detained arbitrarily and physically abused by military personnel as part of a campaign to suppress community opposition to the operations of Shell Nigeria, Royal Dutch Petroleum Co., and Shell Transport and Trading Co.

To establish this claim, each plaintiff must prove by a preponderance of the evidence:
1) That the individual suffered harassment, violence, terror, invasions of privacy, or other arbitrary invasions of the rights to life, liberty, and personal security;
2) That these acts were intended to deprive the individual of her right to peaceful assembly and expression; and
3) That these acts were committed by, or with the consent of, a public official or other person acting in an official capacity.

Public officials
In this context, members of the Nigerian military or military government, including those working with Shell, are considered public officials.

Relation to other rights and violations

The rights to life, liberty, and personal security encompasses the right not to be subjected to arbitrary detention, summary execution, torture, cruel, inhuman or degrading treatment, and other abusive treatment by governments.  In the context of peaceful assembly and expression, violations of these rights may include, among other things:

      a) The use of abusive or excessive force to disperse or suppress non-violent protests or demonstrations;

      b) Harassment, intimidation, arrest, and/or detention of individuals for their participation in political or social associations; or

      c) Invasion of the home and other private spaces.

The types of acts that constitute violations of the right to life, liberty, security of the person, and peaceful assembly and expression need not rise to the level of gravity that characterize claims for torture, arbitrary detention, and cruel, inhuman and degrading treatment. If they do not, plaintiffs still may bring a claim as long as the acts were meant to deprive an individual of his right to peaceful assembly and expression and were part of a consistent pattern of gross violations committed pursuant to a state policy.

Defendants' liability

If you find that members of the Nigerian military or military government committed violations of the rights to life, liberty, security of the person, and peaceful assembly and expression, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Sources:**

*Tachiona v. Mugabe*, 234 F. Supp. 2d 401 (S.D.N.Y. 2002)

    -"Hence, **a systematic campaign of terror and violence** conceived and arbitrarily waged by state agents arising not from any legitimate response to a demonstrable need related to the protection of public order, health or safety or other imperative governmental purpose, but rather hatched and calculated to suppress political opinion and expression, is neither provided by law, necessary to safeguard other vital rights or public purposes, nor proportionate to any justifiable state aims pursued. When accompanied by extreme deprivations of life and liberty and **unwarranted invasions of privacy** as the instruments employed to achieve these repressive ends, **the state's actions present unique dimensions that should qualify under a standard requiring a consistent pattern of gross violations of internationally recognized human rights**." *Id.* at 432

    -few would justify or defend by legally supportable reasons that, as a matter of domestic or international law, a sufficient mandate exists for a state, as a means of advancing valid public purposes, to engage in an **affirmative campaign of systematic harassment, egregious organized violence and terror, and arbitrary invasions of individual life, liberty and privacy specifically intended to deprive its people of freedoms of political thought, conscience, opinion and expression**. *Id.* at 433

    -But hypocrisy exposed and materialized in the power of the state committed to organized brutality and violence inflicted against its own people and specifically calculated to deny political freedoms of conscience, opinion  and expression the state itself ostensibly has conferred, may be a different matter. **For, when the state undertakes to give expression and force of law not to foster the protection of fundamental human rights it publicly proclaims, but rather to execute systematic denials of those freedoms, the action may**

**cross over the imprecise line and assume the added dimension of virulence necessary to transgress into the domain of what qualifies as a pattern of gross violations of universal norms**. *Id.* at 433-34.

Restatement (Third) of Foreign Relations, §702, cmt. (m):

-"*Consistent pattern of gross violations of human rights.* … A violation is gross if it is particularly shocking because of the importance of the right or the gravity of the violation. All the rights proclaimed in the Universal Declaration and protected by the principal International Covenants (see § 701, Reporters' Note 6) are internationally recognized human rights, but some rights are fundamental and intrinsic to human dignity. **Consistent patterns of violation of such rights as state policy may be deemed "gross" *ipso facto*. These include, for example, systematic harassment, invasions of the privacy of the home, arbitrary arrest and detention (even if not prolonged); denial of fair trial in criminal cases; grossly disproportionate punishment … denial of freedom of conscience and religion; … any state is liable under customary law for a consistent pattern of violations of any such right as state policy.**"

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 U.S. Dist. LEXIS 3293 (February 28, 2002):

-"In its general terms, **the right to life, liberty, and personal security encompasses the right not to be subjected to arbitrary detention, summary execution, and other abusive treatment by governments**." *Id.* at *33.

Violations of these rights may include, among other things:

a. The abusive or excessive force to disperse or suppress non-violent protests or demonstrations *Wiwa v. Royal Dutch Petroleum Co.*, 2002 U.S. Dist. LEXIS 3293 at *34 (February 28, 2002), citing Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, 8th U.N. Congress on the Prevention of Crime and the Treatment of Offenders, principles 9, 12-14, U.N. Doc. A/CONF. 144/28/Rev.1, at 112 (1990),

b. Harassment, intimidation, arrest, and/or detention of individuals for their participation in political or social associations *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 433 (S.D.N.Y. 2002), Restatement (Third) of Foreign Relations, §702, cmt. (m)

c. Invasion of the home and other private spaces Restatement (Third) of Foreign Relations, §702, cmt. (m)

Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, 8th U.N. Congress on the Prevention of Crime and the Treatment of Offenders, U.N. Doc. A/CONF. 144/28/Rev.1, at 112 (1990)

**d.** *Principle 9:* Law enforcement officials shall not use firearms against persons except in self defence or defence of others against the imminent threat of death or serious injury

e. *Principle 12:* **As everyone is allowed to participate in lawful and peaceful assemblies**, in accordance with the principles embodied in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, Governments and law enforcement agencies and officials shall recognize that force and firearms may be used only in accordance with principles 13 and 14.

f. *Principle 13:* **In the dispersal of assemblies that are unlawful but non-violent, law enforcement officials shall avoid the use of force or, where that is not practicable, shall restrict such force to the minimum extent necessary**.

g. *Principle 14:* **In the dispersal of violent assemblies, law enforcement officials may use firearms only when less dangerous means are not practicable and only to the**

**minimum extent necessary.** Law enforcement officials shall not use firearms in such cases, except under the conditions stipulated in principle 9.

22 U.S.C. §2151n (Development Assistance Authorizations section of the Foreign Assistance Act of 1961)

   h.(a) Violations barring assistance; assistance for needy people. No assistance may be provided under this part to the government of any country which engages in a **consistent pattern of gross violations of internationally recognized human rights**, including torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges, causing the disappearance of persons by the abduction and clandestine detention of those persons, or other flagrant denial of the right to life, liberty, and the security of person

22 U.S.C. §2304 (Military Assistance and Sales section of the Foreign Assistance Act of 1961)

   i.(a) Observance of human rights as principal goal of foreign policy; implementation requirements.

   2) Except under circumstances specified in this section, no security assistance may be provided to any country the government of which engages in a **consistent pattern of gross violations of internationally recognized human rights**.
   **\*\*\***
- (d) Definitions. For the purposes of this section----

   (1) **the term "gross violations of internationally recognized human rights" includes torture or**
   **cruel, inhuman, or degrading treatment or punishment, prolonged detention**
   **without charges and trial, causing the disappearance of persons by the abduction**
   **and clandestine detention of those persons, and other flagrant denial of the right to**
   **life, liberty, or the security of person**

22 U.S.C. §262d (International Financial Institutions Act of 1977)

   j.(a) Policy goals. The United States Government… shall advance the cause of human rights, including by seeking to channel assistance toward countries other than those whose governments engage in--

   (1) **a pattern of gross violations of internationally recognized human rights**, such as torture or cruel, inhumane, or degrading treatment or punishment, prolonged detention without charges, or other flagrant denial to life, liberty, and the security of person.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.7

Defendants' object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part I.B.6.)   There is no universal, specific and obligatory norm of customary international law for civil indirect liability for violations of the rights to life, liberty and security of person, and peaceful assembly and association.

In *Kiobel*, this Court granted the defendants' motion to dismiss plaintiffs' claim for violation of the rights to life, liberty, security, and association.  456 F. Supp. 2d at 467.  This Court held that "'[t]here is no particular or universal understanding of the civil and political rights' covered by Plaintiffs' claim, and thus, pursuant to *Sosa*, these 'rights' are not actionable under the ATS". *Id.*

Plaintiffs' claims are based on an amalgamation of civil and political rights and are not "sufficiently definite" under the standard set forth in *Sosa* to support a cause of action under the

ATS.  542 U.S. at 732.  This amalgamation of other rights and lack of definiteness of this claim is evidenced by plaintiffs' own instruction which states that violations of the rights to life, liberty and security of person, and peaceful assembly and association includes four of plaintiffs' other ATS claims:  arbitrary detention, summary execution, torture, and cruel, inhuman or degrading treatment.  Violationsof the rights to life, liberty and security of person, and peaceful assembly and association lacks the "definite content" of the 18th-century paradigms of piracy, offenses against ambassadors and violations of safe conduct.

None of plaintiffs' allegations against the defendants, the alleged "perpetrator[s] being sued", is captured by any norm of customary international law.  There is no "definite" norm of customary international law that holds corporations liable for alleged violations of the rights to life, liberty and security of person, and peaceful assembly and association committed by a foreign government based on the types of activities plaintiffs allege as to defendants.

Plaintiffs also rely on a host of incompetent sources, including the Basic Principles on the Use of Force, that are not "those sources [the Supreme Court has] long, albeit cautiously, recognized". *Sosa*, 542 U.S. at 733-34 (citing *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

Defendants object to plaintiffs' paragraph with the heading "Public Officials".  This paragraph is prejudicial and false as it assumes that the Nigerian military was working with defendants.

Defendants object to plaintiffs' last paragraph with the heading "Defendants' liability" for the reasons explained in Defendants' Statement of Reservations and Objections.  (*See* Defs.' R&O Stmt. Part I.A, I.C.)

**Plaintiffs' Proposed Jury Instruction No. 2.8: No Affirmative Defenses for International Law Violations; Political Views**

In your deliberations, you should not give any regard to the political views, beliefs, affiliations, or past actions of any parties, or any other person about whom you have heard testimony, as a basis to excuse extrajudicial execution; torture; cruel, inhuman or degrading treatment; crimes against humanity; arbitrary arrest or detention; and violations of the rights to life, liberty and security of the person and peaceful assembly and association. The prohibitions against these abuses are absolute.  Every person—no matter what his or her political views, beliefs, affiliations, or past actions—has the right to be free from these abuses. There are no circumstances that justify, necessitate, or excuse their commission.

**Sources**

*In re Estate of Marcos Human Rights Litigation*, No. MDL 840, Final Jury Instructions at 29 (D. Haw.), *aff'd*, 103 F.3d 767 (9th Cir. Dec. 17, 1996) ("In your deliberations, you should not give any regard to whether the plaintiffs in this case may have opposed the Philippine government or what their political views may have been.  Every person—even if they are in custody because they have been accused of violating the law—has the right to be free from being tortured by the government or military officials.  And every person—no matter what their political persuasion—has the right to be free from being tortured, summarily executed, or 'disappeared' or prolonged arbitrary detention by officials.")

***Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*** **Dec. 10, 1984, art. 2, G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984), 23 I.L.M. 1027 and 24 I.L.M 535 (ratified by the United States October 21, 1994)** ("No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political in stability or any other public emergency, may be invoked as a justification of torture.")

***International Covenant on Civil and Political Rights,*** **article 4, adopted Dec. 16, 1966, entered into force Mar. 23, 1976, G.A. Res. 2200, 21 U.N. GAOR Supp. (No.16), at 52, U.N. Doc. A/6316 (1966)** ("In time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations under the present Covenant to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with their other obligations under international law and do not involve discrimination solely on the ground of race, colour, sex, language, religion or social origin.")

***Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment,*** **Principle 6, G.A. Res. 43/173, 43 U.N. GAOR Supp.(No. 49), U.N. Doc. A/43/49, at 297 (1988)** ("No person under any form of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.* No circumstance whatever may be invoked as a justification for torture or other cruel, inhuman or degrading treatment or punishment.")

***American Convention on Human Rights,*** **article 5(2), signed Nov. 22, 1969, entered into**

force July 18,1978, O.A.S. T.S. No. 36, at 1, O.A.S. Doc. OEA/Ser. L/V/II.50,doe. 6 art 27 **(1980)** (""(1): In time of war, public danger, or other emergency that threatens the independence or security of a State Party, it may take measures derogating from its obligations under the present Convention to the extent and for the period of time strictly required by the exigencies of the situation, provided that such measures are not inconsistent with its other obligations under international law and do not involve discrimination on the ground of race, color, sex, language, religion, or social origin.  (2) .The foregoing provision does not authorize any suspension of the following articles: Article 3 (Right to Juridical Personality), Article 4 (Right to Life), Article 5 (Right to Humane Treatment), Article 6 (Freedom from Slavery), Article 9 (Freedom from Ex Post Facto Laws), Article 12 (Freedom of Conscience and Religion), Article 17 (Rights of the Family), Article 18 (Right to a Name), Article 19 (Rights of the Child), Article 20 (Right to Nationality), and Article 23 (Right to Participate in Government), or of the judicial guarantees essential for the protection of such rights.)")

***Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*** **article 2, adopted Dec. 9, 1975, G.A. Res. 3452, 30 U.N. GAOR Supp. (No. 34), at 91, U.N. Doc. A/1034 (1975)** ("Any act of torture or other cruel, inhuman or degrading treatment or punishment is an offence to human dignity and shall be condemned as a denial of the purposes of the Charter of the United Nations and as a violation of the human rights and fundamental freedoms proclaimed in the Universal Declaration of Human Rights.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 2.8

Plaintiffs' instruction is an inaccurate pronouncement of international law.  There is no source of international law that sets forth plaintiffs' proposition that all six of their ATS claims are "absolute".  Quite to the contrary, one of plaintiffs' own sources, the ICCPR, recognizes that states may derogate from their obligations under the ICCPR.  *International Covenant on Civil and Political Rights,* art. 4, adopted Dec. 16, 1966, entered into force Mar. 23, 1976, G.A. Res. 2200, 21 U.N. GAOR Supp. (No.16), at 52, U.N. Doc. A/6316 (1966).  The ICCPR states that states may derogate from their obligations to guarantee an individual's right to peaceful assembly and freedom of association.  In fact, almost all of plaintiffs' cited sources refer only to torture or other cruel, inhuman or degrading treatment, not all of plaintiffs' ATS claims.

Furthermore plaintiffs do not rely on "those sources [the Supreme Court has] long, albeit cautiously, recognized".  542 U.S. at 733-34 (citing *The Paquete Habana*, 175 U.S. 677, 700 (1900)).  In looking at such "sources", the Court of Appeals has made clear that courts should "look primarily to the formal lawmaking and official actions of States".  *Flores*, 414 F.3d at 250 (quoting *United States v. Yousef*, 327 F.3d 56, 103 (2d Cir. 2003)).  In *Sosa*, the Supreme Court expressly rejected the ICCPR as a potential source of customary international law enforceable under the ATS.  542 U.S. at 734-35.  And as this Court recognized in its 2006 decision in *Kiobel v. Royal Dutch Petroleum Co.*, "[t]he Court rejected . . . the International Covenant on Civil and Political Rights, stating [it has] 'little utility'".  456 F. Supp. 2d 457, 462 (S.D.N.Y. 2006) (quoting *Sosa*, 542 U.S. at 734-35).  The ICCPR has little utility because "the United States ratified the Covenant on the express understanding that it was not self-executing".  *Sosa*, 456 U.S. at 734-35.  Similarly, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") is not a competent source to establish the

existence of an international norm actionable under the ATS.  Although the Senate has ratified CAT, it did so subject to the express condition that many of CAT's provisions, including Article 16 (upon which this Court relied in its 2002 opinion with respect to plaintiffs' cruel, inhuman or degrading treatment claims) are *not* self-executing.  *See* 136 Cong. Rec. S17486-01 (1990); *Wiwa*, No. 96 Civ. 8386, U.S. Dist. LEXIS 3293, at *22.

Plaintiffs also rely on two U.N. documents that are "soft law", which is non-binding even in international courts.  *See* W. Michael Reisman, *The Supervisory Jurisdiction of the International Court of Justice*, 258 Recueil des Cours 9, 180 (1996) (defining soft law as "international law-making that is designed, in whole or part, not to be enforceable").

Finally, this Court has already held in *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 464-65, 467 (S.D.N.Y. 2006), that plaintiffs cannot make out a claim for summary execution or violations of the rights to life, liberty and security of person, and peaceful assembly and association, against defendants.

## 4.      INSTRUCTIONS FOR ELEMENTS OF STATE LAW CLAIMS

### Plaintiffs' Proposed Jury Instruction No. 4.1: Assault

Plaintiffs contend that members of the Nigerian military or military government committed assault against Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, John Kpiunen, and Karalolo Kogbara.  Plaintiffs must prove this claim by a preponderance of the evidence.

An assault is the intentional placing of another person in fear of imminent harmful or offensive contact. A person commits an assault when he intentionally causes the plaintiff to become concerned that the person is about to cause a harmful or offensive bodily contact. In order to commit an assault, the person must have the real or apparent ability to bring about that harmful or offensive bodily contact. Ordinarily, threatening words without some action are not enough to constitute an assault. There must be some menacing act or gesture that causes the plaintiff to believe that a harmful or offensive bodily contact is about to occur. It is not necessary that there be any contact.

Intent

Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result. Even if he has no desire to bring about the result, if he does the act knowing, with substantial certainty, that the result will follow, he is also said to have intended that result. You should presume that members of the Nigerian military or military government intended to accomplish the natural and probable consequences of their actions.

Defendants' liability

If you find that members of the Nigerian military or military government committed assault, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are liable under any one of the theories of liability presented in the case. Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are liable for assault against Ken Saro-Wiwa, Owens Wiwa, Karalolo Kogbara, Blessing Kpuinen, and John Kpuinen.  Plaintiffs additionally contend that Brian Anderson is liable for assault against Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, and John Kpuinen.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether this claim is controlled by Nigerian or New York law, and disagree whether the burden of proof is a preponderance of the evidence or beyond a reasonable doubt. Plaintiffs believe the parties agree that the elements of assault include the intentional placing of another person in fear of imminent harmful or offensive contact.  Additional disagreements are reflected in the objections.

**Sources**
**New York Pattern Jury Instructions--Civil 3:2 Intentional Torts—Interference with Person or Property—Assault (modified)**
("An assault is the intentional placing of another person in apprehension of imminent harmful or offensive contact. A defendant is liable for assault when (he, she) intentionally causes another

31

person to become concerned that the defendant is about to cause a harmful or offensive bodily contact. In order to commit an assault, the defendant must have the real or apparent ability to bring about that harmful or offensive bodily contact. Ordinarily, threatening words without some action are not enough to constitute an assault. There must be some menacing act or gesture that causes the plaintiff to believe that a harmful or offensive bodily contact is about to occur. It is not necessary that there be any contact.

Notice that I used the word "intentionally" in defining an assault. Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, (he, she) is said to have intended that result. Further, although (he, she) has no desire to bring about the result, if (he, she) does the act knowing, with substantial certainty, that the result will follow, (he, she) is also said to have intended that result.

The plaintiff claims that the defendant (*[describe act, such as:]* shook (his, her) fist in the plaintiff's face). The defendant denies that (he, she) did so. If you find that the defendant voluntarily (*[describe act:]* shook (his, her) fist in the plaintiff's face), and that the defendant intended by doing so to cause the plaintiff to become apprehensive that a (harmful, offensive) bodily contact was about to occur, and that the defendant had the real or apparent ability to carry out the threat, and that the plaintiff had such apprehension, you will find that the defendant committed an assault.

If you find that the defendant did not voluntarily (*[describe act:]* shake (his, her) fist in the plaintiff's face), or that although the defendant (*[describe act:]* shook (his, her) fist in the plaintiff's face), the defendant did not intend to cause the plaintiff to become apprehensive that a (harmful, offensive) bodily contact was about to occur, or that the defendant had neither the real nor apparent ability to carry out the threat, or that the plaintiff did not become apprehensive, you will find that the defendant did not commit an assault ")

**New York Pattern Jury Instructions—Civil 3:1 Intentional Torts—Intent Defined** ("Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, (he, she) is said to have intended that result. Further, although (he, she) has no desire to bring about the result, if (he, she) does the act knowing, with substantial certainty, that the result will follow, (he, she) is also said to have intended that result.

Here it is undisputed that the defendant voluntarily (*[state act, such as:]* stuck (his, her) foot in plaintiff's path) which resulted in (*[state claimed result, such as:]* plaintiff's tripping and falling). If you find that the defendant acted with the desire to bring about that result, or that the defendant knew with substantial certainty that such a result would follow, you will find that the defendant intended the result. If you find that the defendant did not desire to bring about that result and that defendant did not know with substantial certainty that such a result would follow, you will find that the defendant did not intend the result.")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.1**

       Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.A.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise

supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

   If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also* Restatement (Second) of Conflict of Laws § 145.

   Plaintiffs' instruction is incorrectly based on New York law.  Plaintiffs incorrectly contend that they must prove this claim only by a preponderance of the evidence, but under Nigerian law, this claim must be proven beyond a reasonable doubt.  *Okuarume v. Obabokor*, [1965] N.S.C.C. 286, 286-87; Nigerian Evidence Act (1990), Cap. 112, § 138(1).

**Plaintiffs' Proposed Jury Instruction No. 4.2: Battery**

Plaintiffs contend that Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, John Kpuinen, and Karalolo Kogbara suffered battery when members of the Nigerian military or military government used force in shooting, beating, or otherwise physically harming them.  Plaintiffs must prove this claim by a preponderance of the evidence.

A person who intentionally touches another person, without that person's consent, and causes an offensive bodily contact commits a battery and is liable for all damages resulting from his act. If you find that a member of the military so touched a plaintiff, you will find that that plaintiff suffered a battery.

Intent
Intent involves the state of mind with which an act is done. The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive. An offensive bodily contact is one that is done for the purpose of harming another or one that offends a reasonable sense of personal dignity, or one that is otherwise wrongful.

If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result. Even if he has no desire to bring about the result, if he does the act knowing, with substantial certainty, that the result will follow, he is also said to have intended that result. You should presume that members of the Nigerian military or military government intended to accomplish the natural and probable consequences of their actions.

Defendants' liability
If you find that members of the Nigerian military or military government committed battery, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case. Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are liable for battery against Ken Saro-Wiwa, Owens Wiwa, Karalolo Kogbara, Blessing Kpuinen, and John Kpuinen.  Plaintiffs additionally contend that Brian Anderson is liable for battery against Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, and John Kpuinen.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether this claim is controlled by Nigerian or New York law, and disagree whether the burden of proof is a preponderance of the evidence or beyond a reasonable doubt. Plaintiffs believe the parties agree that the elements of battery include physical contact without the plaintiff's consent.  The parties disagree whether the physical contact must be unlawful. Additional disagreements are reflected in the objections.

**Sources**
**New York Pattern Jury Instructions—Civil 3:3 Intentional Torts—Interference with Person or Property—Battery—Generally** ("In this action, plaintiff AB seeks damages for battery. A person who intentionally touches another person, without that person's consent, and causes an offensive bodily contact commits a battery and is liable for all damages resulting from

(his, her) act.

Intent involves the state of mind with which an act is done. The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive. An offensive bodily contact is one that is done for the purpose of harming another or one that offends a reasonable sense of personal dignity, or one that is otherwise wrongful.

Plaintiff AB claims that defendant CD (*[describe act, such as:—]* shoved AB causing AB to sustain injuries). CD admits that (he, she) shoved AB but says that (he, she) did not do so intentionally.

If you find that CD intentionally (*[describe act, such as:—]* shoved AB) and that contact was offensive, you will find that CD committed a battery. If you find that CD did not intentionally (*[describe act, such as:—]* shove AB) or that, although (he, she) did (*[repeat alleged act, such as:—]* shove AB), that such contact was not offensive, you will find that CD did not commit a battery.")

**New York Pattern Jury Instructions—Civil 3:1 Intentional Torts—Intent Defined** ("Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, (he, she) is said to have intended that result. Further, although (he, she) has no desire to bring about the result, if (he, she) does the act knowing, with substantial certainty, that the result will follow, (he, she) is also said to have intended that result.  Here it is undisputed that the defendant voluntarily (*[state act, such as:]* stuck (his, her) foot in plaintiff's path) which resulted in (*[state claimed result, such as:]* plaintiff's tripping and falling). If you find that the defendant acted with the desire to bring about that result, or that the defendant knew with substantial certainty that such a result would follow, you will find that the defendant intended the result. If you find that the defendant did not desire to bring about that result and that defendant did not know with substantial certainty that such a result would follow, you will find that the defendant did not intend the result.")

*See also* Nigerian Criminal Code Act § 298 ("Any person authorised by law to use force is criminally responsible for any excess, according to the nature and quality of the act which constitutes the excess.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.2

Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.A.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993);

*see also* Restatement (Second) of Conflict of Laws § 145.

Plaintiffs' instruction is incorrectly based on New York law. Plaintiffs incorrectly contend that they must prove this claim only by a preponderance of the evidence, but under Nigerian law, this claim must be proven beyond a reasonable doubt. *Okuarume v. Obabokor*, [1965] N.S.C.C. 286, 286-87; Nigerian Evidence Act (1990), Cap. 112, § 138(1).

**Plaintiffs' Proposed Jury Instruction No. 4.3: Negligence of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria or Brian Anderson in calling in/assisting the military or bribing witnesses.**

Plaintiffs contend that Ken Wiwa, Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, John Kpuinen, and Karalolo Kogbara were harmed by the negligence of Royal Dutch Petroleum Co. and Shell Transport and Trading Co., and/or by the negligence of Shell Nigeria. Plaintiffs contend that Ken Wiwa, Ken Saro-Wiwa, Owens Wiwa, Blessing Kpuinen, John Kpuinen, Michael Tema Vizor, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, Daniel Gbokoo, and David Kiobel were harmed by the negligence of Brian Anderson. Plaintiffs must prove this claim by a preponderance of the evidence.

Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria, and/or Brian Anderson is responsible for negligence if:
>    1) That corporation or individual failed to use the degree of care that a reasonably prudent person would have used under the same circumstances;
>    2) The risk of injury to the plaintiff from that corporation or individual's negligent act or omission was reasonably foreseeable; and
>    3) That person's negligent act or omission caused the injury to the plaintiff.

Reasonable care
Negligence is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances. Negligence may arise from doing an act that a reasonably prudent person would not have done under the same circumstances, or, on the other hand, from failing to do an act that a reasonably prudent person would have done under the same circumstances. You must decide how a reasonably careful person in the situation of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and Brian Anderson would have acted.

Foreseeable injury
Negligence requires both a reasonably foreseeable danger of injury to another and conduct that is unreasonable in proportion to that danger. A person is only responsible for the results of his or her conduct if the risk of injury is reasonably foreseeable. The exact occurrence or exact injury does not have to be foreseeable; but the likelihood of some injury as a result of negligent conduct must be greater than the likelihood of no injury. There is negligence if a reasonably prudent person could foresee injury as a result of his or her conduct, and acted unreasonably in the light of what could be foreseen.

Thus, you may determine that Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and/or Brian Anderson are responsible for negligence, even though the acts directly causing injury to the plaintiffs were committed by members of the Nigerian military or military government, if you find that a reasonably prudent person in Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and/or Brian Anderson's situation would have foreseen that an act of the kind committed by members of the Nigerian military or military government would be a probable result of their negligence.

Causation

An act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury. There may be more than one cause of an injury, but to be substantial, it cannot be slight or trivial. You may, however, decide that a cause is substantial even if you assign a relatively small percentage to it. A person's negligence may combine with another factor, including another person's actions, to cause harm. A person or entity cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the harm.

Plaintiffs' contentions

Plaintiffs contend that they were harmed by the negligence of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and Brian Anderson, and that each defendant is responsible for Shell Nigeria's negligence. Among other things, Plaintiffs allege that the defendants are liable for Shell Nigeria's calling in, or providing assistance to the military during the relevant incidents and participation in the bribery of witnesses before the Special Tribunal. They also allege that the Defendants were negligent for their role in the detention, abuse, conviction and execution of plaintiffs Ken Saro-Wiwa, John Kpuinen, Felix Nuate, Daniel Gbokoo, Saturday Doobee and Dr. Barinem Kiobel, as well as the detention and abuse of Michael Tema Vizor.

Plaintiffs contend that Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and/or Brian Anderson knew or should have known that the military would injure persons, based on knowledge about prior violent actions of the Nigerian military, and that this was what made them negligent. A person or entity that unreasonably creates a risk that another person may harm the plaintiff is responsible for negligence regardless of whether the act of causing the plaintiff harm is innocent, negligent, intentionally harmful or criminal.

Defendants' liability

If you find that the negligence of Royal Dutch Petroleum Co., Shell Transport and Trading Co., or Brian Anderson was a substantial factor in causing a plaintiff's harm, then they are liable for the harm.

Moreover, if you find that Shell Nigeria or Brian Anderson is responsible for negligence, you will have to decide whether Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for that negligence under any one of the theories of liability presented in the case.

**Sources**

**New York Pattern Jury Instructions--Civil 2:10 Common Law Standard of Care—Negligence Defined—Generally** ("Negligence is lack of ordinary care. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances. Negligence may arise from doing an act that a reasonably prudent person would not have done under the same circumstances, or, on the other hand, from failing to do an act that a reasonably prudent person would have done under the same circumstances.")

**N.Y. Pattern Jury Instr.--Civil 2:12 Common Law Standard of Care-Foreseeability-Generally** ("Negligence requires both a reasonably foreseeable danger of injury to another and

conduct that is unreasonable in proportion to that danger. A person is only responsible for the results of his or her conduct if the risk of injury is reasonably foreseeable. The exact occurrence or exact injury does not have to be foreseeable; but injury as a result of negligent conduct must be not merely possible, but be probable.  There is negligence if a reasonably prudent person could foresee injury as a result of his or her conduct, and acted unreasonably in the light of what could be foreseen. On the other hand, there is no negligence if a reasonably prudent person could not have foreseen any injury as a result of his or her conduct, or acted reasonably in the light of what could have been foreseen.")

**N.Y. Pattern Jury Instr.--Civil 2:70 Proximate Cause-In General**  ("An act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury. … There may be more than one cause of an injury, but to be substantial, it cannot be slight or trivial. You may, however, decide that a cause is substantial even if you assign a relatively small percentage to it.")

**N.Y. Pattern Jury Instr.--Civil 2:72 Proximate Cause-Intervening Causes** ("The defendant claims that (he, she) is not responsible for the plaintiff's injuries because the injuries were caused by (AB, a third person). If you find that the defendant was negligent but that the plaintiff's injuries were caused by the act of (AB) you may still find the defendant responsible for the plaintiff's injuries, if you also find that a reasonably prudent person in the defendant's situation, before the defendant allegedly committed (his, her) act of negligence, would have foreseen that an act of the kind committed by (AB) would be a probable result of the defendant's negligence. If you find that a reasonably prudent person would not have foreseen an act of the kind committed by (AB) as a probable consequence of the defendant's negligence, then the defendant is not responsible for the plaintiff's injuries and plaintiff may not recover.")

**<u>DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.3</u>**

Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.A.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also* Restatement (Second) of Conflict of Laws § 145.  Plaintiffs' instruction is incorrectly based on New York law.

**Plaintiffs' Proposed Jury Instruction No. 4.4: Negligence of Shell Nigeria in hiring, supervising, and training members of the Nigerian military or military government.**

In addition to the negligence claims described above, Owens Wiwa and Karalolo Kogbara bring claims of negligence based on their contention that they were harmed by Shell Nigeria in hiring and failing to adequately supervise and train members of the Nigerian military or military government they hired, including but not limited to Major or Colonel Paul Okuntimo. Plaintiffs must prove this claim by a preponderance of the evidence.

An entity that hires another person or entity is liable to a third person who is injured as a result of the employee's conduct if it is shown that the person who hired the employee was negligent in selecting a careless or incompetent person with whom to contract.

Employer's negligence
An employer has a duty to use reasonable care in the employment, training and supervision of its employees to find out whether they are competent to do their work without danger of harm to others. If it does not, it is liable for the acts of the employee, even if such acts are outside the scope of his employment.

Reasonable care means that degree of care that a reasonably prudent employer would use under the same circumstances. This duty of reasonable care has two aspects. First, an employer fails in this duty where it knows that an employee is incompetent, has vicious propensities, or a bad disposition, and the employer fails to use reasonable care to correct or remove the employee. Second, an employer also fails in the duty of reasonable care when it knows of facts that would lead a reasonably prudent person to conduct an investigation which could have uncovered the information about the employee and fails to do so.

Extent of employer's liability
When the employer fails in its duty, it is liable for harm that results provided a reasonably prudent person would have foreseen the likelihood of injury to others by that employee. The employer is liable for any harm to other persons resulting from its employee's vicious or mean act, even though the employee was not at the time acting within the scope of his authority.

Defendants' liability
If you find that Shell Nigeria is responsible for negligence in hiring, supervising and training members of the Nigerian military or military government, you will have to decide whether Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for that negligence under any one of the theories of liability presented in the case.

**Sources**
N.Y. Pattern Jury Instr.--Civil 2:240 Derivative Responsibility-Negligent Hiring or Retention of Employee ("While generally an employer is not responsible for acts of an employee that are outside the scope of (his, her) employment, it has a duty to use reasonable care in the employment, training and supervision of its employees to find out whether they are competent to do their work without danger of harm to others. This duty of reasonable care has two aspects. An employer fails in this duty where it knows that an employee (is incompetent, has vicious

propensities, has a bad disposition, is given to horseplay) and the employer fails to use reasonable care to correct or remove the employee. An employer also fails in the duty of reasonable care when it knows of facts that would lead a reasonably prudent person to conduct an investigation which could have uncovered the information about the employee and fails to do so.

When the employer fails in its duty, it is liable for harm that results provided a reasonably prudent person would have foreseen the likelihood of injury to others by that employee. The employer is liable for any harm to other persons resulting from its employee's (incompetent, vicious, mean, horseplay) act, even though the employee was not at the time acting within the scope of (his, her) authority. By reasonable care is meant that degree of care that a reasonably prudent employer would use under the same circumstances.

If you find: (1) that defendant's employee AB was (incompetent, of vicious propensities, of bad disposition, given to horseplay) and (2) that defendant had knowledge of that fact or facts which cause a reasonably prudent person to investigate the employee's (capacity, disposition), and (3) that defendant could reasonably have anticipated that AB's (incompetence, disposition) would be likely to result in injury to others, and (4) that defendant failed to use reasonable care to correct or remove AB, you will find that defendant was at fault. If, however, you find that AB was not (incompetent, vicious, of bad disposition, given to horseplay), or that though (he, she) was, that defendant did not know that fact or of facts that would cause a reasonably prudent person to investigate the employee's (capacity, disposition), or that a reasonably prudent person would not foresee that AB's (incompetence, viciousness, bad disposition, horseplay) would cause injury to others, you will find that defendant was not at fault.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.4

Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.A.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also* Restatement (Second) of Conflict of Laws § 145.  Plaintiffs' instruction is incorrectly based on New York law.

Defendants further object to this instruction as being misleading and prejudicial because the defendants were not the employers of the Nigerian military, and the military were not employees of defendants.

**Plaintiffs' Proposed Jury Instruction No. 4.5: Knowledge**

In the law, "knowledge" includes both actual knowledge and possessing the means to acquire knowledge.  This is often indicated by referring to whether a person "knew or should have known" some fact.  So, if it appears from the evidence that a person or entity had information about a fact that would lead a reasonably prudent person in its position and with its resources to make inquiries through which it would surely learn certain facts, then it may be found to have had knowledge of those facts, the same as if it made such inquiries and had actually learned such facts. That is to say, the law will charge a person with knowledge of whatever he would have learned upon making a reasonably diligent inquiry.  A person cannot avoid being charged with knowledge of a fact simply by failing to make a reasonably diligent inquiry.

Knowledge or notice may also be established by circumstantial evidence. Since we cannot look into a person's mind to find what that person knows or does not know, you may rely on evidence of what a person says or what the person does or does not do in light of all of the surrounding circumstances to determine a person's knowledge.

**Sources**

*In re Marcos Human Rights Litigation*, No. MDL 840, Final Jury Instructions at 15 (D. Haw.), *aff'd*, 103 F.3d 767 (9th Cir. Dec. 17, 1996) ("The means of knowledge are ordinarily equivalent in law to knowledge.  So, if it appears from the evidence in the case that [defendant] had information . . . which would lead a reasonably prudent person in his position and with his resources . . . to make inquiry through which he would surely learn certain facts, then he may be found to have had actual knowledge of those facts, the same as if he made such inquiry and had actually learned such facts.  That is to say, the law will charge a person with notice and knowledge of whatever he would have learned, upon making such inquiry as it would have been reasonable with this information available to expect him to make under the circumstances. . . . Knowledge or notice may also be established by circumstantial evidence. Since we cannot look into the operation of a human mind to find what a person knows or does not know you may rely on circumstantial evidence of what a person says or what the person does or does not do in light of all the surrounding circumstances to determine a person's knowledge of what is going on about that person in the actions taken.")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.5**

        Defendants object to this instruction because it is based on a modified Ninth Circuit jury instruction.  Furthermore, it is unclear why plaintiffs have included this instruction in their state law claims when it was taken from instructions with respect to international law claims.  Plaintiffs contend that New York law should apply to their state law claims.  However, this instruction is not based on New York law.

**Plaintiffs' Proposed Jury Instruction No. 4.6: Intentional Infliction of Emotional Distress—Shell Nigeria, Brian Anderson and members of the Nigerian military or military government**

Plaintiffs contend that Ken Saro-Wiwa, John Kpuinen, Owens Wiwa, Karalolo Kogbara and Blessing Kpiunen suffered intentional infliction of emotional distress.  Plaintiffs contend that members of  the military committed intentional infliction of emotional distress when they injured Ken Saro-Wiwa, John Kpuinen, Owens Wiwa, Karalolo Kogbara and Blessing Kpiunen, and that Shell Nigeria committed intentional infliction of emotional distress by helping members of the Nigerian military or military government to commit violence against these individuals and by bribing witnesses at the Special Tribunal. Plaintiffs must prove this claim by a preponderance of the evidence.

Plaintiffs also contend that Brian Anderson and Shell Nigeria committed intentional infliction of emotional distress against Owens Wiwa by offering to trade Ken Saro-Wiwa's freedom for an end to the international protests against Shell.

A person or entity who either intentionally and for the purpose of causing severe emotional distress or recklessly conducts himself or itself toward another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency is liable to such person for any resulting severe emotional distress.

If you find, first, that Shell Nigeria, Brian Anderson or members of the Nigerian military or military government's conduct toward a plaintiff was so outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average person would tolerate and, second, that such conduct caused severe emotional distress to plaintiff and, third, that Shell Nigeria or Brian Anderson either acted with the desire to cause such distress to plaintiff, acted under circumstances known to them which made it substantially certain that that result would follow, or acted recklessly and with utter disregard of the consequences that might follow; your finding on this issue will be for plaintiff.

Intent
Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result. Further, although he has no desire to bring about the result, if he does the act knowing, with substantial certainty, that the result will follow, he is also said to have intended that result. An act is reckless when it is done in such a manner and under such circumstances as to show utter disregard of the consequences that may follow.

Severe emotional distress
Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it.

Defendants' liability
If you find that Brian Anderson committed intentional infliction of emotional distress, then he is liable for that act, and you will also have to decide whether Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for his wrongdoing under any one of the

theories of liability presented in the case.

If you find that Shell Nigeria or members of the Nigerian military or military government committed intentional infliction of emotional distress, you will have to decide whether Brian Anderson, Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible under any one of the theories of liability presented in the case.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether this claim is controlled by Nigerian or New York law.   The parties additionally disagree whether, if the claim is controlled by Nigerian law, any such claim is cognizable under Nigerian law.  Plaintiffs believe the parties agree that the elements of this claim include that the perpetrator either intended to cause severe emotional distress to an individual, or acted with reckless disregard toward another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency.   Plaintiffs believe the parties further agree that "severe emotional distress" is of a character that no reasonable person should be expected to endure it.  Additional disagreements are reflected in the objections.

**Sources**

N.Y. Pattern Jury Instr. 3:6 Intentional Torts—Interference with Person or Property— Outrageous Conduct Causing Emotional Distress ("One who (intentionally and for the purpose of causing severe emotional distress, recklessly) conducts (himself, herself) toward another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency is liable to such person for any resulting severe emotional distress. (*[To charge "intent", use the first four sentences; to charge "recklessness", use the fifth sentence; to charge both, use the entire paragraph.]* Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, (he, she) is said to have intended that result. Further, although (he, she) has no desire to bring about the result, if (he, she) does the act knowing, with substantial certainty, that the result will follow, (he, she) is also said to have intended that result. An act is reckless when it is done in such a manner and under such circumstances as to show utter disregard of the consequences that may follow.)  Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it.  If you find, first, that defendant's conduct toward plaintiff was so outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average member of the community would tolerate and, second, that defendant's conduct caused severe emotional distress to plaintiff and, third, that defendant acted (*[select as appropriate]* with the desire to cause such distress to plaintiff; under circumstances known to defendant which made it substantially certain that that result would follow; recklessly and with utter disregard of the consequences that might follow) your finding on this issue will be for plaintiff.  If, on the other hand, you find, first, that defendant's conduct was not so outrageous and shocking as to exceed all reasonable bounds of decency as measured by what the average member of the community would tolerate or, second, that although it was, defendant's conduct did not cause severe emotional distress to plaintiff or, third, that although defendant's conduct was outrageous and shocking and did cause severe emotional distress to plaintiff, defendant did not act (*[select as appropriate]* with the desire to cause such distress to plaintiff; nor under circumstances known to defendant which made it substantially certain that that result would follow; recklessly and with utter disregard of the consequences that might follow) your finding

on this issue will be for the defendant.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.6

Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.B.2.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also* Restatement (Second) of Conflict of Laws § 145.  Plaintiffs' instruction is incorrectly based on New York law.

Under Nigerian law, there is no cause of action for intentional infliction of emotional distress.  *See Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455761, at *8 (N.D. Cal. Aug. 22, 2006) (finding that Nigerian law does not recognize intentional infliction of emotional distress).  Thus, this Court should not give the jury an instruction related to this claim.

**Plaintiffs' Proposed Jury Instruction No. 4.7: Negligent infliction of emotional distress**

Plaintiffs contend that Ken Wiwa, Ken Saro-Wiwa, John Kpuinen, Owens Wiwa, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, and Daniel Gbokoo suffered negligent infliction of emotional distress.  Plaintiffs must prove this claim by a preponderance of the evidence.

A person may be liable for negligently causing severe emotional distress to a plaintiff, even though the plaintiff suffers no bodily injury, under several circumstances:

(a)      If the person's negligence toward the plaintiff directly causes severe emotional distress, such that the severe emotional distress results directly from the person's conduct toward plaintiff, rather than from the injury or death of any other person; or

(b)      If the person's negligence toward the plaintiff either endangers the plaintiff's physical safety or causes the plaintiff fear for his or her own physical safety, and severe emotional distress results; or

(c)      If the person causes severe injury or death to a member of plaintiff's immediate family (a parent, child, spouse, or sibling), and the plaintiff observes the injury or death, and the person's conduct negligently exposes the plaintiff to unreasonable risk of bodily injury or death, and severe emotional distress results.  The emotional distress need not result from fear for the plaintiff's own safety.

Negligence

Negligence is failure to exercise ordinary care. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances. Negligence may arise from doing an act that a reasonably prudent person would not have done under the same circumstances, or, on the other hand, from failing to do an act that a reasonably prudent person would have done under the same circumstances.

Severe emotional distress

Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it.

Defendants' liability

If you find that Brian Anderson committed negligent infliction of emotional distress, then he is liable for that act, and you will also have to decide whether one or more of the corporate defendants are responsible under any one of the theories of liability presented in the case. Plaintiffs contend that Brian Anderson is liable for negligent infliction of emotional distress against Ken Wiwa, Ken Saro-Wiwa, John Kpuinen, Owens Wiwa, Lucky Doobee, Saturday Doobee, Friday Nuate, Felix Nuate, Monday Gbokoo, and Daniel Gbokoo.

If you find that Shell Nigeria committed negligent infliction of emotional distress, you will have to decide whether either Brian Anderson or one or more of the corporate defendants are responsible under any one of the theories of liability presented in the case.  Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are liable for negligent infliction of emotional distress against Ken Wiwa, Ken Saro-Wiwa, Blessing Kpuinen, John Kpuinen, Owens Wiwa, and Karalolo Kogbara.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether this claim is controlled by Nigerian or New York law.  The parties additionally disagree whether, if the claim is controlled by Nigerian law, any such claim is cognizable under Nigerian law.  The parties agree that one circumstance in which such a claim may arise is if a person causes severe injury or death to a member of plaintiff's immediate family, and the plaintiff suffered emotional injury from witnessing the death or bodily injury of a member of their immediate family.  The parties additionally agree as to what constitutes severe emotional distress.   Additional disagreements are reflected in the objections.

**Sources**

[note: New York has no pattern instruction for liability for negligent infliction of emotional distress]

New York Pattern Jury Instructions--Civil 3:6 ("Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it.")

New York Pattern Jury Instructions--Civil 2:10 ("Negligence is lack of ordinary care. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances. Negligence may arise from doing an act that a reasonably prudent person would not have done under the same circumstances, or, on the other hand, from failing to do an act that a reasonably prudent person would have done under the same circumstances.")

*Martinez v. Long Island Jewish Hillside Medical Center*, 70 N.Y.2d 697, 699 (1987) (where the plaintiff's "mental anguish and depression are the direct result of defendants' breach of a duty owed directly to her," and not from "observing or learning of injury or death to a third person," plaintiff may recover; "where there is a breach of a duty owed by defendant to plaintiff, the breach of that duty resulting directly in emotional harm is actionable")

*Sheppard-Mobley v. King*, 4 N.Y.3d 627, 637-38 (2005) (recovery for negligent infliction of emotional distress may be allowed where "as a result of defendants' breach of their duties owed directly to" a plaintiff, the plaintiff "suffered mental anguish resulting from an independent injury")

61 NY Jur. Fright, Shock, and Mental Disturbance § 11 ("There may be a right of action for the negligent infliction of physical or mental injury, even though such injury was caused by fright negligently induced without any physical contact.  While physical injury is not a necessary element of a cause of action to recover damages for negligent infliction of emotional distress, such cause of action must generally be premised upon a breach of a duty owed directly to the plaintiff which either unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her own safety.")

*Brown v. New York City Health & Hosps. Corp.*, 225 A.D.2d 36, 44 (1996) ("Where a duty is owed, the breach of that duty resulting directly in emotional harm is compensable, and physical injury is no longer a necessary component of a cause of action to recover damages for the negligent infliction of emotional distress," if the breach of a duty owed toward plaintiff "''either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical

safety"'"")

61 NY Jur. Fright, Shock & Mental Disturbance § 12 ("A plaintiff may recover damages for injuries suffered in consequence of shock or fright resulting from the contemporaneous observation of serious physical injury or death of a member of his or her immediate family, where the defendant's conduct negligently exposes the plaintiff to unreasonable risk of bodily injury or death, and is also a substantial factor bringing about injury or death of plaintiff's immediate family member.")

*Hass v. Manhattan & Bronx Surface Transit Operating Auth.*, 204 A.D.2d 208, 208-09 (1994) ("[A] defendant is subject to liability for a plaintiff's immediate emotional distress from viewing bodily harm to an immediate family member where the defendant's negligent conduct also threatens bodily harm to the plaintiff.  This rule applies even when the plaintiff's shock or fright is not due to any fear for her own safety but for fear for the safety of spouse or child.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 4.7

Defendants object to this instruction because this Court does not have subject matter jurisdiction over this claim.  (*See* Defs.' R&O Stmt. Part II.B.3.)  Because this Court does not have subject matter jurisdiction over plaintiffs' ATS claims, it may not exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

If this Court, however, were to recognize plaintiffs' state law claims, they must be governed by Nigerian law.  Under a New York choice of law analysis, Nigerian law provides the applicable substantive law for plaintiffs' state law claims because (1) the alleged injuries occurred in Nigeria, (2) the alleged conduct that caused the alleged injuries occurred in Nigeria, (3) the plaintiffs are Nigerian citizens, and (4) Nigeria has the most significant relationship to plaintiffs and the alleged injuries.  *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also* Restatement (Second) of Conflict of Laws § 145.  Plaintiffs' instruction is incorrectly based on New York law.

Under Nigerian law, there is no cause of action for negligent infliction of emotional distress.  *See Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455761, at *8 (N.D. Cal. Aug. 22, 2006) (finding that Nigerian law does not recognize intentional infliction of emotional distress).  Thus, this Court should not give the jury an instruction related to this claim.

Even under New York law, plaintiffs' instruction is improper.  Under New York law, a plaintiff may establish a claim for negligent infliction of emotional distress in one of two ways:  (1) the "bystander" theory; or (2) the "direct duty theory".  Plaintiffs' instruction does not accurately reflect New York law.

**Plaintiffs' Proposed Jury Instruction No. 4.8: Wrongful death**

Plaintiffs contend that defendants are liable for the wrongful death of Ken Saro-Wiwa and John Kpuinen.

If you find any defendant liable for any wrongful act or neglect, such as assault, battery, or negligence, and that wrongful act or neglect caused the death of Ken Saro-Wiwa or John Kpuinen, that defendant is liable for wrongful death.

**Sources**
[note: New York has no pattern instruction for liability for wrongful death]

NY CLS EPTL § 5-4.1 ("The personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.")

## 6.    INSTRUCTIONS FOR ROYAL DUTCH PETROLEUM CO. AND/OR SHELL TRANSPORT AND TRADING CO., SHELL NIGERIA AND BRIAN ANDERSON'S RESPONSIBILITY FOR GSF'S CONDUCT

**Plaintiffs' Proposed Jury Instruction No. 6.1: Overview of Responsibility of Defendants and Shell Nigeria for the military**

You have been asked to consider a number of claims regarding the acts of members of the Nigerian military or military government and military government.  You must consider the relationships between these actors.  Plaintiffs seek to hold defendants liable under various theories of liability. A theory of liability explains why one individual or corporation is legally responsible for the actions of another individual or corporation. Each theory is separate. You only need to find in plaintiffs' favor on one theory to hold a person or entity fully responsible for the conduct of another.  If you find against plaintiffs on any one such theory, such a finding does not affect any other theory.  You must still individually consider plaintiffs' other theories of liability.

A.    LIABILITY OF ROYAL DUTCH PETROLEUM CO. AND/OR SHELL TRANSPORT AND TRADING CO.

    i.    Negligence and intentional infliction of emotional distress by Shell Nigeria.

Plaintiffs contend that Shell Nigeria committed negligence or intentional infliction of emotional distress that harmed plaintiffs.

If you find that Shell Nigeria was negligent and/or intentionally inflicted emotional distress on plaintiffs, you must then decide whether the corporate defendants are responsible for Shell Nigeria's conduct on the basis of:

    a.  agency,
    b.  ratification,
    c.  aiding and abetting, or
    d.  conspiracy,

If you find that plaintiffs have shown one of these theories, then these defendants are liable for damages for Shell Nigeria's negligence or intentional infliction of emotional distress.

    ii.  Wrongs by members of the Nigerian military or military government.

If you find that members of the Nigerian military or military government committed any wrong that harmed plaintiffs, such as torture, cruel, inhuman, or degrading treatment, wrongful death, assault, battery, intentional infliction of emotional distress, or negligence, then you must determine whether defendants are liable for that harm.

Plaintiffs contend that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of the military because:

    a.  one or both conspired with members of the Nigerian military or military government; or

    b.  one or both are responsible for Shell Nigeria's and/or Shell Nigeria's officers' conduct, and Shell Nigeria and/or Shell Nigeria's officers are responsible for the conduct of members of the Nigerian military or military government.

As to b., Plaintiffs' theories of liability for holding Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. responsible for Shell Nigeria's and/or Shell Nigeria's officers are discussed below, following this section.

Plaintiffs contend that Shell Nigeria and/or its officers are responsible for the conduct of members of the Nigerian military or military government under one or more of the following theories of liability:

1) members of the Nigerian military or military government were Shell Nigeria's **agents**;
2) Shell Nigeria **ratified** the conduct of the military;
3) Shell Nigeria and/or its officers **aided and abetted** members of the Nigerian military or military government;
4) Shell Nigeria and/or its officers **conspired** with the military;
5) Shell Nigeria **engaged in a joint venture** with the Nigerian government;
6) Shell Nigeria **engaged in a joint enterprise** with members of the Nigerian military or military government;
7) Shell Nigeria and/or its officers **instigated or induced wrongful acts** of members of the Nigerian military or military government;
8) Shell Nigeria hired members of the Nigerian military or military government to do work that involved **inherent danger** to others; or
9) Shell Nigeria and/or its officers had **reckless disregard** regarding the actions of the military.

If you find for the plaintiffs on any one of these theories of liability, this is sufficient to find Shell Nigeria responsible for the conduct of the military, and you must separately determine whether Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are liable for Shell Nigeria's conduct under the theories of liability discussed below.

### B.  LIABILITY OF BRIAN ANDERSON

i.  Negligence and intentional infliction of emotional distress by Mr. Anderson.

Plaintiffs contend that Mr. Anderson committed negligence or intentional infliction of emotional distress that harmed plaintiffs. If you find that to be the case, he is liable for that conduct.  If you also find that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for Anderson's conduct on the basis of **agency**, **ratification**, **aiding and abetting**, or **conspiracy**, then these defendants are liable for Anderson's negligence or intentional infliction

of emotional distress.

ii. Wrongs by members of the Nigerian military or military government.

Plaintiffs contend that Mr. Anderson is liable for the treatment and/or execution of Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo and Barinem Kiobel, Michael Vizor and Owens Wiwa under one or more of the following theories of liability:

> a. Anderson **aided and abetted** members of the Nigerian military or military government;
> b. Anderson **conspired** with members of the Nigerian military or military government to commit wrongful acts;
> c. Anderson **instigated or induced** the military; or
> d. **reckless disregard**.

If you find for the plaintiffs on any one of these theories of liability, this is sufficient to find Anderson liable for the conduct of the military, and you must separately determine whether Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible Mr. Anderson's conduct under the theories of liability discussed below.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.1

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Furthermore, plaintiffs' theories of indirect liability must find their source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  International law does not recognize, even under international criminal law, plaintiffs' theories of joint venture, joint enterprise, instigation or inducement of wrongful acts, ratification, reckless disregard, and inherent danger to others.  (*See id.*; *see, e.g.*, Int'l Law Br. 62-66.)  And none of plaintiffs' theories of indirect liability is no a well-defined norm of international law that meets the *Sosa* standard.

Additionally, any instruction that would seek to hold defendants liable for intentional infliction of emotional distress and/or negligent infliction of emotional distress is simply incorrect.  Under Nigerian law, there is no cause of action for either intentional infliction of emotional distress or negligent infliction of emotional distress.  (*See* Defs.' R&O Stmt. Part II.B.2-3.)

**Plaintiffs' Proposed Jury Instruction No. 6.0A: Corporation is a person under law**

Certain defendants are corporations.  Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed while they are on the job, i.e., acts performed within the scope of their duties as employees of the corporation. These acts are considered to be acts of the corporation.

**Sources**

**Federal Jury Practice And Instructions (5th ed.) § 108. 01. Agents of corporation** ("A corporation may act only through natural persons as its agents or employees. In general, agents or employees of a corporation may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation, or within the scope of their duties as employees of the corporation.")

**Ninth Circuit Model Civil Jury Instructions §4.2 Liability of Corporations—scope of Authority Not in Issue** ("Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.0A**

Defendants object to this instruction because it is an incorrect statement of law that corporations are responsible for all acts of its employees, agents, directors and officers performed while "on the job".  Rather, corporations *may* be responsible, under certain circumstances, for the acts and declarations made by employees, agents, directors and officers while acting within the scope of their authority delegated to them by the corporation, or within the scope of their duties as employees of the corporation.  *See, e.g.*, Federal Jury Practice and Instructions (5th ed.) § 108.01 (Agents of Corporation); *see also* Ninth Circuit Model Civil Jury Instructions § 4.2 Liability of Corporations—Scope of Authority Not in Issue.  It is not correct that such acts are considered to be acts of the corporation; rather, the corporation may be held responsible for the acts.

**Plaintiffs' Proposed Jury Instruction No. 6.2: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Agency**

Plaintiffs contend that members of the Nigerian military or military government were acting as Shell Nigeria's agent during the incidents in question.  If you find that the military are responsible for injuries to a plaintiff, you must decide whether the members of the Nigerian military or military government involved were acting as Shell Nigeria's agent.  Defendants deny that the military were Shell Nigeria's agent.

If members of the Nigerian military or military government were acting as the agent of Shell Nigeria, any act or omission of such members of the Nigerian military or military government within the scope of authority is considered the act or omission of Shell Nigeria, and Shell Nigeria is responsible for such acts even if Shell Nigeria did nothing wrong.

To show that Shell Nigeria is responsible for the military's conduct based on agency, plaintiffs must prove:
> 1.      That members of the Nigerian military or military government were acting as agents of Shell Nigeria; and
> 2.      That these members of the Nigerian military or military government were acting within the scope of their authority during the incidents in question.

Agent
An agent is a person or entity who performs services for another person or entity under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services.  The other person is called a principal. The principal need not exercise control; what is important is the ability to control.  One may be an agent without receiving compensation for services.  Plaintiffs contend that Shell Nigeria was the principal, and members of the Nigerian military or military government were Shell Nigeria's agents.

Scope of authority
The agent is acting within the scope of its authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agent by the principal.

It is not necessary that any particular act or failure to act by members of the Nigerian military or military government was expressly authorized by Shell Nigeria to bring it within the scope of authority. Such conduct is within the scope of authority, even if unauthorized, if it occurred while the agent was engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority.

An agent's wrongful or criminal conduct may be within the scope of authority even if it violates a company policy or does not benefit the principal.

Other theories of liability
Each theory of liability is independent, such that if you reject agency, you must still consider

whether any other theory of liability applies to Shell Nigeria.

**Sources**

**4A New York Practice Series - Commercial Litigation in New York State Courts -§ 69:52. Jury instructions—Definition of scope of authority** ("One of the questions for you to determine is whether [Alleged Agent] was acting within the scope of his [her] authority.  An agent is acting within the scope of his [her] authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agent by the principal.  It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority. Such conduct is within the scope of his [her] authority if it occurred while the agent was engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority.")

**4ANew York Practice Series - Commercial Litigation in New York State Courts § 69:10, Prerequisites to creation or existence of agency—Control** ("Prerequisites to creation or existence of agency—Control: "Control is critical to an agency relationship. The principal and agent must agree that the principal will be able to control the agent's actions and that the agent will follow the principal's reasonable instructions. The fact that the principal does not exercise control is irrelevant; what is important is the ability to control, not whether it is actually exercised. When the nature of a relationship is disputed, courts look to indicia of control to determine how to characterize the relationship. The greater the degree of control that one party exercises over another, the more likely it is that the parties have gone beyond an ordinary commercial arrangement and created a principal-agent relationship.")

**Ninth Circuit Model Instruction No.** 4.4 AGENT AND PRINCIPAL—DEFINITION ("An agent is a person who performs services for another person under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person is called a principal. [One may be an agent without receiving compensation for services.] [The agency agreement may be oral or written.]")

**Ninth Circuit Model Instruction No.** 4.6 ACT OF AGENT IS ACT OF PRINCIPAL— SCOPE OF AUTHORITY NOT IN ISSUE ("Any act or omission of an agent within the scope of authority is the act or omission of the principal.")

**Ninth Circuit Model Instruction No.** 4.10 PRINCIPAL SUED BUT NOT AGENT— AGENCY OR AUTHORITY DENIED ("The defendant [*name of alleged principal*] is sued as a principal. The plaintiff claims that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent. [*Name of alleged principal*] [denies that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [admits that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [and] [denies that [*name of alleged agent*] was acting within the scope of authority.] If you find that [*name of alleged agent*] [was the agent of [*name of alleged principal*] and] was acting within the scope of authority, then any act or omission of [*name of alleged agent*] was the act or omission of [*name of alleged principal*]. If you find that [*name of alleged agent*] was not acting within the scope of authority as [*name of alleged principal*]'s agent, then you must find for [*name of alleged principal*].")

***Bowoto v. Chevron Texaco Corp.*, Order re Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, at 19 (N.D. Cal. Aug. 14, 2007)** (ATS case) ("To establish actual agency a party must demonstrate the following elements: '(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.' *Rubin Bros. Footwear, Inc. v. Chemical Bank*, 119 B.R. 416, 422 (S.D.N.Y.1990). 'There is no agency relationship where the alleged principal has no right of control over the alleged agent.' *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *see also Rubin Bros*, 119 B.R. at 422.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.2

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and federal common law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Furthermore, there is no well-defined norm of agency that would meet the *Sosa* standard.

Defendants object to this instruction because it fails to lay out the elements the jury must find in order to find that the Nigerian Government was acting as the agent of SPDC in committing any wrongful acts, even under New York or federal common law.  *See* Restatement (Second) of Agency §§ 82, 84-85, 91.

Plaintiffs' recitation that a principal is liable for unauthorized acts committed by agents as long as they are incidental to the performance of an authorized act or relates to duties it was employed to perform is incorrect.  Even under New York law which plaintiffs purport to apply, not only must the act have been for the principal's benefit *and* reasonably foreseeable, but the principal must have controlled the agent in violating the law.  N.Y. Pattern Jury Instr.—Civil 2:236 Vicarious Responsibility-Employer-Employee-Prohibited Act.

**Plaintiffs' Proposed Jury Instruction No. 6.3: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Inherent Danger to Others**

Plaintiffs contend that members of the Nigerian military or military government were performing work for Shell Nigeria that was inherently dangerous to others, that is, to third parties.  If you find that members of the Nigerian military or military government are responsible for injuries to a plaintiff, you must decide whether they were performing work for Shell Nigeria that was inherently dangerous to others.  Defendants deny that members of the Nigerian military or military government were performing work for Shell Nigeria that was inherently dangerous.

If you find that members of the Nigerian military or military government were performing work for Shell Nigeria, even if you find that were the military was not Shell Nigeria's agent, then Shell Nigeria is responsible for their conduct if they were performing work that was inherently dangerous and Shell Nigeria reasonably should have anticipated from the nature of the work that it would be dangerous to others.

Distinction from agency
This is a separate theory of liability from agency, which also asks whether members of the Nigerian military or military government were performing services for Shell Nigeria, but which does not require that the work be inherently dangerous.  Unlike agency, this theory does not require that members of the Nigerian military or military government were subject to Shell Nigeria's control or right to control the manner and means of performing the services.

Inherent danger
Danger inherent in the work means danger to others that arises out of the normal performance of the work, as distinct from the danger that may arise out of the unusual manner in which the work is done.

Anticipation of danger
Whether Shell Nigeria reasonably should have anticipated that the normal performance of the work would be dangerous to others depends on whether a reasonably prudent person would have anticipated that danger under the circumstances.

Other theories of liability
Each theory of liability is independent, such that if you reject responsibility for inherent danger to others, you must still consider whether any other theory of liability applies to hold Shell Nigeria responsible for the acts of members of the Nigerian military or military government.

**Sources**
**N.Y. Pattern Jury Instr.--Civil 2:256 Vicarious Responsibility-Independent Contractor-Danger Inherent in the Work** ("If you find that plaintiff AB is entitled to recover from defendant CD, you must then determine whether defendant EF is also liable for plaintiff's injuries. While generally one who hires an independent contractor is not responsible for the acts of the contractor or the contractor's employees, an exception to that rule exists when danger to others is inherent in the work and the hirer reasonably should have anticipated from the nature of the work that it would be dangerous to others. By danger inherent in the work is meant danger that arises out of the normal performance of the work as distinct from danger arising out of the

unusual manner in which the work is done. Whether EF reasonably should have anticipated that the normal performance of the work would be dangerous to others depends on whether a reasonably prudent person would have anticipated that danger under the circumstances.

[*State facts giving rise to action, such as*]: (The parties agree that plaintiff was injured when a window cleaning brush fell on him as he was walking along the sidewalk in front of a building owned by EF, that CD was an independent contractor hired by EF to wash the windows of the building, and that the brush was dropped by one of CD's employees). In determining whether there was danger for passersby inherent in the work, you may consider (the height of the windows on which CD's employee was assigned to work and the location of those windows with respect to the sidewalk, the time of day the work was usually done), and all of the other circumstances existing at the time and place of the occurrence. If you find that there was danger to passersby inherent in the normal performance of the work CD was hired to do, that a reasonably prudent person would have anticipated that danger under the circumstances, and that at the time plaintiff was injured, CD's employee was performing the work by a method that EF should reasonably have anticipated (he, she) would use, then AB would be entitled to a verdict against both CD and EF. If, however, you find that danger to passersby was not inherent in the normal performance of the work CD was hired to do, or that a reasonably prudent person would not have anticipated danger to passersby from the normal performance of the work, or that CD adopted a method of performance that would not have been anticipated by a reasonably prudent person, then AB would be entitled to a verdict against CD only.")

*Woodson v. Rowland*, 329 N.C. 330, 352 (1991) (holding that independent subcontractor's willful failure to take safety precautions was an intentional tort, and attributing liability to general contractor because of inherent danger doctrine).


## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.3

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no theory of indirect liability for inherent danger to others, let alone one that would meet *Sosa*'s standard.

Defendants further object to this instruction because the inherent danger principle applies only to negligence claims.  (*See* Defs.' R&O Stmt. Part II.C.)

**Plaintiffs' Proposed Jury Instruction No. 6.4: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Ratification**

Plaintiffs contend that Shell Nigeria ratified or approved the conduct of members of the Nigerian military or military government after it occurred. If you find that the military are responsible for injuries to plaintiffs, you must decide whether Shell Nigeria approved the military's conduct. Defendants deny that Shell Nigeria ratified the military's conduct.

To show that Shell Nigeria is responsible for members of the Nigerian military or military government's conduct on the basis of ratification, plaintiffs must prove:
      1) That Shell Nigeria knew or should have known of the military' wrongful conduct, and
      2) That Shell Nigeria ratified, adopted, or approved of this conduct.

Ratification of unauthorized conduct
Shell Nigeria is responsible for the military's conduct if, after the fact, Shell Nigeria ratified, adopted, or approved that conduct, even if it was originally unauthorized.  Therefore, even if you conclude that members of the Nigerian military or military government were not conducting themselves as Shell Nigeria's agent, Shell Nigeria is nonetheless responsible for their actions if you find that Shell Nigeria ratified those actions after the fact.

Evidence for ratification
Approval or ratification can be shown through Shell Nigeria's statements or it can be inferred from defendants' conduct that implies an intent to consent or adopt the act.  A variety of different types of conduct permit you to infer approval.  Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact of the military's actions.  Defending the military's actions or covering up their misdeeds may also constitute ratification.  Failure to disavow the military's acts may constitute ratification, even if the acts were not within the scope of the agency relationship.  Ratification also exists if Shell Nigeria, after knowledge of or opportunity to learn of the misconduct, continued to use the services of those members of the Nigerian military or military government.  Failure to take adequate steps to investigate or remedy the military's misconduct also constitutes ratification.

In considering whether Shell Nigeria ratified the acts of Shell Nigeria or Anderson, you may consider, among other things, whether Shell Nigeria has made statements to the media that evidence a cover-up or ratification, including false or conflicting statements about the military's involvement in the incidents in question.

Knowing ratification
Shell Nigeria's "knowing" ratification can be shown by circumstantial evidence including through evidence of the nature of the acts done, the interests of the alleged agent and ratifier, and other circumstances.

Other theories of liability
Each theory of liability is independent, such that if you reject ratification, you must still consider whether any other theory of liability applies to Shell Nigeria.

**Sources**

***Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004)** (ATS case)
("Ratification is demonstrated through knowing acceptance after the fact by the principal of an
agent's actions. . . . Covering up of the misdeeds of an agent can also constitute ratification.
Where the acts by the agent were not within the scope of the agency relationship, if they are not
disavowed by the principal, failure to disavow may constitute ratification. *Shultz Steel Co. v.
Hartford Accident & Indemnity Co.*, 187 Cal.App.3d 513, 519, 523, 231 Cal. Rptr. 715 (1986)
('A purported agent's act may be adopted expressly or . . . by implication based on conduct of the
purported principal from which an intention to consent or adopt the act may be fairly
inferred.').")

**2A N.Y. Jur.2d Agency §172**
("General application and binding effect:  The doctrine of ratification is generally and broadly
applied to many situations and to many acts performed without authority by an agent or by a
person assuming to act as such; such acts, when ratified, are binding on the principal. Thus,
when an agency arises by proof of ratification, it has as complete binding force as an agency
directly or expressly conferred in advance.")

***Schultz Steel Co*. v. *Hartford Accident & Indemnity Co*., 187 Cal.App.3d 513, 519, 523 (1986)**
("'An agency may be created, and an authority may be conferred, by a . . . subsequent
ratification." ( Civ. Code, § 2307.) "A ratification can be made . . . by accepting or retaining the
benefit of the act, with notice thereof." ( Civ. Code, § 2310.) "Ratification of part of an
indivisible transaction is a ratification of the whole." ( Civ. Code, § 2311.) "A principal is
responsible for . . . wrongs committed by his agent [if] . . . he has . . . ratified them, . . ." ( Civ.
Code, § 2339.) . . . .   "Thus, a principal may become liable for an act he did not originally
authorize, if the principal ratifies the act. (1 Witkin, Summary of Cal. Law, *supra*, § 154, p.
754.)")

***McChristian v. Popkin*, 75 Cal.App.2d 249, 256 (1946)**  ("Failure to discharge an agent guilty
of oppressive acts toward patrons of the employer is in itself evidence tending to show
ratification.")

***Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1283-84 (M.D. Ala. 1999)**
("'Ratification is the affirmance by a person of a prior act which did not bind him but which was
done or professedly done on his account, whereby the act as to some or all persons is given
effect as if originally authorized by him.' Under Alabama law, in order for FMCC to be liable
under a ratification theory for Auburn Ford's alleged fraud, Pescia must show that FMCC (1) had
actual knowledge of Auburn Ford's allegedly fraudulent conduct; (2) knew or should have
known that this conduct constituted a tort; and (3) armed with this knowledge it failed to take
adequate steps to remedy the situation.")

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, Instructions to Jury (Final as Amended –
11/25/08) at 38-39 (N.D. Cal. Nov. 25, 2008) (ATS case) ("To show that CNL is responsible for
the Nigerian security forces' conduct on the basis of ratification, plaintiffs must prove: 1. That
CNL knew or should have known of all material facts related to the Nigerian security forces'
wrongful conduct, and 2. That CNL ratified, adopted, or approved of this conduct.  Ratification
means to treat the act as if originally authorized. CNL is responsible for the Nigerian security

forces' conduct if, after the fact, CNL ratified, adopted, or approved that conduct, even if it was originally unauthorized.  Approval or ratification can be shown through CNL's statements or it can be inferred from CNL's conduct that implies an intent to consent to or adopt the act. A variety of different types of conduct permit you to infer approval. Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact of the Nigerian security forces' actions. Defending the Nigerian security forces' actions or covering up their misdeeds may also constitute ratification. Failure to disavow the Nigerian security forces' acts may constitute ratification, even if the acts were not within the scope of the agency relationship. Ratification also exists if CNL, after knowledge of or opportunity to learn of the misconduct, continued to use the Nigerian security forces' services. Failure to take adequate steps to investigate or remedy the Nigerian security forces' misconduct also constitutes ratification.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.4

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law, New York law, and California law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no theory of indirect liability for ratification, let alone one that would meet *Sosa*'s standard.  (*See, e.g.*, Int'l Law Br. 62-66.)

Defendants further object to the instruction in that the description of evidence sufficient to prove ratification is prejudicial and misleading.  In order for defendants to be held liable for the acts of its agents under a theory of ratification, it must be proven that SPDC willingly affirmed the prior acts of its agent; failure to disavow or condemn acts, particularly where they were outside the scope of the agency, does not constitute ratification, nor does continuing to employ a particular agent after learning of misconduct.  Defendants also object to this instruction as prejudicial in that it implies that statements to the media would constitute a "cover-up" of its agents' actions.

61

**Plaintiffs' Proposed Jury Instruction No. 6.5: Responsibility of Brian Anderson and Shell Nigeria for acts of the military - Aiding and Abetting**

Plaintiffs contend that Shell Nigeria and/or Brian Anderson aided and abetted wrongful conduct of the military. If Brian Anderson aided and abetted such wrongful conduct, then he is liable for that conduct. If Brian Anderson or Shell Nigeria aided and abetted such wrongful conduct, and you find that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of Shell Nigeria or Brian Anderson under any theory noted above, then Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are also responsible for that conduct.  Defendants deny that Shell Nigeria or Brian Anderson aided and abetted the military's conduct.

To show that Shell Nigeria or Brian Anderson is responsible for aiding and abetting Shell Nigeria's conduct, plaintiffs must prove:

> 1) That Shell Nigeria or Brian Anderson provided assistance, encouragement, or moral support to the military;
> 2) That this assistance had a substantial effect on the perpetration of the wrongful acts; and
> 3) That, when Shell Nigeria or Brian Anderson provided the assistance, they knew or should have known that the wrongful acts would be committed or had been committed.

Assistance
The assistance need not have been tangible. Assistance of any kind, including providing moral or psychological support, can establish aiding and abetting, and one or more kinds of assistance may be considered together in determining whether the assistance is substantial.  Aiding and abetting includes assistance that is provided after the commission of the offense, or at a place distant from the site of the offense.

Substantial effect
The assistance must have had a substantial effect on the perpetration of the wrongful acts, but it need not have been indispensable to the wrongful acts, nor need it have caused those acts.

Shell Nigeria and Brian Anderson's intent or knowledge
Shell Nigeria or Brian Anderson must have intended to provide the assistance.  However, they need not share any intent to commit the wrongful acts.  Even if you determine that their conduct itself was perfectly lawful, it may become unlawful if it assisted the military's unlawful conduct. For example, the act of deliberately providing a person with a poisonous chemical may not ordinarily be wrong, but it may become wrongful if the provider knows that the person will use the chemical to murder someone, even if the provider does not want the murder to happen.

In order to show that Shell Nigeria or Brian Anderson knew or reasonably should have known that their acts would assist wrongful conduct, plaintiffs need only show that they knew or should have known that assisting a wrongful act would be a possible and foreseeable consequence of their conduct.  Knowledge can be inferred from the circumstances. You may consider, among other things, whether they knew of the military's general history of committing abuses, including against oil protestors.

Other theories of liability
Each theory of liability is independent, such that if you reject aiding and abetting for Shell
Nigeria or Brian Anderson, you must still consider whether the other aided and abetted, and must
still consider whether either is responsible under any other theory of liability.

**Plaintiffs' Statement on Areas of Agreement**

The parties disagree whether aiding and abetting applies to ATS claims.  Plaintiffs believe the
parties agree that the elements of aiding and abetting include providing practical assistance that
had a substantial effect on the wrongdoing.  The parties disagree about other elements of aiding
and abetting.

**Sources**
*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005)
(*21:  The district court instructed the jury that to find Fernandez indirectly liable for aiding and
abetting, the Cabello survivors needed to prove "active participation" by preponderance of the
evidence. In assessing "active participation," the jury was instructed to consider if (1) one or
more of the wrongful acts that comprise the claim were committed, (2) Fernandez substantially
assisted some person or persons who personally committed or caused one or more of the
wrongful acts that comprise the claim, and (3) Fernandez knew that his actions would assist in
the illegal or wrongful activity at the time he provided the assistance.)

*Restatement (Second) of Torts* § 876(b) (1979).
(" § 876 Persons Acting in Concert: " For harm resulting to a third person from the tortious
conduct of another, one is subject to liability if he … (b)  knows that the other's conduct
constitutes a breach of duty and gives substantial assistance or encouragement to the other so to
conduct himself.")

*Miele v. American Tobacco Co.*, 2 A.D.3d 799, 770 N.Y.S.2d 386 (App. Div. 2d Dep't 2003)
("The concerted action theory of liability for injury to a third party will attach when one knows
that another's conduct constitutes a breach of duty and gives substantial assistance or
encouragement to the other, and '[t]his is true both when the act done is an intended trespass . . .
and when it is merely a negligent act' (Restatement of [Second] Torts § 876 [b], Comment *d*,
Illustration 6]).")

**Knew or should have known**; plaintiffs need only show defendants knew or should have known
that assisting wrongful act would be possible and foreseeable consequence of their conduct:
*Presbyterian Church of Sudan v. Talisman Energy*,  244 F. Supp. 2d 289, 324 (S.D.N.Y.
2003)(constructive knowledge sufficient); *Prosecutor v. Furundzija*, IT-95-17/1 ¶245 (ICTY
Trial Chamber Dec. 10, 1998)("would reasonably have known"); *U.S. v. Flick*, 6 Trials of War
Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 at 1220
(1949)(defendants convicted because they could not "reasonably believe" that money they
contributed was to be used for its stated purpose); *In re Altstotter*, 6 Trials of War Criminals
Before the Nuremberg Military Tribunals Under Control Council Law No. 10 at 88-89
(1949)(defendants convicted based on presumption they had knowledge of abuses); *Dachau
Concentration Camp Trial*, 11 Trials of War Criminals Before the Nuremberg Military Tribunals
Under Control Council Law No. 10 at 15 (1949)(noting that in *Mauthausen Concentration Camp*

*Trial* defendants convicted based on presumption of knowledge).

**Abettor need not share wrongful intent or have any positive intention to commit the harm. Even if abettor's conduct perfectly lawful, it may become unlawful when combined with tortfeasor's unlawful conduct**: *Furundzija* Trial Judgment at ¶¶ 243, 245; *Mehinovic v. Vuckovic*, 19 F. Supp.2d 1322, 1355–56 (N.D. Ga. 2002); *Bowoto v. Chevron Corp.*, 2006 U.S. Dist. LEXIS 63209 (N.D. Cal. August 22, 2006).

**Assistance need not have been indispensable to the wrongful acts, nor must it have caused those acts:** *Presbyterian Church*, 2003 U.S. Dist. LEXIS 4085 *89 *quoting* Furundzija Trial Judgment, ¶209; *Furundzija* ¶233-34; *Prosecutor v. Kunarac, et .al.,* IT-96-23 and IT-96-23/1, Trial Judgment (Feb. 22, 2001), ¶ 391; *see also Trial of Otto Ohlendorf and Others (Einsatzgruppen Case),* 4 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1, 572 (1949) in *Prosecutor v. Furundzija*, ¶ 217 (convicting military officer of aiding and abetting summary executions because he had power to object yet "chose to let the injustice go uncorrected).  *Trial of Bruno Tesch and Two Others* (*Zyklon B Case*), 1 British Mil. Court, Hamburg, Law Reports, at 93 (1946), *cited in Furundzija*, ¶ 222-23 (convicting officers of chemical company because they were in a position to influence sale of poison to concentration camps).

**Assistance need not have been tangible.** Assistance of any kind, including providing moral or psychological support, can establish culpable participation: August 22, 2006 Order Granting in Part Def's Mot. To Dismiss at 7-8, Dkt. 1203. *Mehinovic*, 198 F. Supp.2d at 1355. *Furundzija*, ¶¶ 199-204 (citing British Military Tribunal cases); *Prosecutor v. Musema*, ICTR-96-13-T, Trial Judgment ¶ 126 (Jan. 27, 2000).

**Assistance that is provided before or after the commission of the offense, or at a place distant from the site of the offense, is sufficient to incur liability:** *Musema*, ICTR-96-13-T, ¶¶ 125-26; *Prosecutor v. Furundzija*, IT-95-17/1, Trial Judgment (Dec. 10, 1998) ¶¶ 199-204; *Celibici*, IT-96-21, Appeals Judgment, ¶ 352 ("the relevant act of assistance may be removed both in time and place from the actual commission of the offense."); *accord  Presbyterian Church*, 224 F.Supp.2d at 333 (assistance need not occur at the site of the offense).

**Knowledge can be inferred from the circumstances:** *Prosecutor v Delalic*, I.T.-96-21(Nov.16, (1998) at ¶328.

*Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 17-19. Although plaintiffs do not rely on Nigeria law, such law also recognizes aiding and abetting liability. *Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 17.  Under Nigerian law, "[i]f the tort be committed, then all who have aided . . .  in the commission are joint tort feasors."  *Pratt v. British Medical Ass'n* [1919] 1 K.B. 244, 254 (1918) (emphasis added).

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.5

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law and New York law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20

(emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no well-defined norm of aiding and abetting that would meet *Sosa*'s standard.  (*See, e.g.*, Int'l Law Br. 62-66.)

Defendants further object to this instruction because the paragraph on substantial effect is incomplete and misleading.  The acts of SPDC or Brian Anderson would have a substantial effect only if the violation most probably would not have occurred or did not occur in the same way without defendants' assistance.

In addition, the instructions regarding the requisite intent are incorrect.  It would not be enough to demonstrate that SPDC or Brian Anderson had knowledge that the Nigerian Government either had or was going to engage in a violation of law and failed to prevent that violation.  Rather, plaintiffs must demonstrate that SPDC and/or Brian Anderson intended that the Nigerian Government commit that violation of law.

Furthermore, the instruction does not recognize that in order to prove aiding and abetting liability, plaintiffs must prove that SPDC and Brian Anderson had effective control over the Nigerian Government's alleged misconduct.

**Plaintiffs' Proposed Jury Instruction No. 6.6A: Responsibility of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. for acts of the military - Conspiracy.**

Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. conspired with the military. If Royal Dutch Petroleum Co. or Shell Transport and Trading Co. conspired with the military, then that defendant is liable for the conduct of the military. Defendants deny that Royal Dutch Petroleum Co. or Shell Transport and Trading Co. conspired with the military.

A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the co-conspirators.

To show that Royal Dutch Petroleum Co. or Shell Transport and Trading Co. is responsible for the conduct of the military on the basis of conspiracy, plaintiffs must prove the following:
> 1) That Royal Dutch Petroleum Co. or Shell Transport and Trading Co. was aware that members of the Nigerian military or military government planned to commit some wrongful acts; and
> 2) That Royal Dutch Petroleum Co. or Shell Transport and Trading Co. agreed with those members of the Nigerian military or military government and intended that these wrongful acts be committed;
> 3) That the acts that harmed plaintiffs were either the wrongful acts that the co-conspirators agreed to, or these acts were done in furtherance of the purpose of the conspiracy and were the natural and foreseeable consequence of the conspiracy.

Existence of conspiracy
A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.  It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement.  Plaintiffs are not required to prove that any defendant personally committed a wrongful act or that it knew all the details of the agreement or the identities of all the other participants.

In determining whether Royal Dutch Petroleum Co. or Shell Transport and Trading Co. conspired with the military, you may consider, among other things, whether each was directly involved in the wrongful acts, or whether they knew of the military's general history of committing abuses, including against oil protestors.

Extent of liability
If you find that Royal Dutch Petroleum Co. or Shell Transport and Trading Co. joined the conspiracy to commit some wrongful acts, then it is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after it joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy.  A conspirator is responsible not only for the particular wrongful act or acts that, to its knowledge, the military agreed to commit, but is also responsible for the natural and probable consequences of any wrongful act of the military done to further the purpose of the conspiracy, including acts that the conspirator did not

intend as part of the agreed-upon objective but that were nevertheless a natural and foreseeable consequence of the effecting of that common purpose, and regardless of whether the conspirator was present at the time of the commission of the wrongful acts.

Other theories of liability

Each theory of liability is independent, such that if you reject conspiracy, you must still consider whether any other theory of liability applies to Royal Dutch Petroleum Co. or Shell Transport and Trading Co.

**Sources**

*Wiwa*, 2002 U.S. Dist. LEXIS 3293 *43.

Plaintiffs' Brief on International Law Norms Pursuant to Order of October 7, 2008 at 52-54.

*Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17 (N.D.Cal. Aug. 14, 2007) at 19.
Conspiracy may be inferred from circumstances: *Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 19; *Prosecutor v. Vasiljevic*, IT 98 32 ¶100 (ICTY Appeals Chamber Feb. 25, 2004); 20 N.Y. Jur.2d Conspiracy–Civil Aspects §20; *Bedard v. La Bier*, 20 Misc. 2d 614, 616 (Sup. 1959)
Plaintiffs are not required to prove that any defendant personally committed a wrongful act or that it knew all the details of the agreement. 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10; *Bedard v. La Bier*, 20 Misc. 2d 614, 616-17 (Sup. 1959).
If Shell Nigeria joined conspiracy, then it is responsible for all acts done as part of the conspiracy whether the acts occurred before or after it joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy. 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10.
Not necessary to show a meeting of alleged conspirators or making of express or formal agreement. *Vasiljevic*, IT 98 32 ¶100 ("There is no necessity for this purpose to have been previously arranged or formulated. It may materialise extemporaneously and be inferred from the facts."); 20 N.Y. Jur.2d Conspiracy–Civil Aspects §20.
Shell Nigeria responsible not only for the particular wrongful act or acts that, to its knowledge, the Nigerian military agreed to commit, . . .natural and probable consequences . . . regardless of whether Shell Nigeria personnel were present at the time of the commission of the wrongful acts. *Prosecutor v. Tadic*, IT-94-1-A ¶ 204 (ICTY Appeals Chamber July 15, 1999)(liability exists in "cases involving a common design to pursue one course of conduct where one of the perpetrators commits an act which, while outside the common design, was nevertheless a natural and foreseeable consequence of the effecting of that common purpose."); *Vasiljevic*, IT 98 32, ¶100 (same); *see also* 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10 ("it is not essential that one be fully aware of the conspiracy's objects and aims").
These same standards apply under the ATS. Ninth Circuit has upheld jury instructions permitting conspiracy liability for torture, summary execution, and disappearance under the ATS. *Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996). The Eleventh Circuit has done likewise, post-*Sosa*. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158–60 (11th Cir. 2005)(recognizing ATS conspiracy liability for torture, extra-judicial killing, cruel and unusual punishment, and crimes against humanity); *accord In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d

539, 565 (S.D.N.Y. 2005) (conspiracy claim for aircraft hijacking); *Eastman Kodak Co.*, 978 F. Supp. at 1091–92 (recognizing conspiracy liability for unlawful arbitrary detention); *see also Prosecutor v. Tadic*, IT-94-1-A ¶¶ 192-94, 196, 204–20, 226–28 (ICTY Appeals Chamber July 15, 1999)(detailing joint criminal enterprise liability); *Prosecutor v. Vasiljevic*, IT 98 32 ¶¶ 95–101 (ICTY Appeals Chamber Feb. 25, 2004)(same).

*Cabello* recognized that to prove conspiracy under the ATS, the plaintiff must show "(1) two or more persons agreed to commit a wrongful act, (2) [defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." This formulation is fully consistent with plaintiffs' formulation above.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.6A

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and federal common law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)

In order to prove a claim for criminal conspiracy under international law, plaintiffs must prove that the Nigerian Government committed genocide or waged aggressive war.  Because plaintiffs have not pleaded either of those two claims, plaintiffs do not have a claim for conspiracy under international law.  *Sosa*, 542 U.S. at 732 n.20; *Presbyterian Church of Sudan v. Talisman Energy*, 453 F. Supp. 2d 633, 663 (S.D.N.Y. 2006); (Int'l Law Br. 63-65.)

Defendants further object to this instruction because it seeks to lower plaintiffs' burden of proof.  Plaintiffs' general instruction on the type of evidence sufficient to prove the existence of a conspiracy is incomplete, misleading and prejudicial, as are the examples of factors it proposes the jury consider in determining whether a conspiracy existed.  The instruction focuses only on what plaintiffs need not prove in order to establish conspiracy and neglects to instruct that in order to prove that a conspiracy existed and defendants engaged in that conspiracy, plaintiffs must establish that defendants intended to participate in the conspiracy.  Plaintiffs must also prove that defendants and the Nigerian Government had a common purpose of violating the law and that to establish this common purpose, plaintiffs must show that there was an understanding or arrangement between defendants and the Nigerian Government that amounted to an agreement to commit this violation.  *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999); *Prosecutor v. Blagojevic*, Case No. IT-02-60-T, Judgment, ¶ 703 (Jan. 17, 2005); *Prosecutor v. Krnojelac*, Case No. IT-97-25-T, Judgment, ¶ 80 (Mar. 15, 2002).  Plaintiffs' instruction wholly ignores these elements of proving conspiracy.

Defendants also object to plaintiffs' instruction because it states that plaintiffs need only show that defendants were aware that the Nigerian Government planned to commit a wrongful act and intended or had knowledge that the act would occur.  This is incorrect because plaintiffs must show that defendants participated in the conspiracy, in that they must have performed some act that was directed toward furthering the conspiracy.  *See Prosecutor v. Tadic*,

Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999).  It would not be enough to show that defendants had knowledge that the Nigerian Government was going to commit some wrongful act.

**Plaintiffs' Proposed Jury Instruction No. 6.6: Responsibility of Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria and/or Brian Anderson for acts of the military - Conspiracy.**

Plaintiffs contend that Shell Nigeria and Brian Anderson conspired with the military.  If Brian Anderson conspired with the military, then he is liable for the military's conduct.  If Brian Anderson or Shell Nigeria conspired with the military, and you find that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of Shell Nigeria or Brian Anderson under any theory noted above, then Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the military's conduct through Brian Anderson or Shell Nigeria. Defendants deny that Shell Nigeria or Brian Anderson conspired with the military.

A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the co-conspirators.

To show that Shell Nigeria or Brian Anderson is responsible for the conduct of the military on the basis of conspiracy, plaintiffs must prove the following:
> 1) That Shell Nigeria or Brian Anderson was aware that members of the Nigerian military or military government planned to commit some wrongful acts; and
> 2) That Shell Nigeria or Brian Anderson agreed with those members of the Nigerian military or military government and intended that these wrongful acts be committed;
> 3) That the acts that harmed plaintiffs were either the wrongful acts that the co-conspirators agreed to, or these acts were done in furtherance of the purpose of the conspiracy and were the natural and foreseeable consequence of the conspiracy.

Existence of conspiracy
A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.  It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement.  Plaintiffs are not required to prove that any defendant personally committed a wrongful act or that it knew all the details of the agreement or the identities of all the other participants.

In determining whether Shell Nigeria or Brian Anderson conspired with the military, you may consider, among other things, whether each was directly involved in the wrongful acts; whether Shell Nigeria transported the military; whether Shell Nigeria paid the military generally or for their services at particular places; or whether Shell Nigeria or Brian Anderson knew of the military's general history of committing abuses, including against oil protestors.

Extent of liability
If you find that Shell Nigeria or Brian Anderson joined the conspiracy to commit some wrongful acts, then it is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after it joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy.  A conspirator is responsible not only for the particular wrongful act or acts that, to its knowledge, the military agreed to commit, but is also responsible for the

natural and probable consequences of any wrongful act of the military done to further the purpose of the conspiracy, including acts that the conspirator did not intend as part of the agreed-upon objective but that were nevertheless a natural and foreseeable consequence of the effecting of that common purpose, and regardless of whether the conspirator was present at the time of the commission of the wrongful acts.

Other theories of liability

Each theory of liability is independent, such that if you reject conspiracy, you must still consider whether any other theory of liability applies to Royal Dutch Petroleum Co., Shell Transport and Trading Co., Shell Nigeria or Brian Anderson.

**Sources**

*See* Plaintiffs' Brief on International Law Norms Pursuant to Order of October 7, 2008 at 52-54.

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 U.S. Dist. LEXIS 3293 at *43 (S.D.N.Y. Feb. 28, 2002) ("individuals engaged in a conspiracy with government actors to deprive others of their constitutional rights act 'under color of law' to commit those violations")

*Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158–60 (11th Cir. 2005) (recognizing ATS conspiracy liability for torture, extra-judicial killing, cruel and unusual punishment, and crimes against humanity; to prove conspiracy under the ATS, the plaintiff must show "(1) two or more persons agreed to commit a wrongful act, (2) [defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy"); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996) (upholding jury instructions permitting conspiracy liability for torture, summary execution, and disappearance); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 565 (S.D.N.Y. 2005) (conspiracy claim for aircraft hijacking); *Eastman Kodak Co.*, 978 F. Supp. at 1091–92 (recognizing conspiracy liability for unlawful arbitrary detention); *see also Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17 (N.D.Cal. Aug. 14, 2007) at 19.

Conspiracy may be inferred from circumstances: *Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 19; *Prosecutor v. Vasiljevic*, IT 98 32 ¶100 (ICTY Appeals Chamber Feb. 25, 2004); 20 N.Y. Jur.2d Conspiracy–Civil Aspects §20; *Bedard v. La Bier*, 20 Misc. 2d 614, 616 (Sup. 1959)

20 N.Y. Jur.2d Conspiracy–Civil Aspects §10 (no requirement that any defendant personally committed a wrongful act or that it knew all the details of the agreement); *see also Bedard v. La Bier*, 20 Misc. 2d 614, 616-17 (Sup. 1959).

20 N.Y. Jur.2d Conspiracy–Civil Aspects §10 (conspirators are responsible for all acts done as part of the conspiracy whether the acts occurred before or after they joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy)

*Vasiljevic*, IT 98 32 ¶100 ("There is no necessity for this purpose to have been previously

arranged or formulated. It may materialise extemporaneously and be inferred from the facts."); 20 N.Y. Jur.2d Conspiracy–Civil Aspects §20.

*Prosecutor v. Tadic*, IT-94-1-A ¶ 204 (ICTY Appeals Chamber July 15, 1999) (liability exists in "cases involving a common design to pursue one course of conduct where one of the perpetrators commits an act which, while outside the common design, was nevertheless a natural and foreseeable consequence of the effecting of that common purpose."); *Vasiljevic*, IT 98 32, ¶100 (same); *see also* 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10 ("it is not essential that one be fully aware of the conspiracy's objects and aims").

*see also Prosecutor v. Tadic*, IT-94-1-A ¶¶ 192-94, 196, 204–20, 226–28 (ICTY Appeals Chamber July 15, 1999) (detailing joint criminal enterprise liability); *Prosecutor v. Vasiljevic*, IT 98 32 ¶¶ 95–101 (ICTY Appeals Chamber Feb. 25, 2004) (same).

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.6

Defendants object to this instruction because under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and federal common law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.)

Furthermore, in order to prove a claim for criminal conspiracy under international law, plaintiffs must prove that the Nigerian Government committed genocide or waged aggressive war. Because plaintiffs have not pleaded either of those two claims, plaintiffs do not have a claim for conspiracy under international law. *Sosa*, 542 U.S. at 732 n.20; *Presbyterian Church of Sudan v. Talisman Energy*, 453 F. Supp. 2d 633, 663 (S.D.N.Y. 2006); (Int'l Law Br. 63-65).

Defendants further object to this instruction because it seeks to lower plaintiffs' burden of proof. Plaintiffs' general instruction on the type of evidence sufficient to prove the existence of a conspiracy is incomplete, misleading and prejudicial, as are the examples of factors it proposes the jury consider in determining whether a conspiracy existed. The instruction only focuses on what plaintiffs need not prove in order to establish conspiracy and neglects to instruct that in order to prove that a conspiracy existed and that SPDC and Brian Anderson engaged in that conspiracy, plaintiffs must establish that SPDC and Brian Anderson intended to participate in the conspiracy. Plaintiffs must also prove that SPDC and Brian Anderson and the Nigerian Government had a common purpose of violating the law and that to establish this common purpose, plaintiffs must show that there was an understanding or arrangement between SPDC and Brian Anderson and the Nigerian Government that amounted to an agreement to commit this violation. *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999); *Prosecutor v. Blagojevic*, Case No. IT-02-60-T, Judgment, ¶ 703 (Jan. 17, 2005); *Prosecutor v. Krnojelac*, Case No. IT-97-25-T, Judgment, ¶ 80 (Mar. 15, 2002). Plaintiffs' instruction wholly ignores these elements of proving conspiracy.

Defendants also object to plaintiffs' instruction because it states that plaintiffs need only show that SPDC and Brian Anderson were aware that the Nigerian Government

planned to commit a wrongful act and intended or had knowledge that the act would occur.  This is incorrect because plaintiffs must show that SPDC and Brian Anderson participated in the conspiracy, in that they must have performed some act that was directed toward furthering the conspiracy.  *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999).  It would not be enough to show that SPDC and Brian Anderson had knowledge that the Nigerian Government was going to commit some wrongful act.

**Plaintiffs' Proposed Jury Instruction No. 6.7: Responsibility of Shell Nigeria for acts of the Nigerian military—Joint Venture**

Plaintiffs contend that Shell Nigeria was engaged in a joint venture with the Nigerian government to produce oil.  If you find that members of the Nigerian military or military government are responsible for injuries to a plaintiff, you must decide whether Shell Nigeria was engaged in a joint venture with the Nigerian government.  Defendants deny that Shell Nigeria was engaged in a joint venture with the Nigerian government.

A joint venture is an association of two or more persons or corporations, to carry on a business as co-owners. The members of a joint venture are called joint venturers or partners.  Joint venturers are each others' agents. An act or omission of a partner within the scope of the joint venture business is considered the act or omission of all partners.  The employee of any member of a joint venture is considered an employee of the other members. Therefore each member of a joint venture is responsible for the wrongful conduct of another member, or its employees, acting within the scope of the member's authority. A joint venturer is liable for the acts of its partner without fault, that is, even if the venturer itself has done nothing wrong.

To show that Shell Nigeria is responsible for the military's conduct on the basis of joint venture liability, a plaintiff must prove:
1. That Shell Nigeria was engaged in a joint venture with the Nigerian government, and
2. That the Nigerian military were acting within the scope of the joint venture business during the incident in question.

To show that Shell Nigeria was engaged in a joint venture with the Nigerian government: plaintiffs must show that Shell Nigeria and the Nigerian government (1) entered into a specific agreement to carry on an enterprise for profit; (2) their agreement evidenced their intent to be joint venturers; (3) each made a contribution of property, financing, skill, knowledge, or effort; (4) each had some degree of joint control over the venture; and (5) there was a provision for the sharing of both profits and losses.

Evidence for joint venture
In considering whether Shell Nigeria was engaged in a joint venture with the Nigerian government, you may consider, among other things, whether Shell Nigeria or defendants made statements that Shell Nigeria was a member of such a joint venture.

Scope of joint venture business
A joint venturer is acting within the scope of the joint venture business when doing anything which is either expressly or impliedly authorized by the joint venture or which is in furtherance of the joint venture business.

Extent of liability
If you find that Shell Nigeria and the Nigerian government were joint venturers and that soldiers were acting within the scope of the joint venture, and if you find those soldiers committed wrongful acts against the plaintiffs, then you must find Shell Nigeria responsible for those wrongful acts.

<u>Other theories of liability</u>
Each theory of liability is independent, such that if you reject joint venture, you must still consider whether any other theory of liability applies to Shell Nigeria.

**Sources**

Ninth Circuit Model Civil Jury Instructions  No. 4.12 GENERAL PARTNERSHIP: (**"**A partnership is an association of two or more persons to carry on a business as co-owners. The members of a partnership are called partners.")

Ninth Circuit Model Civil Jury Instructions  No. 4.13 GENERAL PARTNERSHIP—SCOPE OF PARTNERSHIP BUSINESS DEFINED (**"**A partner is acting within the scope of the partnership business when doing anything which is either expressly or impliedly authorized by the partnership or which is in furtherance of the partnership business.")

Ninth Circuit Model Civil Jury Instructions No. 4.14 GENERAL PARTNERSHIP—ACT OF PARTNER IS ACT OF ALL PARTNERS ("An act or omission of a partner within the scope of the partnership business is the act or omission of all partners.")

Ninth Circuit Model Civil Jury Instructions No. 4.1**7** PARTNERSHIP—EXISTENCE OF PARTNERSHIP IN ISSUE—EFFECT ("The defendant [*name of acting partner*] and the defendants [*names of nonacting partners*] are sued as partners. It is denied that any partnership existed. If you find that [*name of acting partner*] and [*names of nonacting partners*] were partners and that [*acting partner*] was acting within the scope of the partnership business, and if you find against [*acting partner*], then you must find against [both] [all] defendants. If you find against [*name of acting partner*], but you either find there was no partnership or that [*name of acting partner*] was not acting within the scope of the partnership business, then, in either case, you must find for the defendants [*names of nonacting partners*]. If you find for [*acting partner*], then you must find for [both] [all] of the defendants.")

**14 N.Y. Prac., New York Law of Torts § 9:9** ("A joint venture or enterprise is analogous to a partnership but the joint enterprise is focused upon a single or short term goal, while a partnership typically envisions a greater degree of permanency. Thus, when two or more parties pool their respective resources, expertise and efforts for the purpose of engaging in a single enterprise for profit, a joint venture may be found to exist." "When two or more parties undertake to engage in a joint venture or enterprise, the employee of any one of them will be considered an employee of all the others for purposes of potential liability to third parties under the doctrine of *respondeat superior.*  Similarly, the negligence of one member of a joint enterprise may be imputed to other members of the enterprise." "Liability for a joint venture does not depend on the existence of any plan to act tortiously. It creates vicarious liability as a matter of policy for the torts of any member of the joint venture regardless of the innocence of a joint venturer. There is liability without fault for the fault of another in vicarious liability, whereas in joint and several liability each tortfeasor is negligent.")

*ITEL Containers Int'l Corp. v. Atlanttrafik Express Service*, Ltd., 909 F.2d 698, 701 (2d Cir. 1990)(the elements of joint venture are: "(1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to

be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses." *accord Flammia v. Mite Corp.*, 401 F. Supp. 1121, 1127 (E.D.N.Y. 1975), *aff'd without opinion*, 553 F.2d 93 (2d Cir. 1977); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 472 F. Supp. 2d 544, 552 (S.D.N.Y. 2007); *Toporoff Engineers, P.C. v Fireman's Fund Ins. Co.*, 371 F.3d 105 (2d Cir. 2004). None of these cases require, as defendants claim, that the purpose of the venture was to violate the norm of international law.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.7

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and Ninth Circuit law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.) Under international law, there is no theory of indirect liability for joint venture, let alone one that would meet *Sosa*'s standard. (*See, e.g.*, Int'l Law Br. 62-66.)

Defendants further object to this instruction because its description of how the jury should determine whether a joint venture existed is incomplete. Plaintiffs set forth only one factor which it asserts the jury may consider in determining whether SPDC and the Nigerian Government were engaged in a joint venture. Under the law, it cannot be determined that SPDC engaged in a joint venture with the Nigerian government simply based on statements by SPDC or defendants that SPDC was engaged in a joint venture with the Nigerian Government. Rather, plaintiffs must prove, among other things, that SPDC and the Nigerian Government entered into a specific agreement to carry on an enterprise whose purpose was to violate the norm of international law, from which they sought to profit; that SPDC and the Nigerian Government each intended to be joint venturers in a venture intended for violating the norm of international law; that SPDC and the Nigerian Government each contributed either property, financing, skill, knowledge or effort to violate the norm of international law. Also, plaintiffs would have to prove that both SPDC and the Nigerian Government each had a degree of joint control over the venture for violating the norm of international law and that they each shared in both the profits and losses of the venture through the violation of the norm of international law. *See ITEL Containers Int'l Corp. v. Atlanttrafik Express Service*, Ltd., 909 F.2d 698, 701 (2d Cir. 1990); *Flammia v. Mite Corp.*, 401 F. Supp. 1121, 1127 (E.D.N.Y. 1975), *aff'd without opinion*, 553 F.2d 93 (2d Cir. 1977); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 472 F. Supp. 2d 544, 552 (S.D.N.Y. 2007).

**Plaintiffs' Proposed Jury Instruction No. 6.8: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Joint Enterprise**

Plaintiffs contend that Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government. Defendants deny that Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government.

A joint enterprise is an endeavor in which two or more persons unite to achieve a common purpose under such circumstances that each has express or implied authority to act for all with respect to the control of the means or agencies employed to execute the plan.

Extent of liability
If Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government, it is responsible for the military's wrongful conduct committed in the course of executing the common purpose, even if Shell Nigeria has done nothing wrong.

Common purpose
The common purpose need not be wrongful or illegal.  A joint enterprise need not be a business venture.

Other theories of liability
Each theory of liability is independent, such that if you reject joint enterprise, you must still consider whether any other theory of liability applies to Shell Nigeria or Brian Anderson.

**Sources**
*Fairbairn v. New York*, **107 A.D.2d. 864, 864-65 (N.Y. App. Div. 1985),** *aff'd*  **485 N.E.2d 239 (N.Y. 1985)**
("It is well recognized that a joint enterprise is an endeavor in which two or more persons unite to achieve a common purpose under such circumstances that each has express or implied authority to act for all with respect to the control of the means or agencies employed to execute the plan; in such an enterprise, the negligence of one member may be imputed to the others (see 41 NY Jur, Negligence, § 78, pp 96-97)."

*Becker v. Club Las Velas*, No. 94-CIV-2412, 1994 WL 376016 at *5 (S.D.N.Y. July 18, 1994)
("In general, the negligence of any one member of a joint enterprise may be imputed to the other members.")

**Restatement (Second) of Torts § 491, cmt. B**
(*"*A 'joint enterprise' is in the nature of a partnership, but is a broader and more inclusive term. […] A joint enterprise includes a partnership, but it also includes less formal arrangements for cooperation, for a more limited period of time and a more limited purpose. It includes an undertaking to carry out a small number of activities or objectives, or even a single one, entered into by members of the group under such circumstances that all have a voice in directing the conduct of the enterprise. The law then considers that each is the agent or servant of the others, and that the act of any one within the scope of the enterprise is to be charged vicariously against the rest. ")

*See generally Bowoto v. Chevron Texaco*, CV-99-2506 SI, Instructions to Jury Final as amended, 11-25-08 at 41 (N.D.Cal. 2008) ("To show that CNL is responsible for the conduct of the Nigerian security forces on the basis of joint enterprise, plaintiffs must prove: 1. That CNL was engaged in concerted action with the Nigerian security forces with a common end or joint purpose; and 2. That the Nigerian security forces committed wrongful acts in the course of executing that common end or joint purpose. The common end or joint purpose need not be wrongful or illegal. A joint enterprise need not be a business venture.")

**Plaintiffs' Proposed Alternative Jury Instruction No. 6.8: Responsibility of Shell Nigeria for acts of members of the Nigerian military or military government—Joint Enterprise (Nigerian Law)**

*Note: Plaintiffs do not believe Nigerian law applies to this theory of liability. Nonetheless, should Nigerian law apply, plaintiffs propose the following instruction:*

Plaintiffs contend that Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government. Defendants deny that Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government.

A joint enterprise is an endeavor in which two or more persons engage in concerted action with a common end or joint purpose.

Extent of liability
If Shell Nigeria was engaged in a joint enterprise with members of the Nigerian military or military government, it is responsible for the military's wrongful conduct committed in the course of executing the common purpose, even if Shell Nigeria has done nothing wrong.

Common purpose
The common purpose need not be wrongful or illegal. A joint enterprise need not be a business venture.

Other theories of liability
Each theory of liability is independent, such that if you reject joint enterprise, you must still consider whether any other theory of liability applies to Shell Nigeria or Brian Anderson.

**Sources**
Enemo, Notes on the Law of Tort, Vol. 2 at 230-31 ("Tortfeasors are treated as joint tortfeasors in the following cases: . . . Where the parties act in pursuance of a common design. Thus, where the persons take a concerted action to a common end, and in the course of executing that joint purpose, any of them commits a tort. . . . [Liability has been imposed where] the enterprise in which the [defendants] were engaged, was the joint enterprise of both . . . .")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.8 AND ALTERNATIVE PROPOSED INSTRUCTION NO. 6.8**

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law and New York law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no theory of indirect liability for joint enterprise, let alone one that would meet *Sosa*'s standard.

Defendants further object to this instruction because this principle applies only to negligence claims.   (*See* Defs.' R&O Stmt. Part II.C.)

Defendants also object to this instruction because it is based almost entirely on New York law, as is evident from the similarities between Plaintiffs' Proposed Jury Instruction 6.8 and their Proposed Alternative Jury Instruction 6.8.  Plaintiffs' instruction is improper even based on the source of Nigerian law cited in support of this proposed instruction.  The instruction fails to state that those who take concerted action together must actually commit a tort.  Enemo 231.  Plaintiffs' proposed instruction would hold liable every individual who engages in *any* action with another individual for a common end.  Furthermore, plaintiffs' source of Nigerian law confounds agency and joint enterprise within the same theory of indirect liability.

**Plaintiffs' Proposed Jury Instruction No. 6.9: Responsibility of Shell Nigeria and Brian Anderson for acts of the military—Instigation or Inducement**

Plaintiffs contend that Shell Nigeria and Brian Anderson instigated or induced wrongful actions of the military.  Defendants deny that Shell Nigeria or Brian Anderson instigated or induced wrongful actions.

"Instigating" includes any conduct prompting another person to act in a particular way. This element is satisfied if it is shown that the conduct was a clear contributing factor to the conduct of the other person(s). It is not necessary to demonstrate that the conduct would not have occurred without the instigation. The plaintiffs must show that the instigator either intended to provoke or induce the commission of the wrongful conduct, or that the instigator was aware of the substantial likelihood that the commission of the wrongful conduct would be a probable consequence of his acts.

If Brian Anderson instigated or induced wrongful actions, then he is liable for those actions.  If Brian Anderson or Shell Nigeria instigated or induced wrongful actions, and you find that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of Shell Nigeria or Brian Anderson under any theory noted above, then Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are also responsible for the military's conduct.

Other theories of liability
Each theory of liability is independent, such that if you reject instigation or inducement, you must still consider whether any other theory of liability applies to Shell Nigeria.

**Sources**
**103 N.Y. Jur. 2d Torts § 33.**
("One who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another is as responsible as the one who commits the act, so as to impose liability on the former to the same extent as if he or she had performed the act himself or herself, and the liability in such a case is joint and several.")

*Prosecutor v. Kvocka*, ICTY Case No. IT-98-30/1-T ¶252 (2 November 2001) (The *actus reus* required for "instigating" a crime is any conduct by the accused prompting another person to act in a particular way. This element is satisfied if it is shown that the conduct of the accused was a clear contributing factor to the conduct of the other person(s). It is not necessary to demonstrate that the crime would not have occurred without the accused's involvement. The required *mens rea* is that the accused intended to provoke or induce the commission of the crime, or was aware of the substantial likelihood that the commission of a crime would be a probable consequence of his acts.)(footnotes omitted)

**Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 7**
("**Individual criminal responsibility:**  1. A person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in articles 2 to 5 of the present Statute, shall be individually responsible for the crime.")

Enemo, Notes on the Law of Tort, Vol. 2 at 230 ("Tortfeasors are treated as joint tortfeasors in

the following cases: . . . Where there is . . . instigation of another to commit a tort.")

*See generally Bowoto v. Chevron Texaco*, CV-99-2506 SI, Instructions to Jury Final as amended, 11-25-08 at 42 (N.D.Cal. 2008)("To show that CNL is responsible for the conduct of the Nigerian security forces on the basis of instigation or inducement, plaintiffs must prove: 1. That CNL instigated, induced, or invited the Nigerian security forces to commit wrongful acts; 2. That it was foreseeable that these wrongful acts would cause harm to [a plaintiff]; and 3. These wrongful acts caused harm to [a plaintiff].)"

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.9

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York and Nigerian law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Plaintiffs' reliance on the Statute of the ICTY and a decision from that Tribunal is misplaced.  The Statute of the ICTY and decisions of the Tribunal address only criminal liability, and do not articulate any norm that reaches secondary civil liability.

*Sosa* recognized that federal courts should not blur the line between indirect liability in the criminal and civil context:  "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion".  542 U.S. at 727; *see also Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181 (1994).  This distinction between criminal and civil procedure is another "good reason[] for a restrained conception of the discretion a federal court should exercise in considering new causes of action" for violations of international law.  542 U.S. at 725.  Civil indirect liability is not a norm that is defined with a specificity comparable to the features of the 18th-century paradigms and that is universally accepted by the civilized world.  *Id*. at 732.

Furthermore, no international tribunal, including the ICTY, permits the imposition of civil indirect liability against corporations under international law.  *See, e.g*., Statute of the International Criminal Tribunal for the former Yugoslavia, art. 6; *see also* Statute of the International Criminal Tribunal for Rwanda, art. 5; Rome Statute of the International Criminal Court, art. 25, July 17, 1998, 37 I.L.M. 1999.  In fact, ICTY does not have jurisdiction to adjudicate corporate liability.  As Judge Korman noted in *Khulumani*, "[t]here is a significant basis for distinguishing between personal and corporate liability", and the "sources evidencing the relevant norms of international law at issue plainly do not recognize [corporate] liability". *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 321-22 (2d Cir. 2007) (Korman, J., concurring in part, dissenting in part).

Defendants further object to this instruction insofar as it mischaracterizes the definition of instigation from *Prosecutor v. Kvocka*, ICTY Case No. IT-98-30/1-T ¶ 252 (Nov. 2, 2001).  In the third paragraph of the instruction, plaintiffs contend that instigation includes "any conduct prompting another person to act in a particular way".  Defendants object to this because the

"instigator" must prompt the other person "to commit an offense", not simply to act in certain way. *Id*. ¶ 243. The paragraph plaintiffs cite from *Kvocka* does state that "instigating" is any conduct by the accused prompting another person to act in a particular way, but the defendant must "instigate" a *crime*. *Id*. ¶ 252. Defendants also object to the replacement of the word "crime" from *Kvocka*, with "conduct" in plaintiffs' proposed instruction.

**Plaintiff's Proposed Jury Instruction No. 6.10: Responsibility of Shell Nigeria and Brian Anderson for acts of the military -- reckless disregard**

Plaintiffs contend that Brian Anderson and Shell Nigeria are responsible for the acts of members of the Nigerian military or military government and military government because they acted with reckless disregard for the safety of others in using the military's services and requesting that the military take action.  Defendants deny that Brian Anderson or Shell Nigeria acted with reckless disregard.

To hold Shell Nigeria or Brian Anderson responsible for the wrongful acts of the military based on reckless disregard, plaintiffs must prove by a preponderance of the evidence:
> 1. That Shell Nigeria or Brian Anderson acted despite an unjustifiably high risk of harm to others;
> 2. That this risk of harm was either known to Shell Nigeria or Brian Anderson or was so obvious that it should have been known;
> 3. That the reckless conduct of Shell Nigeria or Brian Anderson was a substantial factor contributing to the commission of wrongful acts against any plaintiff by the military.

If Brian Anderson acted with reckless disregard, then he is liable for those actions.  If Brian Anderson or Shell Nigeria acted with reckless disregard, and you find that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for the conduct of Shell Nigeria or Brian Anderson under any theory noted above, then Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are also responsible for the military's conduct.

Other theories of liability
Each theory of liability is independent, such that if you reject reckless disregard, you must still consider whether any other theory of liability applies to Shell Nigeria.

**Sources:**
***Farmer v. Brennan*, 511 U.S. 825, 836 (1994)** ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.")

**DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 6.10**

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no theory of indirect liability for reckless disregard, let alone one that would meet *Sosa*'s standard.

Defendants further object to this instruction because it fails to acknowledge that in order to establish liability under this theory, plaintiffs must prove that SPDC either acted to

facilitate the Nigerian Government's violation of law or intentionally failed to act to prevent the violation of law and SPDC had a duty to the plaintiffs to prevent such a violation.  Moreover, it is incorrect that the theory requires proof that SPDC or Brian Anderson acted despite an unjustifiably high risk of harm to others; instead, it requires proof that SPDC's conduct itself created an unjustifiably high risk of violating the law and harming others.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); Restatement (Second) of Torts § 500, p 587 (1963-1964); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).

## 7.    INSTRUCTIONS FOR DEFENDANTS' LIABILITY FOR SHELL NIGERIA'S AND BRIAN ANDERSON'S CONDUCT; INSTRUCTIONS FOR BRIAN ANDERSON'S LIABILITY FOR SHELL NIGERIA'S CONDUCT

### Plaintiffs' Proposed Jury Instruction No. 7.1: Overview of Responsibility of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. for Shell Nigeria and Brian Anderson.

Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are responsible for Shell Nigeria's and its officers' conduct under various theories of liability. A theory of liability explains why one individual or corporation is legally responsible for the actions of another individual or corporation. A plaintiff need only prove one theory of liability to make a person fully responsible for another person's conduct.

Plaintiffs seek to hold the corporate defendants responsible for Shell Nigeria's acts under the following theories of liability: 1) Shell Nigeria was an agent of one or both of the corporate defendants, 2) one or both corporate defendants ratified Shell Nigeria's actions, 3) one or both corporate defendants aided and abetted Shell Nigeria's actions, 4) one or both corporate defendants conspired with Shell Nigeria, 5) one or both corporate defendants is the alter ego of Shell Nigeria, or 6) one or both corporate defendants was engaged in a joint venture with Shell Nigeria.  If you find plaintiffs have established even one of these theories of liability with respect to a defendant, you should hold that defendant responsible for all of Shell Nigeria's conduct.

Plaintiffs separately contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are responsible for the conduct of Brian Anderson and other officers of Shell Nigeria under one or more of the following theories of liability: 1) Brian Anderson and/or other officers of Shell Nigeria were agents of one or both corporate defendants, 2) one or both corporate defendants ratified Brian Anderson's actions and/or those of other officers of Shell Nigeria, 3) one or both corporate defendants aided and abetted Brian Anderson's actions and/or those of other officers of Shell Nigeria, or 4) one or both corporate defendants conspired with Brian Anderson and/or other officers of Shell Nigeria.  If you find plaintiffs have established even one of these theories of liability with respect to a defendant, you should hold that defendant responsible for all of the conduct of Brian Anderson and/or other officers of Shell Nigeria.

Each theory of liability is separate. If you find against plaintiffs on any one theory, such a finding does not affect any other theory. You must still individually consider plaintiffs' other theories of liability.

### DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.1

Defendants object to this instruction because under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.  Furthermore, international law does not recognize the imposition of civil indirect liability under any theory. (*See* Defs.' R&O Stmt. Part I.C.)  No treaty or convention permits the imposition of civil indirect liability against corporations under international law.  *See, e.g.*, Statute of the International Criminal Tribunal for the former Yugoslavia, art. 6; Statute of the International Criminal

Tribunal for Rwanda, art. 5; Rome Statute of the International Criminal Court, art. 25, July 17, 1998, 37 I.L.M. 1999.  In fact, no international tribunal has ever imposed direct liability on a corporation for violating international law.  *See, e.g.*, *United States v. Krauch (The I.G. Farben Case)*, 8 Trials of War Criminals Before the Nuremberg Military Tribunals at 1113, 1127, 1170.  Moreover, no international tribunal has jurisdiction to adjudicate corporate liability for the types of claims that plaintiffs raise in this case.  As Judge Korman noted in *Khulumani*, "[t]here is a significant basis for distinguishing between personal and corporate liability", and the "sources evidencing the relevant norms of international law at issue plainly do not recognize [corporate] liability".  *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 321-22 (2d Cir. 2007) (Korman, J., concurring in part, dissenting in part).

**Plaintiffs' Proposed Jury Instruction No. 7.3: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria—Agency**

Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are responsible for Shell Nigeria's conduct because Shell Nigeria was acting as the agent of each defendant.  Defendants deny that Shell Nigeria was their agent.

If Shell Nigeria is the agent of one or more of the corporate defendants, any act or omission of Shell Nigeria within the scope of authority is considered the act or omission of such defendants, and such defendants are liable for Shell Nigeria's acts or responsibility even if they have done nothing wrong.

In deciding whether Shell Nigeria was an agent of Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co., you should consider the actual conduct and relationship between Shell Nigeria and the corporate defendants.  It is possible for a subsidiary to be an agent of its parent or another affiliated corporation.

An agent is a person or entity who performs services for another person or entity under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person who is called a principal, need not actually exercise control over the agent; what matters is whether the principal has the ability to control manner or means of performing the services. One may be an agent without receiving compensation for services.  Each corporate defendant is sued as a principal, and plaintiffs contend that Shell Nigeria was acting as the agent of one or both of the corporate defendants.

To show that Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co. are responsible for Shell Nigeria's conduct based on agency, plaintiffs must prove:

> 1.     That Shell Nigeria acted as an agent of that defendant or defendants; and
> 2.     That Shell Nigeria was acting within the scope of its authority as an agent.

The rest of this instruction concerns the first point, whether Shell Nigeria acted as an agent of any corporate defendant.  The second point will be covered in a later instruction.

<u>Existence of agency relationship</u>
In deciding whether Shell Nigeria acted as an agent of any corporate defendant, you should assess the relationship between Shell Nigeria and the corporate defendants as it relates to this case, rather than whether any sort of agency relationship generally existed between Shell Nigeria and those defendants.  The relationship must be relevant to each plaintiff's claim of wrongdoing. The agent, however, need only be acting within the scope of the agency. Plaintiffs do not need to show that Shell Nigeria was an agent for the purpose of committing any wrongful act, or that the corporate defendants knew Shell Nigeria would be responsible for any wrongdoing. In this case, plaintiffs allege that the corporate defendants' agency relationship with Shell Nigeria is relevant to plaintiffs' claims of wrongdoing because Shell Nigeria's policies and actions were designed to protect Shell Nigeria's ability to produce oil for the benefit of defendants, and because the relationship between Shell Nigeria and the corporate defendants reflects defendants'

involvement in Shell Nigeria's security and publicity practices, including those practices that injured plaintiffs, and defendants' involvement in Shell Nigeria's response to the arrest, detention and executions of Ken Saro-Wiwa, John Kpuinen, Saturday Doobee, Felix Nuate, Daniel Gbokoo and Dr. Barinem Kiobel.

Also in considering whether Shell Nigeria acted as the agent of Royal Dutch Petroleum Co. and/or Shell Transport and Trading Co., you should consider a variety of factors, including:

A.      Whether the defendants and their subsidiaries functioned or held themselves out as a "super-corporation";

B.      Whether Shell Nigeria was functioning as an incorporated arm of one or more defendants;

C.      Whether Shell Nigeria was involved in activities that, but for Shell Nigeria's presence in Nigeria, one or more of the defendants would have been forced to undertake themselves;

D.      The degree and content of communications between Shell Nigeria and any of the defendants;

E.      The degree to which one or more of the defendants set or participated in setting policy, particularly security policy, for Shell Nigeria;

F.      The nature and degree of overlap between the officers, directors and managers of the defendants and Shell Nigeria.  The fact that some directors and officers of the parent corporation also serve as directors of the subsidiary will not alone support a finding of agency.

G.      The extent to which Shell Nigeria officers, managers and employees were selected, supervised or controlled by any of the defendants;

H.      The importance of the subsidiary to the defendants' overall operations, including the amount of revenue the subsidiary produces for defendants and the level of the defendants' involvement in the budget, financial affairs, and production activities of the subsidiary.  The fact of a parent's ownership of the subsidiary alone will not support a finding of agency.

I.      Whether the parent exercised more than the usual degree of direction and control that a parent exercises over a subsidiary.  The usual level of parental involvement includes the monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget, and articulation of general policies and procedures.

Finally, in considering whether Shell Nigeria acted as the agent of any corporate defendant, you should remember that in order for a corporate subsidiary to be an agent, the subsidiary must be carrying out the business of the parent or affiliate.  No agency may be found where the subsidiary is acting solely to advance its own business and that business is entirely different from the business of the parent or affiliate.  However, an agency relationship may arise where the subsidiary is acting both for the benefit of its own business and that of its parent or affiliate, as where they have similar or overlapping kinds of business.

<u>Liability as to each defendant; other theories of liability</u>
Using these tests and factors, you may find that Shell Nigeria was the agent of either, both or neither of the corporate defendants.  If you find that Shell Nigeria is not the agent of one corporate defendant, you must still consider whether Shell Nigeria has an agency relationship with the other corporate defendant.

Each theory of liability is independent, such that if you reject agency for any defendant, you must also consider whether any other theory of liability applies to that defendant.

**Sources**

**4A New York Practice Series - Commercial Litigation in New York State Courts -§ 69:52. Jury instructions—Definition of scope of authority** ("One of the questions for you to determine is whether [Alleged Agent] was acting within the scope of his [her] authority.  An agent is acting within the scope of his [her] authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agent by the principal.  It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority. Such conduct is within the scope of his [her] authority if it occurred while the agent was engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority.")

**4ANew York Practice Series - Commercial Litigation in New York State Courts § 69:10, Prerequisites to creation or existence of agency—Control** ("Prerequisites to creation or existence of agency—Control: "Control is critical to an agency relationship. The principal and agent must agree that the principal will be able to control the agent's actions and that the agent will follow the principal's reasonable instructions. The fact that the principal does not exercise control is irrelevant; what is important is the ability to control, not whether it is actually exercised. When the nature of a relationship is disputed, courts look to indicia of control to determine how to characterize the relationship. The greater the degree of control that one party exercises over another, the more likely it is that the parties have gone beyond an ordinary commercial arrangement and created a principal-agent relationship.")

**Ninth Circuit Model Instruction No.** 4.4 AGENT AND PRINCIPAL—DEFINITION ("An agent is a person who performs services for another person under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person is called a principal. [One may be an agent without receiving compensation for services.] [The agency agreement may be oral or written.]")

**Ninth Circuit Model Instruction No.** 4.6 ACT OF AGENT IS ACT OF PRINCIPAL— SCOPE OF AUTHORITY NOT IN ISSUE ("Any act or omission of an agent within the scope of authority is the act or omission of the principal.")

**Ninth Circuit Model Instruction No.** 4.10 PRINCIPAL SUED BUT NOT AGENT— AGENCY OR AUTHORITY DENIED ("The defendant [*name of alleged principal*] is sued as a principal. The plaintiff claims that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent. [*Name of alleged principal*] [denies that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [admits that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [and] [denies that [*name of alleged agent*] was acting within the scope of authority.] If you find that [*name of alleged agent*] [was the agent of [*name of alleged principal*] and] was acting within the scope of authority, then any act or omission of [*name of alleged agent*] was the act or omission of [*name of alleged principal*]. If you find that [*name of*

*alleged agent*] was not acting within the scope of authority as [*name of alleged principal*]'s agent, then you must find for [*name of alleged principal*].")

***Bowoto v. Chevron Texaco Corp.*, Order re Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, at 19 (N.D. Cal. Aug. 14, 2007)** (ATS case) ("To establish actual agency a party must demonstrate the following elements: '(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.' *Rubin Bros. Footwear, Inc. v. Chemical Bank*, 119 B.R. 416, 422 (S.D.N.Y.1990). 'There is no agency relationship where the alleged principal has no right of control over the alleged agent.' *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *see also Rubin Bros*, 119 B.R. at 422.")

*Bellomo v. Pennsylvania Life, Co.*, 488 F. Supp. 744, 745-46 (S.D.N.Y. 1980) ("In *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 227 N.E.2d 851, 281 N.Y.S.2d 41 (N.Y.1967), the New York  Court of Appeals held that a foreign corporation, whose affiliate was doing on its behalf in New York all the business which the foreign corporation 'could do were it here by its own officials,' was 'doing business' through an agent and subject to jurisdiction under N.Y. CPLR § 301. The court found that the common ownership of the two corporations was significant 'only because its gives rise to a valid inference as to the broad scope of the agency in the absence of an express agency agreement.' *Id.* 281 N.Y.S.2d at 45, 227 N.E.2d at 854. . . . Where a holding company is nothing more than an investment mechanism a device for diversifying risk through corporate acquisitions the subsidiaries conduct business not as its agents but as its investments. The business of the parent is the business of investment, and that business is carried out entirely at the parent level. Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries. There is a presumption, in effect, that the parent is sufficiently involved in the operation of the subsidiaries to become subject to jurisdiction.  The record before me now suggests that Pennsylvania Life is not merely an investor, but is rather a super-corporation engaged primarily in underwriting and selling a variety of insurance policies through several subsidiaries. Its own representations to stockholders and to potential stockholders support that conclusion.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.3

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Furthermore, plaintiffs' reliance on New York and federal common law is misplaced.   Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)

Defendants also object to this instruction for its use of the term "super-corporation" because it is a not a term defined under the law.  Defendants also object to the use

of the term "incorporated arm" because that is likewise not a term defined under the law.

Defendants further object to the instruction to the extent that it implies that if SPDC were not in Nigeria, defendants would still have business to conduct in Nigeria or would be "forced to undertake" business there themselves.

Defendants further object to the use of the phrase "usual degree of direction and control" since the meaning of the term "usual" here is ambiguous and the jury would have no frame of reference.

**Plaintiffs' Proposed Jury Instruction No. 7.4: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria's Officers—Agency**

Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are responsible for the conduct of the managing director of Shell Nigeria, (a position filled during the relevant time period first by Phillip Watts and then by Brian Anderson) and for the conduct of other Shell Nigeria officials with managerial authority, because each of these Shell Nigeria officials was acting as the agent of one or more corporate defendant. Defendants deny that these individuals were their agents and contend instead that these individuals only served as the employees or agents of Shell Nigeria.

This is a separate theory of liability from plaintiffs' contention that Shell Nigeria served as the agent of each defendant. If you conclude that Shell Nigeria did not serve as the agent of a defendant, you must still consider whether Shell Nigeria officials served as agents of a defendant.

If an official is the agent of one or more of the corporate defendants, any act or omission of that individual within the scope of authority is considered the act or omission of such defendants, and such defendants are liable for that official's acts or responsibility even if they have done nothing wrong.

An agent is a person or entity who performs services for another person or entity under an express or implied agreement and who is subject to the other's control or right to control the manner and means in which the agent performs the services. The other person, who is called the principal, need not actually exercise control over the agent. What matters is whether the principal has the ability to control the agent.

One may be an agent without receiving compensation for services. Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are sued as principals, and plaintiffs contend that Shell Nigeria officials were acting as the agent of one or both of the corporate defendants.

To show that one or both of the corporate defendants are responsible for one of these persons' conduct based on agency, plaintiffs must prove:
> 1. That a particular Shell Nigeria official was an agent of that corporate defendant or defendants; and
> 2. That the official was acting within the scope of its authority during the incidents in question.

Existence of agency relationship

The rest of this instruction concerns the first point, whether the Shell Nigeria officials were agents of any corporate defendant. The second point will be covered in a later instruction.

In considering whether a Shell Nigeria official acted as the agent of one or more of the corporate defendants, you may consider, among other things, whether the corporate defendants transferred that individual to Shell Nigeria; whether they controlled or paid him; and whether he was involved in activities of Shell Nigeria that, but for Shell Nigeria's presence, one or more of the defendants would have been forced to undertake themselves.

92

Liability as to each defendant
Using these tests and factors, you may find that a Shell Nigeria official was the agent of either, both or neither of the corporate defendants.  If you find that such an official was not the agent of one corporate defendant, you must still consider whether each individual had an agency relationship with the other corporate defendant.

**Sources**
**4ANew York Practice Series - Commercial Litigation in New York State Courts § 69:10, Prerequisites to creation or existence of agency—Control** ("Prerequisites to creation or existence of agency—Control: "Control is critical to an agency relationship. The principal and agent must agree that the principal will be able to control the agent's actions and that the agent will follow the principal's reasonable instructions. The fact that the principal does not exercise control is irrelevant; what is important is the ability to control, not whether it is actually exercised. When the nature of a relationship is disputed, courts look to indicia of control to determine how to characterize the relationship. The greater the degree of control that one party exercises over another, the more likely it is that the parties have gone beyond an ordinary commercial arrangement and created a principal-agent relationship.")

**Ninth Circuit Model Instruction No.** 4.4 AGENT AND PRINCIPAL—DEFINITION ("An agent is a person who performs services for another person under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person is called a principal. [One may be an agent without receiving compensation for services.] [The agency agreement may be oral or written.]")

**Ninth Circuit Model Instruction No.** 4.6 ACT OF AGENT IS ACT OF PRINCIPAL— SCOPE OF AUTHORITY NOT IN ISSUE ("Any act or omission of an agent within the scope of authority is the act or omission of the principal.")

**Ninth Circuit Model Instruction No.** 4.10 PRINCIPAL SUED BUT NOT AGENT— AGENCY OR AUTHORITY DENIED ("The defendant [*name of alleged principal*] is sued as a principal. The plaintiff claims that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent. [*Name of alleged principal*] [denies that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [admits that [*name of alleged agent*] was acting as [*name of alleged principal*]'s agent] [and] [denies that [*name of alleged agent*] was acting within the scope of authority.] If you find that [*name of alleged agent*] [was the agent of [*name of alleged principal*] and] was acting within the scope of authority, then any act or omission of [*name of alleged agent*] was the act or omission of [*name of alleged principal*]. If you find that [*name of alleged agent*] was not acting within the scope of authority as [*name of alleged principal*]'s agent, then you must find for [*name of alleged principal*].")

***Bowoto v. Chevron Texaco Corp.*, Order re Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, at 19 (N.D. Cal. Aug. 14, 2007)** (ATS case) ("To establish actual agency a party must demonstrate the following elements: '(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.' *Rubin Bros. Footwear, Inc. v. Chemical Bank*, 119 B.R. 416,

422 (S.D.N.Y.1990). 'There is no agency relationship where the alleged principal has no right of control over the alleged agent.' *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *see also Rubin Bros*, 119 B.R. at 422.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.4

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Furthermore, plaintiffs' reliance on New York and Ninth Circuit law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.)

Defendants also object to the instruction to the extent that it implies that if SPDC were not in Nigeria, defendants would still have business to conduct in Nigeria or would be "forced to undertake" business there themselves.

Defendants further object to the factors plaintiffs cite as relevant to considering whether a SPDC official acted as the agent of one or more of the corporate defendants because they are confusing and prejudicial. "Whether the corporate defendants transferred [an] individual to Nigeria" and "whether they controlled or paid him" are too vague to be instructive to the jury; whether the corporate defendants transferred an individual to Nigeria does not establish agency. Naming these few factors, without others, as factors to consider in determining whether an agency relationship existed misleading and prejudicial.

**Plaintiffs' Proposed Jury Instruction No. 7.5:  Agency: Scope of Authority/Agent's Imperfect Compliance with Principal's Regulations**

This instruction concerns the second point that plaintiffs must prove to show that a defendant is responsible for the conduct of Shell Nigeria or one of its officials under a theory of agency: that is whether Shell Nigeria or its officials were acting within the scope of their authority.

An agent is acting within the scope of its authority if the agent is performing duties that were expressly or impliedly assigned to the agent by the principal.

It is not necessary that a particular act or failure to act be expressly authorized by a principal for it to be within the scope of the agent's authority. Such conduct is within the scope of authority, even if unauthorized, if it occurred while the agent was engaged in the duties which he was employed to perform and relates to those duties. Moreover, conduct is within the scope of an agent's authority if it is for the benefit of the principal, and is either incidental to, customarily connected with, or reasonably necessary for the performance of an authorized act.

An agent's wrongful or criminal conduct may be within the scope of authority even if it violates a principal's company policy or does not benefit the principal.

An agent's lack of compliance with the principal's regulations does not mean that there is no agency relationship between them.  An employer or other principal is not excused because its agent performs negligently or otherwise not up to standards.  Even if the principal specifically instructed the agent not to perform a given act, as long as you find that act was done in furtherance of the principal's business and was reasonably foreseeable by the principal, you may find that it was within the scope of the agent's authority. The principal will be held liable so long as the agent was doing his principal's work, no matter how irregularly or with what disregard of instructions.

**Sources**

**4A New York Practice Series - Commercial Litigation in New York State Courts -§ 69:52. Jury instructions—Definition of scope of authority (modified)** ("One of the questions for you to determine is whether [Alleged Agent] was acting within the scope of his [her] authority. An agent is acting within the scope of his [her] authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agent by the principal.         It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority. Such conduct is within the scope of his [her] authority if it occurred while the agent was engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority.")

***Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 825 (S.D.N.Y. 2006)** (to establish agency, "'(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.'")

**N.Y. Pattern Jury Instr.--Civil 2:236 Vicarious Responsibility-Employer-Employee-Prohibited Act** ("Even though you find that AB, the employer, specifically instructed CD, the employee, not to perform [*describe the act in question*], if you find that it was done in furtherance of the employer's business and was reasonably foreseeable by the employer, you may find that it was within the scope of the employee's authority.)

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.5

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Furthermore, plaintiffs' reliance on New York law is misplaced.  Any theory of liability for a claim under international law must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)

Defendants object to the instruction to the extent that a principal is not liable for all unauthorized acts committed by agents because even under New York law which plaintiffs purport to apply, an employer is liable only where the act was in furtherance of the employer's business *and* was reasonably foreseeable to the employer.  N.Y. Pattern Jury Instr.—Civil 2:236 Vicarious Responsibility-Employer-Employee-Prohibited Act.

Defendants further object to the instruction because it implies that a principal is presumed liable for the acts of its agents.  It is plaintiffs' burden to prove liability; not defendants' burden to disprove it.

**Plaintiffs' Proposed Jury Instruction No. 7.6: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria and/or Brian Anderson— Ratification**

Plaintiffs contend that Royal Dutch Petroleum Co. and Shell Transport and Trading Co. are responsible for the acts of Shell Nigeria and Brian Anderson because they ratified or approved that conduct after it occurred.  Defendants deny that they ratified Shell Nigeria or Brian Anderson's conduct.

To show that one or both of the corporate defendants is responsible for ratifying Shell Nigeria's or Brian Anderson's acts or omissions, plaintiffs must prove:
>    1) That any defendant knew or should have known of Shell Nigeria or Brian Anderson's conduct, and
>    2) That this defendant ratified, adopted, or approved of this conduct.

Ratification of unauthorized conduct

Defendants are responsible for Shell Nigeria or Brian Anderson's conduct if, after the fact, they ratified, adopted, or approved that conduct, even if it was originally unauthorized.  Therefore, even if you conclude that Shell Nigeria or Brian Anderson's was not conducting itself as the agent of any corporate defendant during the incident, a corporate defendant is nonetheless responsible for Shell Nigeria or Brian Anderson's 's actions if you find that it ratified Shell Nigeria or Brian Anderson's 's actions after the fact.

Evidence for ratification

Approval or ratification can be shown through defendants' statements or it can be inferred from defendants' conduct that implies an intent to consent to or adopt the act.  A variety of different types of conduct permit you to infer approval.  Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact of Shell Nigeria or Brian Anderson's actions.  Defending Shell Nigeria or Brian Anderson's actions or covering up its misdeeds may also constitute ratification.  Failure to disavow or condemn acts may constitute ratification, even if the acts were not within the scope of the agency relationship.  Ratification also exists if the corporate defendants, after knowledge of or opportunity to learn of the misconduct, continued to use Shell Nigeria or Brian Anderson's services.  Failure to take adequate steps to investigate or remedy Shell Nigeria or Brian Anderson's misconduct also constitutes ratification.  In considering whether the corporate defendants ratified the acts of Shell Nigeria or Brian Anderson, you may consider, among other things, whether defendants have made statements to the media that evidence a cover-up or ratification, including false or conflicting statements about Shell Nigeria or Brian Anderson's involvement in the incidents in question.

Knowing ratification

A defendant's "knowing" ratification can be shown by circumstantial evidence, including evidence of the nature of the acts done, the relation of the parties, the interests of the alleged agent and ratifier, and other circumstances.

Liability as to each defendant; other theories of liability

If you find that one corporate defendant did not ratify Shell Nigeria's conduct, you must still consider whether the other corporate defendant ratified Shell Nigeria's conduct.

Each theory of liability is independent, such that if you reject ratification for any defendant, you must also consider whether any other theory of liability applies to that defendant.

**Sources**

***Bowoto v. Chevron Texaco Corp.*, 312 F. Supp.2d 1229 (N.D. Cal. 2004)** (ATS case) ("Ratification is demonstrated through knowing acceptance after the fact by the principal of an agent's actions. . . . Covering up of the misdeeds of an agent can also constitute ratification. Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Shultz Steel Co. v. Hartford Accident & Indemnity Co.*, 187 Cal.App.3d 513, 519, 523, 231 Cal. Rptr. 715 (1986) ('A purported agent's act may be adopted expressly or . . . by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.').")

**2A N.Y. Jur.2d Agency §172**
("General application and binding effect:  The doctrine of ratification is generally and broadly applied to many situations and to many acts performed without authority by an agent or by a person assuming to act as such; such acts, when ratified, are binding on the principal. Thus, when an agency arises by proof of ratification, it has as complete binding force as an agency directly or expressly conferred in advance.")

***Schultz Steel Co***. **v.** ***Hartford Accident & Indemnity Co***., **187 Cal.App.3d 513, 519, 523 (1986)** ("'An agency may be created, and an authority may be conferred, by a . . . subsequent ratification." ( Civ. Code, § 2307.) "A ratification can be made . . . by accepting or retaining the benefit of the act, with notice thereof." ( Civ. Code, § 2310.) "Ratification of part of an indivisible transaction is a ratification of the whole." ( Civ. Code, § 2311.) "A principal is responsible for . . . wrongs committed by his agent [if] . . . he has . . . ratified them, . . ." ( Civ. Code, § 2339.) . . . .   "Thus, a principal may become liable for an act he did not originally authorize, if the principal ratifies the act. (1 Witkin, Summary of Cal. Law, *supra*, § 154, p. 754.)")

***McChristian v. Popkin***, **75 Cal.App.2d 249, 256 (1946)**  ("Failure to discharge an agent guilty of oppressive acts toward patrons of the employer is in itself evidence tending to show ratification.")

***Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1283-84 (M.D. Ala. 1999)** ("'Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons is given effect as if originally authorized by him.' Under Alabama law, in order for FMCC to be liable under a ratification theory for Auburn Ford's alleged fraud, Pescia must show that FMCC (1) had actual knowledge of Auburn Ford's allegedly fraudulent conduct; (2) knew or should have known that this conduct constituted a tort; and (3) armed with this knowledge it failed to take adequate steps to remedy the situation.")

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, Instructions to Jury (Final as Amended – 11/25/08) at 38-39 (N.D. Cal. Nov. 25, 2008) (ATS case) ("To show that CNL is responsible for

the Nigerian security forces' conduct on the basis of ratification, plaintiffs must prove: 1. That CNL knew or should have known of all material facts related to the Nigerian security forces' wrongful conduct, and 2. That CNL ratified, adopted, or approved of this conduct.  Ratification means to treat the act as if originally authorized. CNL is responsible for the Nigerian security forces' conduct if, after the fact, CNL ratified, adopted, or approved that conduct, even if it was originally unauthorized.  Approval or ratification can be shown through CNL's statements or it can be inferred from CNL's conduct that implies an intent to consent to or adopt the act. A variety of different types of conduct permit you to infer approval. Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact of the Nigerian security forces' actions. Defending the Nigerian security forces' actions or covering up their misdeeds may also constitute ratification. Failure to disavow the Nigerian security forces' acts may constitute ratification, even if the acts were not within the scope of the agency relationship. Ratification also exists if CNL, after knowledge of or opportunity to learn of the misconduct, continued to use the Nigerian security forces' services. Failure to take adequate steps to investigate or remedy the Nigerian security forces' misconduct also constitutes ratification.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.6

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Furthermore, plaintiffs' reliance on federal common law, New York law, and California law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  And there is no well-defined norm of international law for ratification that would satisfy the *Sosa* standard.  (*See id*.)

Defendants also object to the instruction in that the description of evidence sufficient to prove ratification is prejudicial and misleading.  In order for defendants to be held liable for the acts of its agents under a theory of ratification, it must be proven that the defendants willingly affirmed the prior acts of its agent; failure to disavow or condemn acts, particularly where they were outside the scope of the agency, does not constitute ratification, nor does continuing to employ a particular agent after learning of misconduct.  Defendants futher object to this instruction as prejudicial in that it implies that statements to the media would constitute a "cover-up" of its agents actions.

**Plaintiffs' Proposed Jury Instruction No. 7.7: Liability of Royal Dutch Petroleum Co. , Shell Transport and Trading Co. and Brian Anderson For Acts of Shell Nigeria— Aiding and Abetting**

Plaintiffs contend that Royal Dutch Petroleum Co., Shell Transport and Trading Co. and Brian Anderson are responsible for Shell Nigeria's conduct because they aided and abetted that conduct.  Defendants deny that they aided and abetted Shell Nigeria's conduct.

To show that one or more defendants are responsible for aiding and abetting Shell Nigeria's conduct, plaintiffs must prove:

> 1) That the defendant or defendants provided assistance, encouragement, or moral support to Shell Nigeria;
> 2) That this assistance had a substantial effect on the perpetration of the wrongful acts; and
> 3) That, when the defendant or defendants provided the assistance, they knew or should have known that the wrongful acts would be committed or had been committed.

<u>Assistance</u>
The assistance need not have been tangible. Assistance of any kind, including providing moral or psychological support, can establish aiding and abetting, and one or more kinds of assistance may be considered together in determining whether the assistance is substantial.  Aiding and abetting includes assistance that is provided after the commission of the offense, or at a place far away from the site of the offense.

<u>Substantial effect</u>
Defendants' assistance must have had a substantial effect on the perpetration of the wrongful acts, but it need not have been indispensable to the wrongful acts, nor need it have caused those acts. If you find that more than one type of assistance was offered, you may consider all of these types together in determining whether the assistance had a "substantial effect."

<u>Defendants' intent or knowledge</u>
Defendants must have intended to provide the assistance.  However, defendants need not share any intent to commit the wrongful acts.  Even if you determine that defendants' conduct itself was perfectly lawful, it may become unlawful if it assisted Shell Nigeria's unlawful conduct, including negligence.  For example, the act of deliberately providing a person with a poisonous chemical may not ordinarily be wrongful, but it may become wrongful if the provider knows that the person will use the chemical to murder someone, even if the provider does not want the murder to happen.

In order to show that one or more defendants knew or reasonably should have known that its acts would assist wrongful conduct, plaintiffs need only show that defendants knew or should have known that assisting a wrongful act would be a possible and foreseeable consequence of their conduct. Plaintiffs do not need to present evidence that directly proves what a defendant did or did not know.  Knowledge can be inferred from the circumstances. You may consider, among other things, whether any defendant knew of the  military's general history of committing abuses,

100

including against oil protestors; whether any defendant made false or inconsistent statements regarding the abuses; and the relationship between Shell Nigeria and the defendants.

Liability as to each defendant; other theories of liability

If you find that one defendant did not aid and abet Shell Nigeria's conduct, you must still consider whether each of the other defendants aided and abetted Shell Nigeria's conduct.

Each theory of liability is independent, such that if you reject aiding and abetting for any defendant, you must also consider whether any other theory of liability applies to that defendant.

**Sources**

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005)

*Restatement (Second) of Torts* § 876(b) (1979) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . .  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . .)

*Miele v. American Tobacco Co.*, 2 A.D.3d 799, 770 N.Y.S.2d 386 (App. Div. 2d Dep't 2003), **quoting (Restatement of [Second] Torts § 876[b], Comment; Illustration 6)** ("Moreover, we disagree with the Supreme Court's dismissal of the plaintiff's concerted action claim insofar as it is predicated upon allegations of negligence.  The concerted action theory of liability for injury to a third party will attach when one knows that another's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other, and "[t]his is true both when the act done is an intended trespass . . . and when it is merely a negligent act" Restatement of [Second] Torts § 876 [b], Comment *d*, Illustration 6]).)

**Knew or should have known**:   Plaintiffs need only show defendants knew or should have known that assisting wrongful act would be possible and foreseeable consequence of their conduct:  *Presbyterian Church of Sudan v. Talisman Energy*, 244 F. Supp. 2d 289, 324 (S.D.N.Y. 2003)(constructive knowledge sufficient); *Prosecutor v. Furundzija*, IT-95-17/1 ¶245 (ICTY Trial Chamber Dec. 10, 1998)("would reasonably have known"); *U.S. v. Flick*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 at 1220 (1949)(defendants convicted because they could not "reasonably believe" that money they contributed was to be used for its stated purpose); *In re Altostotter*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 at 88-89 (1949)(defendants convicted based on presumption they had knowledge of abuses); *Dachau Concentration Camp Trial*, 11 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 at 15 (1949)(noting that in *Mauthausen Concentration Camp Trial* defendants convicted based on presumption of knowledge).

Abettor need not share wrongful intent or have any positive intention to commit the harm:
*Furundzija* **Trial Judgment ¶¶ 243, 245, 246, 249** ("243. Therefore, it is not necessary for an aider and abettor to meet all the requirements of mens rea for a principal perpetrator. In particular, it is not necessary that he shares and identifies with the principal's criminal will and purpose, provided that his own conduct was with knowledge. That conduct may in itself be perfectly lawful; it becomes criminal only when combined with the principal's unlawful conduct.

. . . 245. The above analysis leads the Trial Chamber to the conclusion that it is not necessary for the accomplice to share the *mens rea* of the perpetrator, in the sense of positive intention to commit the crime. Instead, the clear requirement in the vast majority of the cases is for the accomplice to have knowledge that his actions will assist the perpetrator in the commission of the crime. This is particularly apparent from all the cases in which persons were convicted for having driven victims and perpetrators to the site of an execution. In those cases the prosecution did not prove that the driver drove for the purpose of assisting in the killing, that is, with an intention to kill. It was the knowledge of the criminal purpose of the executioners that rendered the driver liable as an aider and abettor. Consequently, if it were not proven that a driver would reasonably have known that the purpose of the trip was an unlawful execution, he would be acquitted. . . . 246. Moreover, it is not necessary that the aider and abettor should know the precise crime that was intended and which in the event was committed. If he is aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed, he has intended to facilitate the commission of that crime, and is guilty as an aider and abettor. . . . 249. In sum, the Trial Chamber holds the legal ingredients of aiding and abetting in international criminal law to be the following: the actus reus consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime. The mens rea required is the knowledge that these acts assist the commission of the offence. This notion of aiding and abetting is to be distinguished from the notion of common design, where the actus reus consists of participation in a joint criminal enterprise and the mens rea required is intent to participate. ")

***Mehinovic v. Vuckovic*, 19 F. Supp.2d 1322, 1355–56 (N.D. Ga. 2002)** ("United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law . . . . Principles of accomplice liability are well-established under international law. Relevant international conventions  explicitly provide that those who assist in the commission of acts prohibited by international law may be held individually responsible. Article 7(1) of the ICTY Statute, for example, states that '[a] person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in Articles 2 to 5 of the present statute [grave breaches of the Geneva Conventions of 1949, violations of laws or customs of war, genocide or crimes against humanity] shall be individually responsible for the crime.'  The ICTY has held that secondary liability under Article 7(1) requires both an *actus reus* and *mens rea* distinct from the acts and intent of the principal. Under the Tribunal's jurisprudence, the *actus reus* of aiding and abetting requires 'practical assistance, encouragement or moral support which has a substantial effect on the perpetration of the crime.' Notably, this formulation does not require the tangible assistance of the aider and abettor. As to *mens rea*, the ICTY has found that it is not necessary for the accomplice to share the same wrongful intent as the principal. Rather, it is sufficient that the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime.")

Even if abettor's conduct perfectly lawful, it may become unlawful when combined with tortfeasor's unlawful conduct: *Furundzija* Trial Judgment at ¶¶ 243, 245; *Mehinovic v. Vuckovic*, 19 F. Supp.2d 1322, 1355–56 (N.D. Ga. 2002).

**Assistance need not have been indispensable to the wrongful acts, nor must it have caused**

**those acts**: *Presbyterian Church*, 244, F.Supp. 2d at 324, *quoting* Furundzija Trial Judgment, ¶209; *Furundzija* ¶233-34; *Prosecutor v. Kunarac, et .al.,* IT-96-23 and IT-96-23/1, Trial Judgment (Feb. 22, 2001), ¶ 391; *see also Trial of Otto Ohlendorf and Others (Einsatzgruppen Case),* 4 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1, 572 (1949) in *Prosecutor v. Furundzija*, ¶ 217 (convicting military officer of aiding and abetting summary executions because he had power to object yet "chose to let the injustice go uncorrected); *Trial of Bruno Tesch and Two Others* (*Zyklon B Case*), 1 British Mil. Court, Hamburg, Law Reports, at 93 (1946), *cited in Furundzija*, ¶ 222-23 (convicting officers of chemical company because they were in a position to influence sale of poison to concentration camps).

**Assistance need not have been tangible.**  Assistance of any kind, including providing moral or psychological support, can establish culpable participation: *Mehinovic*, 198 F. Supp.2d at 1355. *Furundzija*, ¶¶ 199-204 (citing British Military Tribunal cases); *Prosecutor v. Musema,* ICTR-96-13-T, Trial Judgment ¶ 126 (Jan. 27, 2000).

**Assistance that is provided before or after the commission of the offense, or at a place distant from the site of the offense, is sufficient to incur liability**:  *Musema*, ICTR-96-13-T, ¶¶ 125-26; *Prosecutor v. Furundzija,* IT-95-17/1, Trial Judgment (Dec. 10, 1998) ¶¶ 199-204; *Celibici*, IT-96-21, Appeals Judgment, ¶ 352 ("the relevant act of assistance may be removed both in time and place from the actual commission of the offense."); *accord  Presbyterian Church*, 224 F.Supp.2d at 333 (assistance need not occur at the site of the offense).

**Knowledge can be inferred from the circumstances**: *Prosecutor v Delalic*, I.T.-96-21(Nov.16, (1998) at ¶328.

**Can aid and abet negligence.** *Miele v. American Tobacco Co.*, 2 A.D.3d 799, 770 N.Y.S.2d 386 (App. Div. 2d Dep't 2003), *quoting* (Restatement of [Second] Torts § 876[b], Comment; Illustration 6).

Voluminous international authority supports the conclusion that aiding and abetting under the ATS does not require intent to assist in the violation. The Nuremberg jurisprudence makes clear that knowingly facilitating abuses is sufficient for liability.  For example, in *U.S. v. Friederich Flick*, Steinbrinck, a civilian industrialist, was convicted "under settled legal principles" for "knowingly" contributing money to an organization committing widespread abuses, even though it was "unthinkable" he would "willingly be a party" to atrocities. 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1217, 1222 (1952). Similarly, officials of a chemical manufacturer were convicted for selling poison gas to Auschwitz knowing that the gas would be used to kill prisoners.  *Trial of Bruno Tesch and Two Others* (*Zyklon B Case*), 1 British Mil. Court, Hamburg, Law Reports, at 93 (1946).

The Yugoslavia Tribunal has affirmed that customary international law recognizes liability for knowingly aiding abuses.  In *Prosecutor v. Furundzija*, case no IT-95-17/1/T, (Dec. 10, 1998), *reprinted at* 38 I.L.M. 317 (1999), the Tribunal conducted an exhaustive analysis of international law, including numerous post-World War II cases. ¶¶ 195-97, 200-225, 236-49.  It concluded that the *actus reus* of aiding and abetting consists of "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Furundzija,* ¶ 249. The "mens rea required is the knowledge that these acts assist the commission of the offence." *Id.*  In *Prosecutor v. Delalic*, I.T. - 96-21 (*Celibici Case*) (Nov. 16, 1998), the Yugoslavia Tribunal reiterated this conclusion, and specifically held that these aiding and abetting standards are principles of customary international law.  Id., ¶ 321, 325-29. *Accord Prosecutor v. Delalic et. al.*, IT-96-21, Appeals Judgment (Feb. 2001), ¶ 352; *Blaskic*, ICTY-95-

14-A at ¶ 49.

The accomplice need not "share the mens rea of the perpetrator, in the sense of positive intention to commit the crime." *Furundzija*, at ¶ 245; *accord Mehinovic*, 198 F. Supp.2d at 1356. In fact, the conduct itself may be perfectly lawful; it becomes criminal only when combined with the principal's unlawful conduct. *Furundzija* Trial Judgment, ¶ 243. So, in the *Zyklon B Case*, the defendants were not accused of intending to kill prisoners at Auschwitz; it was accepted that they sought only to sell insecticide for profit. They were nevertheless convicted because they knew that their customers intended to use their product for mass murder. *Furundzija* Trial Judgement, ¶ 238.

The Appeals Chamber's decision in *Blaskic* explicitly held that intent is *not* required and knowledge is sufficient. *Blaskic*, ICTY-95-14-A at ¶ 49. The tribunal further noted: "it is not necessary that the aider and abettor…know the precise crime that was intended and which in the event was committed. If he is aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed, he has intended to facilitate the commission of that crime, and is guilty as an aider and abettor." *Id.* at ¶ 50.

It is not necessary that the aider and abettor know the precise crime that the principal intends to commit, as the above quote from paragraph 50 of *Blaskic* makes clear. *Accord Furundzija*, Par. 246.

Although plaintiffs do not rely on Nigeria law, such law also recognizes aiding and abetting liability. *Bowoto v. Chevron Texaco Corp.*, Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 17. Under Nigerian law, "[i]f the tort be committed, then all who have aided . . . in the commission are joint tort feasors." *Pratt v. British Medical Ass'n* [1919] 1 K.B. 244, 254 (1918) (emphasis added).
A parent can abet a subsidiary. *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004)("To the extent that plaintiffs may proceed against defendants on the theory that CNL was acting as defendants' agent, they may also proceed on their claims for aiding and abetting.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.7

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.) And there is no well-defined norm of international law for ratification that would satisfy the *Sosa* standard.

Defendants further object to this instruction because the paragraph on substantial effect is incomplete and misleading. Defendants' acts have a substantial effect only if the violation most probably would not have occurred or did not occur in the same way without defendants' assistance.

In addition, the instructions regarding the requisite intent are incorrect. For a defendant to be held liable under this theory, it is not enough to demonstrate that the defendant had knowledge that SPDC was going to engage in a violation of law and failed to prevent that

violation. Rather, plaintiffs must demonstrate that defendants intended that SPDC commit wrongful acts to substantially assist the Nigerian Government violate the law. Rome Statute of the International Criminal Court, art. 25(3)(c)-(d), July 17, 1998, 37 I.L.M. 999; *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 275-77 (2d Cir. 2007) (Katzmann, J., concurring).

                Furthermore, the instruction does not recognize that in order to prove aiding and abetting liability, plaintiffs must prove that defendants had effective control over SPDC's alleged misconduct. *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States)*, Judgment, 1986 I.C.J. REP. 392, June 27, 1986, ¶¶ 115-16.

**Plaintiffs' Proposed Jury Instruction No. 7.8: Liability of Defendants For Acts of Shell Nigeria—Conspiracy**

Plaintiffs contend that each defendant is responsible for the acts of Shell Nigeria for all claims because each defendant conspired with Shell Nigeria.  Defendants deny that they conspired with Shell Nigeria.  This conspiracy is distinct from any conspiracy under RICO.

A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the co-conspirators.

To show that a defendant is responsible for Shell Nigeria's acts on the basis of conspiracy, plaintiffs must prove the following:

> 1) That the defendant was aware that Shell Nigeria planned to commit some wrongful acts; and
> 2) That the defendant agreed with Shell Nigeria and intended that these wrongful acts be committed;
> 3) That the acts that harmed plaintiffs were either the wrongful acts that the co-conspirators agreed to, or these acts were done in furtherance of the purpose of the conspiracy and were the natural and foreseeable consequence of the conspiracy.

Existence of conspiracy

Plaintiffs do not need to offer direct evidence of a conspiracy. Because conspiracies are often kept secret, the law understands that direct evidence of a conspiracy can be difficult or impossible to obtain.  Thus, plantiffs are allowed to present indirect evidence. That is, a conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.  It is not necessary for plaintiffs to show that there was a meeting of the alleged conspirators or the making of an express or formal agreement.  Plaintiffs are not required to prove that any defendant personally committed a wrongful act or that it knew all the details of the agreement or the identities of all the other participants.

In determining whether defendants conspired with Shell Nigeria, you may consider, among other things, whether any defendant knew of the Nigerian military' general history of committing abuses, including against oil protestors; whether defendants approved payments to the military generally, or for their services in connection with incidents in question; whether any defendant made false or inconsistent statements regarding these incidents; and the relationship between Shell Nigeria and the defendants.

Extent of liability

If you find that any defendant joined the conspiracy to commit some wrongful acts, then it is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after it joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy.  A conspirator is responsible not only for the particular wrongful act or acts that, to its knowledge, Shell Nigeria agreed to commit, but is also responsible for the natural and

probable consequences of any wrongful act of Shell Nigeria done to further the purpose of the conspiracy, including acts that the conspirator did not intend as part of the agreed-upon objective but that were nevertheless a natural and foreseeable consequence of the common purpose, and regardless of whether the conspirator was present at the time of the commission of the wrongful acts.

Liability as to each defendant; other theories of liability
If you find that one defendant did not conspire with Shell Nigeria, you must still consider whether each of the other defendants conspired with Shell Nigeria.

Each theory of liability is independent, such that if you reject conspiracy for any defendant, you must also consider whether any other theory of liability applies to that defendant.

**Sources**
**20 N.Y. Jur.2d Conspiracy–Civil Aspects §1.**
20 NY Jur Conspiracy -- Civil Aspects § 1: Generally; definitions
(" While it has been said that no branch of the law seems less clear than that of conspiracy,[1] and while there is no substantive tort of conspiracy,[2] civil liability for conspiracy has been held to exist. In general terms, a conspiracy is a combination or agreement between two or more persons to do an unlawful thing, or to do a lawful thing in an unlawful manner.[3] A conspiracy requires at least two persons, for a conspiracy is the result of an agreement, and one cannot have an agreement with himself or herself. The essence of the cause of action for civil conspiracy is the tortious conduct of the defendants; therefore, the dismissal of the underlying substantive cause of action also requires the dismissal of the accompanying charges of conspiracy based on the same facts or allegations. Privileged statements cannot be the basis of a cause of action for conspiracy.)

Conspiracy may be inferred from circumstances:
*Bowoto v. Chevron Texaco Corp.*, **Docket 1640, Order, Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 Through 17, (N.D.Cal. Aug. 14, 2007) at 19;**
(" Under California law, conspiracy requires knowledge of a plan to engage in the specific wrongful conduct at issue, and agreement to participate in that plan. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). "[T]he requisite concurrence and knowledge 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.'" *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 785 (Cal. Sup. Ct. 1979) (quoting case).")

**Prosecutor v. Vasiljevic, IT 98 32 ¶100 (ICTY Appeals Chamber Feb. 25, 2004);**
In discussing s. 7 of the ICTY Statute, at para 100: ("… the existence of a common purpose which amounts to or involves the commission of a crime provided for in the Statute is required. There is no necessity for this purpose to have been previously arranged or formulated. It may materialise extemporaneously and be inferred from the facts.")

**20 N.Y. Jur.2d Conspiracy–Civil Aspects §20;**
(" Mere contentions that a conspiracy exists among the defendants, without proof of tortious conduct on their part, are unavailing as grounds for a cause of action. On the other hand, circumstantial evidence is often the only available proof of a conspiracy to defraud or injure,

since a conspirator does not usually broadcast his intentions. By similar reasoning, the testimony
of no more than one witness is required to establish any element of the tort in an action for
damages from conspiracy to defraud.   Evidence, even of disconnected acts, when taken
together, may satisfactorily establish an actionable civil conspiracy. No formal words are
required to establish the agreement or common understanding essential to a cause of action,
provided that the plaintiff shows that there was a meeting of the minds of the parties that brought
about an intelligent and deliberate agreement to do the allleged acts.  To successfully maintain an
action of conspiracy, the plaintiff must prove the essential elements of malice and intent to
injure, and show that the particular defendant had sufficient knowledge of the conspiracy to
warrant a finding that he participated in the conspiracy.")

***Bedard v. La Bier***, **20 Misc. 2d 614, 616-17 (Sup. 1959).**
("Conspiracies from their very nature are usually entered into in secret, and are consequently
difficult to be reached by positive testimony and this renders it necessary and proper to permit
them to be inferred from circumstances. A common design  [*617]  is the essential essence of a
conspiracy and though it is not essential to one's liability for ensuing damages that he shall have
joined in the beginning, or should have complete knowledge of all aims of the conspirators or
take part in each branch of the conspiracy or even that he know of all steps taken toward the
common design, it is necessary that there be intentional participation with a view to furtherance
of the common design. Conspiracies from their very nature are usually entered into in secret, and
are consequently difficult to be reached by positive testimony and this renders it necessary and
proper to permit them to be inferred from circumstances.")

Plaintiffs are not required to prove that any defendant personally committed a wrongful act or
that it knew all the details of the agreement:
 **20 N.Y. Jur.2d Conspiracy–Civil Aspects §10;**
(" § 10 Liability for acts of coconspirators: Once a conspiracy is established, every act and
declaration of each member of the confederacy in pursuance of the original concerted plan is, in
law, the act and declaration of them all, so that all the conspirators are equally liable, jointly and
severally, as tortfeasors.  A conspirator may be liable even though he did not take an active part
in every branch of the conspiracy. Thus liability does not necessarily depend on particular overt
acts; as a passive and silent participant, he is equally culpable. Also, it is not essential that one be
fully aware of the conspiracy's objects and aims. However, a person without knowledge of the
alleged objective cannot be considered a conspirator. The mere fact, moreover, that a person
knew and approved of the common design of a combination will not render him liable for an act
done for a different purpose, even though the act did, in fact, aid in the accomplishment of the
design. A conspirator may be liable as a joint tortfeasor, although he was not a participant in the
conspiracy at the time it was formed,  if he knowingly became a party to the conspiracy before
the consummation of the wrongful transaction upon which liability is predicated.  In addition, the
liability that one can incur by subsequently joining a conspiracy may include acts previously
done by coconspirators in pursuance of the conspiracy. The extent of the benefits to a
conspirator, or the manner in which those benefits are received, has no bearing on his liability. In
any case, where one is to be held liable as a conspirator for the acts of his associates, his
connection with the purpose and plan of the combination must be established by showing his
intentional participation with a view to the furtherance of the common design through his
personal act or that of his agent, or through his ratification of something performed by another
on his behalf. While mere reluctance to join in a conspiracy does not relieve one from liability

for the acts of the other conspirators, one who did not agree to the conspiracy and was coerced into becoming a participant is not liable for damages resulting therefrom.")

**Bedard v. La Bier, 20 Misc. 2d 614, 616-17 (Sup. 1959).**
("Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony and this renders it necessary and proper to permit them to be inferred from circumstances. A common design  [*617]  is the essential essence of a conspiracy and though it is not essential to one's liability for ensuing damages that he shall have joined in the beginning, or should have complete knowledge of all aims of the conspirators or take part in each branch of the conspiracy or even that he know of all steps taken toward the common design, it is necessary that there be intentional participation with a view to furtherance of the common design. Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony and this renders it necessary and proper to permit them to be inferred from circumstances.")

If Shell Nigeria joined conspiracy, then it is responsible for all acts done as part of the conspiracy whether the acts occurred before or after it joined the conspiracy, as long as those acts were done in furtherance of the purpose of the conspiracy: 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10.

Not necessary to show a meeting of alleged conspirators or making of express or formal agreement. *Vasiljevic*, IT 98 32, ¶100 ("There is no necessity for this purpose to have been previously arranged or formulated. It may materialise extemporaneously and be inferred from the facts."); 20 N.Y. Jur.2d Conspiracy–Civil Aspects §20 ("No formal words are required to establish the agreement or common understanding essential to a cause of action").

Shell Nigeria responsible not only for the particular wrongful act or acts that, to its knowledge, the military agreed to commit, . . .natural and probable consequences . . .regardless of whether Shell Nigeria personnel were present at the time of the commission of the wrongful acts. *Prosecutor v. Tadic*, IT-94-1-A ¶ 204 (ICTY Appeals Chamber July 15, 1999)(liability exists in "cases involving a common design to pursue one course of conduct where one of the perpetrators commits an act which, while outside the common design, was nevertheless a natural and foreseeable consequence of the effecting of that common purpose."); *Vasiljevic*, IT 98 32, ¶100 (same); *see also* 20 N.Y. Jur.2d Conspiracy–Civil Aspects §10 ("it is not essential that one be fully aware of the conspiracy's objects and aims").

These same standards apply under the ATS. Ninth Circuit has upheld jury instructions permitting conspiracy liability for torture, summary execution, and disappearance under the ATS.  *Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996).  The Eleventh Circuit has done likewise, post-*Sosa. Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158–60 (11th Cir. 2005)(recognizing ATS conspiracy liability for torture, extra-judicial killing, cruel and unusual punishment, and crimes against humanity); *accord In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 565 (S.D.N.Y. 2005) (conspiracy claim for aircraft hijacking); *Eastman Kodak Co.*, 978 F. Supp. at 1091–92 (recognizing conspiracy liability for unlawful arbitrary detention); *see also Prosecutor v. Tadic*, IT-94-1-A ¶¶ 192-94, 196, 204–20, 226–28 (ICTY Appeals Chamber July 15, 1999)(detailing joint criminal enterprise liability); *Prosecutor v. Vasiljevic*, IT 98 32 ¶¶  95–101 (ICTY Appeals Chamber Feb. 25, 2004)(same).

*Cabello* recognized that to prove conspiracy under the ATS, the plaintiff must show "(1) two or more persons agreed to commit a wrongful act, (2) [defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." This formulation is fully consistent with plaintiffs' formulation above.

The instruction applies to all claims, because New York and ATS law are the same in all relevant respects. joint criminal enterprise (JCE) is an actionable theory under international law. *Hamdan v. Rumsfeld*, 548 U.S. 557, 765, n. 40 (2006)(plurality op. of Stevens, J.) cites with approval JCE liability, and the cases it cites, *Tadic* and *Prosecutor v. Milutinovi c*, make clear that joint criminal enterprise is customary international law. *Tadic* at ¶226; *Milutinovi c*, Decision on Dragoljub Ojdani c's Motion Challenging Jurisdiction—Joint Criminal Enterprise, Case No. It–99–37–ar72, ¶¶28-30 (ICTY App.Chamber, May 21, 2003). JCE is the same as conspiracy as outlined above.

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.8

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and federal common law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.)

Furthermore, in order to prove a claim for criminal conspiracy under international law, plaintiffs must prove that the Nigerian Government committed genocide or waged aggressive war. Because plaintiffs have not pleaded either of those two claims, plaintiffs do not have a claim for conspiracy under international law. *Sosa*, 542 U.S. at 732 n.20; *Presbyterian Church of Sudan v. Talisman Energy*, 453 F. Supp. 2d 633, 663 (S.D.N.Y. 2006); (Int'l Law Br. 63-65.).

Defendants further object to this instruction because plaintiffs must prove each element of conspiracy separately with respect to each defendant. Plaintiffs may not hold all defendants liable by proving that one defendant was a member of a conspiracy.

Plaintiffs' instruction seeks to lighten their burden of proof. The general instruction on the type of evidence sufficient to prove the existence of a conspiracy is incomplete, misleading and prejudicial, as are the examples of factors it proposes the jury consider in determining whether a conspiracy existed. The instruction focuses only on what plaintiffs need not prove in order to establish conspiracy and neglects to instruct that in order to prove that a conspiracy existed and defendants engaged in that conspiracy, plaintiffs must establish that defendants intended to participate in the conspiracy. Plaintiffs must also prove that defendants and SPDC had a common purpose of violating the law and that to establish this common purpose, plaintiffs must show that there was an understanding or arrangement between defendants and SPDC that amounted to an agreement to commit this violation. *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999); *Prosecutor v.*

*Blagojevic*, Case No. IT-02-60-T, Judgment, ¶ 703 (Jan. 17, 2005); *Prosecutor v. Krnojelac*, Case No. IT-97-25-T, Judgment, ¶ 80 (Mar. 15, 2002).  Plaintiffs' instruction wholly ignores these elements of proving conspiracy.

        Defendants object to plaintiffs' instruction because it states that plaintiffs need only show that defendants were aware that SPDC planned to commit a wrongful act and intended or had knowledge that the act would occur.  This is incorrect because plaintiffs must show that defendants participated in the conspiracy, in that they themselves must have performed some act that was directed toward furthering the conspiracy.  *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶¶ 195-96, 227(iii) (July 15, 1999).  It would not be enough to show that defendants had knowledge that SPDC was going to commit some wrongful act.

**Plaintiffs' Proposed Jury Instruction No. 7.9: Liability of Royal Dutch Petroleum Co. and Shell Transport and Trading Co. For Acts of Shell Nigeria—Alter-Ego (ATS Claims)**

Plaintiffs contend, for purposes of their claims for extrajudicial execution; torture; cruel, inhuman or degrading treatment; crimes against humanity; arbitrary arrest or detention; and violations of the rights to life, liberty and security of the person and peaceful assembly and association, that the corporate defendants are liable for any responsibility of Shell Nigeria because Shell Nigeria was the alter-ego of one or both of the corporate defendants.

If you find that Shell Nigeria is the alter-ego of one or more corporate defendants, you must treat Shell Nigeria and the corporate defendant or defendants as the same company, and hold the corporate defendants liable for any responsibility Shell Nigeria may have.

You may find Shell Nigeria to be the alter-ego of a corporate defendant or defendants if treating them as separate entities is not in the interests of public convenience, fairness and equity, or would work injustice or defeat legal or public policies.  A finding of alter ego is appropriate to prevent the misuse of the privileges of legal personality, to protect third persons, or to prevent the evasion of legal requirements or obligations. Defeating a legislative policy need not have been the purpose of creating Shell Nigeria.  You may consider whether treating the Shell Nigeria as separate from the corporate defendants presents a barrier to the enforcement of international human rights law.

Liability as to each defendant; other theories of liability
If you find that Shell Nigeria is not the alter ego of one corporate defendant, you must still consider whether Shell Nigeria is the alter ego of the other corporate defendant.

Each theory of liability is independent, such that if you reject alter ego, you must also consider whether any other theory of liability applies to that defendant.

**Sources**
*See* Pls.' International Law Brief at 59-60.

*Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 26 (1st Cir. 2000) (Federal law is "not bound by the strict standards of the common law alter ego doctrine."  "Nor is there any litmus test"; "a corporate entity may be disregarded in the interests of public convenience, fairness and equity")

*First National City Bank (FNCB) v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 629-30 (1983) (Federal law recognizes a "broad[] equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.'"  "In particular, the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies."

*The Barcelona Traction, Light & Power Co. (Belg. v. Spain)*, 1970 I.C.J. 3, 38–39 (Judgment of Feb. 5, 1970) (*quoted in First National City Bank (FNCB) v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 628 n.20 (1983)) (""'"lifting the corporate veil"'" is appropriate "'to prevent the misuse of the privileges of legal personality . . . to protect third persons . . . or to

prevent the evasion of legal requirements or of obligations.'")

*Brian Anderson v. Abbott*, 321 U.S. 349, 365 (1944) (under the federal veil-piercing test, courts refuse to give effect to the corporate form where it will defeat legislative purposes, irrespective of whether defeating a legislative policy was the reason for incorporation)

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.9

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on federal common law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.) Furthermore, there is no well-defined norm of piercing the corporate veil that would meet the *Sosa* standard.

Plaintiffs' instruction wholly ignores what plaintiffs must prove in order to establish liability under a veil piercing theory or the factors that the jury must consider in determining whether the defendants are alter-egos of any other entities. Plaintiffs' instruction sets forth only the policy reasons that veil piercing liability exists and would allow jurors to give defendants' alter-ego status based solely on those policy reasons. Plaintiffs' instruction does not acknowledge that the law allows corporations to organize for the purpose of isolating liability of related corporate entities or that a corporation, generally, is a separate legal entity authorized under the law to do business in its own right. The mere fact that one corporation owns the stock of another corporation, or that two corporations have common officers or directors, or both, does not mean that the parent corporation may be held liable for the conduct of its subsidiary. Federal Jury Practice and Instructions § 108.05.

Defendants also object because plaintiffs' instruction implies that veil piercing can be presumed, whereas under the law, the presumption is that defendants and SPDC are separate legal entities not responsible for each other's conduct. Moreover, this presumption may only be defeated if plaintiffs prove their claim by satisfying certain elements which their proposed instruction wholly ignores. Plaintiffs fail to engage in any analysis as to what choice of law rules would govern a veil piercing analysis in this action. (*See* Int'l Law Br. at 69-71.) Nigerian law would govern any veil piercing analysis between SPDC and Shell Petroleum Company Limited, otherwise known as SPCo. Under Nigerian law, the principle that an incorporated subsidiary is a "separate legal entity" from its parent company is "fundamental". *Marina Nominees Ltd. v. Fed. Bd. of Inland Revenue*, [1986] N.W.L.R. 48, 55, 57, 59 (S.C.). Nigerian law will disregard the separate legal existence and pierce the corporate veil only where the purpose of the parent company is to use the subsidiary as a sham or façade to avoid existing obligations. *See id.* at 57; *see also Union Beverages Ltd. v. Pepsicola Int'l Ltd.*, [1994] 3 N.W.L.R. 1, 16 (S.C.); *Int'l Offshore Construction Lt.d v. S.L.N. Ltd.*, [2003] 16 N.W.L.R. 157, 179E-180B (C.A.) (piercing the corporate veil where subsidiary used as a smokescreen to avoid proven obligations); *Musa v. Ehidiamhen*, [1994] 3 N.W.L.R. 544, 557 (C.A.). Plaintiffs must then prove that defendants willfully participated in SPCo.'s alleged unlawful conduct under English law. Under English law, a court will pierce the corporate veil only where "special circumstances" exist indicating that the relationship of one corporation to another is a mere

113

"façade concealing the true facts".  *Woolfson v. Strathclyde Reg'l Council*, [1978] 38 P. & C.R. 521.  English courts look to the defendant's purpose in forming the company, and typically pierce the corporate veil only when the defendant creates the company "as a device, a stratagem, in order to mask" liability.  *Gilford Motor Co. v. Horne*, [1933] All E.R. 109 (A.C.); (Int'l Law Br. at 73-74).

        Plaintiffs' instruction does not engage in this two-step process in order to pierce the corporate veil.

**Plaintiffs' Proposed Jury Instruction No. 7.9A: Liability of Royal Dutch Petroleum Co. and
Shell Transport and Trading Co. For Responsibility of Shell Nigeria—Joint Venture**

Plaintiffs contend that corporate defendants Royal Dutch Petroleum Co. and Shell Transport and
Trading Co. are liable for Shell Nigeria's conduct or responsibility because the corporate
defendants were engaged in a "joint venture" with Shell Nigeria. Defendants deny that they
participated in a joint venture with Shell Nigeria.

A joint venture is an association of two or more persons or corporations, to carry on a business
as co-owners. The members of a joint venture are called joint venturers or partners.  Joint
venturers are each others' agents. An act or omission of a partner within the scope of the joint
venture business is considered the act or omission of all partners.  The employee of any member
of a joint venture is considered an employee of the other members. Therefore each member of a
joint venture is responsible for the wrongful conduct of another member, or its employees, acting
within the scope of the member's authority. A joint venturer is liable for the acts of its partner
without fault, that is, even if the venturer itself has done nothing wrong.

To show that a corporate defendant is responsible for Shell Nigeria's conduct on the basis of
joint venture liability, a plaintiff must prove:
    1. That the defendant was engaged in a joint venture with Shell Nigeria, and
    2. That Shell Nigeria was acting within the scope of the joint venture business during the
    conduct in question.

To show that a defendant was engaged in a joint venture with Shell Nigeria, plaintiffs must show
that the defendant and Shell Nigeria: (1) entered into a specific agreement to carry on an
enterprise for profit; (2) their agreement evidenced their intent to be joint venturers; (3) each
made a contribution of property, financing, skill, knowledge, or effort; (4) each had some degree
of joint control over the venture; and (5) there was a provision for the sharing of both profits and
losses.


Evidence for joint venture
In considering whether a defendant was engaged in a joint venture with Shell Nigeria, you may
consider, among other things, whether Shell Nigeria or defendants made statements that Shell
Nigeria was a member of such a joint venture.

Scope of joint venture business
A joint venturer is acting within the scope of the joint venture business when doing anything
which is either expressly or impliedly authorized by the joint venture or which is in furtherance
of the joint venture business.

Extent of liability
If you find that a corporate defendant and Shell Nigeria were joint venturers and that Shell
Nigeria or its agents were acting within the scope of the joint venture, and if you find Shell
Nigeria or its agents committed wrongful acts against the plaintiffs, then you must find that
corporate defendant responsible for those wrongful acts.

<u>Other theories of liability</u>
Each theory of liability is independent, such that if you reject joint venture, you must still consider whether any other theory of liability applies to Shell Nigeria.

**Sources**
Ninth Circuit Model Civil Jury Instructions  No. 4.12 GENERAL PARTNERSHIP: (**"**A partnership is an association of two or more persons to carry on a business as co-owners. The members of a partnership are called partners.")

Ninth Circuit Model Civil Jury Instructions  No. 4.13 GENERAL PARTNERSHIP—SCOPE OF PARTNERSHIP BUSINESS DEFINED (**"**A partner is acting within the scope of the partnership business when doing anything which is either expressly or impliedly authorized by the partnership or which is in furtherance of the partnership business.")

Ninth Circuit Model Civil Jury Instructions No. 4.14 GENERAL PARTNERSHIP—ACT OF PARTNER IS ACT OF ALL PARTNERS ("An act or omission of a partner within the scope of the partnership business is the act or omission of all partners.")

Ninth Circuit Model Civil Jury Instructions No. 4.1**7** PARTNERSHIP—EXISTENCE OF PARTNERSHIP IN ISSUE—EFFECT ("The defendant [*name of acting partner*] and the defendants [*names of nonacting partners*] are sued as partners. It is denied that any partnership existed. If you find that [*name of acting partner*] and [*names of nonacting partners*] were partners and that [*acting partner*] was acting within the scope of the partnership business, and if you find against [*acting partner*], then you must find against [both] [all] defendants. If you find against [*name of acting partner*], but you either find there was no partnership or that [*name of acting partner*] was not acting within the scope of the partnership business, then, in either case, you must find for the defendants [*names of nonacting partners*]. If you find for [*acting partner*], then you must find for [both] [all] of the defendants.")

**14 N.Y. Prac., New York Law of Torts § 9:9** ("A joint venture or enterprise is analogous to a partnership but the joint enterprise is focused upon a single or short term goal, while a partnership typically envisions a greater degree of permanency. Thus, when two or more parties pool their respective resources, expertise and efforts for the purpose of engaging in a single enterprise for profit, a joint venture may be found to exist." "When two or more parties undertake to engage in a joint venture or enterprise, the employee of any one of them will be considered an employee of all the others for purposes of potential liability to third parties under the doctrine of *respondeat superior.*  Similarly, the negligence of one member of a joint enterprise may be imputed to other members of the enterprise." "Liability for a joint venture does not depend on the existence of any plan to act tortiously. It creates vicarious liability as a matter of policy for the torts of any member of the joint venture regardless of the innocence of a joint venturer. There is liability without fault for the fault of another in vicarious liability, whereas in joint and several liability each tortfeasor is negligent.")

*ITEL Containers Int'l Corp. v. Atlanttrafik Express Service*, Ltd., 909 F.2d 698, 701 (2d Cir. 1990)(the elements of joint venture are: "(1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to

be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses." *accord Flammia v. Mite Corp.*, 401 F. Supp. 1121, 1127 (E.D.N.Y. 1975), *aff'd without opinion*, 553 F.2d 93 (2d Cir. 1977); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 472 F. Supp. 2d 544, 552 (S.D.N.Y. 2007); *Toporoff Engineers, P.C. v Fireman's Fund Ins. Co.*, 371 F.3d 105 (2d Cir. 2004).  None of these cases require, as defendants claim, that the purpose of the venture was to violate the norm of international law.

### DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.9A

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability.  *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law and Ninth Circuit law is misplaced.  Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added).  International law, however, does not recognize the imposition of civil indirect liability under any theory of liability.  (*See* Defs.' R&O Stmt. Part I.C.)  Under international law, there is no theory of indirect liability for joint venture, let alone one that would meet *Sosa*'s standard.  (*See, e.g.*, Int'l Law Br. 62-66.)

Defendants further object to this instruction because its description of how the jury should determine whether a joint venture existed is incomplete.  Plaintiffs set forth only one factor which it asserts the jury may consider in determining whether defendants and SPDC were engaged in a joint venture.  Under the law, it cannot be determined that defendants engaged in a joint venture with SPDC simply based on statements by defendants or SPDC that defendants were engaged in a joint venture with SPDC.  Rather, plaintiffs must prove, among other things, that defendants and SPDC entered into a specific agreement to carry on an enterprise whose purpose was to violate the norm of international law, from which they sought to profit; that defendants and SPDC each intended to be joint venturers in a venture intended for violating the norm of international law; that defendants and SPDC each contributed either property, financing, skill, knowledge or effort to violate the norm of international law.  Also, plaintiffs would have to prove that both defendants and SPDC each had a degree of joint control over the venture for violating the norm of international law and that they each shared in both the profits and losses of the venture through the violation of the norm of international law.  *See ITEL Containers Int'l Corp. v. Atlanttrafik Express Service*, Ltd., 909 F.2d 698, 701 (2d Cir. 1990); *Flammia v. Mite Corp.*, 401 F. Supp. 1121, 1127 (E.D.N.Y. 1975), *aff'd without opinion*, 553 F.2d 93 (2d Cir. 1977); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 472 F. Supp. 2d 544, 552 (S.D.N.Y. 2007).

**Plaintiffs' Proposed Jury Instruction No. 7.10: Liability of Brian Anderson for acts of Shell Nigeria – Corporate Officer Liability**

If you find that Shell Nigeria is responsible for any wrongdoing, you must also decide whether defendant Brian Anderson is liable for Shell Nigeria's wrongdoing as a corporate officer.

To show that Brian Anderson is liable as a corporate officer, plaintiffs must prove:
> 1) That Brian Anderson was a director or officer of Shell Nigeria at the time of Shell Nigeria's wrongful conduct; and
> 2) That Brian Anderson authorized, ordered, or participated personally in the wrongful activities of Shell Nigeria.

In your deliberations on corporate officer liability, you may consider the extent to which Brian Anderson controlled the actions of Shell Nigeria and the extent of his personal involvement in matters related to security, the Ogoni, and Shell Nigeria's relationship with the military government.  If you find, for example, that Brian Anderson typically authorized, ordered, or participated in decisions relating to security policy, or that he had the power to do so, you may infer that he exercised that power in the case at hand.

This instruction relates only to defendant Brian Anderson's liability for the acts of Shell Nigeria. Plaintiffs also contend that Brian Anderson is directly liable for certain injuries caused by his own acts, and that he is liable for certain wrongful acts of the Nigerian military.  Even if you find that Mr. Anderson is not liable as a corporate officer of Shell Nigeria, you still must consider his liability under these other theories, on which I will instruct you separately.

**Sources:**
*P&G v. Xetal, Inc.*, 2006 U.S. Dist. LEXIS 24342 (E.D.N.Y March 23, 2006) ("It is well-settled "that **a corporate officer who commits or participates in a tort**, even if it is in the course of his duties on behalf of the corporation, may be held individually liable.")
*LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) ("It has long been established… that **a corporate officer who commits  or participates in a tort**, even if it is in the course of his duties on  behalf of the corporation, may be held individually liable")
*New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir., 1985) ("New York courts have held that **a corporate officer who controls corporate conduct and thus is an active participant** in that conduct is liable for the torts of the corporation.")
*Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 851 (11th Cir. 1988) ("**"**it is equally well settled that personal participation by a corporate… officer… in the wrongful activities of a corporation is sufficient to make the individual, as well as the corporation, substantively liable for any illegal actions he **authorized, ordered, or in which he participated**.") (citing precedents from five other Circuits)
36 Causes of Action 2d 441 §15, 23-26 (2008) ("In order to establish a prima facie case in an action to hold a corporate director or officer personally liable for the corporation's wrongful conduct, the plaintiff must plead and prove these elements: (1) the defendant was a director or officer at the time of the corporation's conduct;  (2) the corporation's conduct was wrongful;  (3) the corporation's conduct caused damage to the plaintiff;  (4) the defendant was responsible for the corporation's conduct.  A defendant director or officer's 'control' of a corporation is not an element in a prima facie case for direct liability but it can be persuasive evidence of his or her

participation. Active control may be considered as equivalent to participation in the wrongful conduct. Even when the defendant may not have been actively involved in the wrongful conduct by directly participating in, directing, or authorizing the conduct, courts have often found an officer or director's control of the corporation sufficient to establish participation. An officer's control can also establish a causal connection between the defendant's conduct and the injury to the plaintiff.")

## DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED INSTRUCTION NO. 7.10

Defendants object to this instruction because, under *Sosa*, the substantive claim at issue must be coupled with the theory of liability. *Sosa*, 542 U.S. at 732 n.20.

Plaintiffs' reliance on New York law is misplaced. Any theory of liability must find its source from international law as it is "*international law* [that] extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual", *Sosa*, 542 U.S. at 732 n.20 (emphasis added). International law, however, does not recognize the imposition of civil indirect liability under any theory of liability. (*See* Defs.' R&O Stmt. Part I.C.)

Defendants object to plaintiffs instruction as prejudicial and misleading. Plaintiffs' examples of factors the jury should consider are improper. Additionally, this instruction is duplicative, confusing, and misleading and is simply plaintiffs' attempt to hold Mr. Anderson liable for the alleged conduct of SPDC even at times when he was not the managing director of SPDC, and when he was not in Nigeria at all. Under plaintiffs' theory of corporate officer liability, plaintiffs claim that Mr. Anderson "authorized, ordered, or participated personally in the wrongful activities of Shell Nigeria". If Mr. Anderson must have *personally* taken part in the alleged wrongful conduct, this instruction adds nothing to plaintiffs' other proposed instructions of indirect liability such as aiding and abetting, conspiracy, instigation or inducement of wrongful acts, and reckless disregard. Plaintiffs may not hold Mr. Anderson liable for alleged acts in which even plaintiffs do not contend Mr. Anderson *personally* participated.

Plaintiffs' instruction also neglects to include that plaintiffs must also prove that the corporation's conduct was wrongful and that it cause damaged to each plaintiff. 36 Causes of Action 2d 441 §15, 23-26 (2008).